UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,                 :
                                          :
-v-                                       :
                                          :        **Ind. No. S31 10-CR-905 (DC)**
JOSE ESPINAL,                             :
                                          :
                        Defendant.        :
                                          :
-------------------------------------------------------- x

 

 

## DEFENDANT JOSE ESPINAL'S
## MOTION TO DISMISS

 

GOTTLIEB & GORDON LLP
111 Broadway, Suite 701
New York, New York 10006
(212) 566-7766

*Attorneys for Jose Espinal*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .............................................................................................v

PRELIMINARY STATEMENT ........................................................................................1

***BRADY* VIOLATIONS** ................................................................................................8

   1.  ▮▮▮▮▮▮▮▮▮▮▮▮
      PROFFER NOTES:   NOVEMBER 29, 2011 .............................................9

   2.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
      PROFFER NOTES:   NOVEMBER 29, 2011 .............................................9

   3.  ▮▮▮▮▮▮▮
      PROFFER NOTES:   SEPTEMBER 11, 2014 ...........................................13

   4.  ▮▮▮▮▮▮▮
      PROFFER NOTES:   SEPTEMBER 16, 2014 ...........................................13

   5.  ▮▮▮▮▮▮▮▮
      PROFFER NOTES:   SEPTEMBER 11, 2014 ...........................................14

   6.  ▮▮▮▮▮▮▮
      PROFFER NOTES:   SEPTEMBER 16, 2014 ...........................................14

   7.  ▮▮▮▮▮
      PROFFER NOTES:   DECEMBER 2, 2011 ...............................................15

   8.  ▮▮▮▮▮
      PROFFER NOTES:   DECEMBER 10, 2014 .............................................16

   9.  ▮▮▮▮▮▮▮
      GRAND JURY TESTIMONY, DECEMBER 8, 2011 ...................................17

  10.  ▮▮▮▮▮▮
      GRAND JURY TESTIMONY, FEBRUARY 16, 2012.................................19

  11.  ▮▮▮▮▮▮
      GRAND JURY TESTIMONY, AUGUST 21, 2012.....................................21

ii

**PERSISTENT, INTENTIONAL MISREPRESENTATIONS** ....................................29

1.  AFFIDAVIT IN SUPPORT OF APPLICATION FOR AUTHORIZATION
    TO INTERCEPT WIRE (MR. ESPINAL'S CELL PHONE)
    SWORN TO BY SPECIAL AGENT JASON SAMUELS, SEPTEMBER 23, 2010 .......29

2.  AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT FOR
    ET MANAGEMENT (MR. ESPINAL'S OFFICE)
    SWORN TO BY SPECIAL AGENT JASON SAMUELS, DECEMBER 8, 2011..........32

3.  AFFIDAVIT IN SUPPORT OF SEARCH WARRANT FOR SAFE DEPOSIT BOX
    SWORN TO BY SPECIAL AGENT DANIEL CALLAGHAN,
    DECEMBER 12, 2011 .................................................................................34

    AFFIDAVIT IN SUPPORT OF SEARCH WARRANT
    FOR TWO LAPTOP COMPUTERS AND CELL PHONE
    SWORN TO BY SPECIAL AGENT JASON SAMUELS
    DECEMBER 20, 2011 ..................................................................................34

4.  GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
    DEFENDANTS' MOTIONS TO SEVER
    AFFIRMATION BY AMIE N. ELY, AUSA, NOVEMBER 15, 2013 ............................36

5.  GOVERNMENT'S MOTIONS *IN LIMINE*
    AFFIRMATION BY SARAH E. PAUL, AUSA & AMIE E. ELY, AUSA
    JULY 7, 2014 .........................................................................................36

6.  AFFIDAVIT IN SUPPORT OF APPLICATION FOR
    A SEARCH WARRANT FOR GARAGE FLOOR
    SWORN TO BY SPECIAL AGENT DANIEL CALLAGHAN, AUGUST 7, 2014 .......37

7.  COURT APPEARANCE
    STATEMENT BY AMIE E. ELY, AUSA, AUGUST 27, 2014.........................37

8.  THE IMAGINARY TRAP DOOR SAFE IN THE GARAGE .........................................38

9.  ███████████ LEGITIMATE BUSINESSES.................................................39

**ADDITIONAL *BRADY* NOT TURNED OVER** .................................................42

***MASSIAH* VIOLATION** ........................................................................42

**ARGUMENT** ...................................................................................................49

**I.**   **THE INDICTMENT MUST BE DISMISSED BECAUSE OF
        PERVASIVE AND EGRIGIOUS PROSECUTORIAL MISCONDUCT** ...........49

    **A. The Applicable Law** ...........................................................................49

    **B. The Government Has Repeatedly and Intentionally
       Failed to Produce *Brady* Information** ...............................................51

        1. *United States v. Chapman,* 524 F.3d 1073 (9th Cir. 2008) ....................53

        2. *United States v. Theodore Stevens,* 08-CR-231 (EGS) (D.D.C.) ............55

    **C. The Government's Flagrant
       Misconduct Has Prejudiced Mr. Espinal** ...........................................58

    **D. Because of the Confirmed Flagrant Misrepresentations Made Within
       The Various Wiretap and Search Warrant Applications, All Seized
       And Recorded Materials, and the Fruits Thereof Must Be Suppressed,
       Or a *Franks* Hearing Must Be Held** ................................................66

**II.**  **THE INDICTMENT MUST BE DISMISSED
        BECAUSE OF PROSECUTORIAL MISCONDUCT
        WITH RESPECT TO THE GRAND JURY PROCEEDINGS** ...........................69

    **A. The Grand Jury Was Unduly Influenced by the Government's
       Misleading Presentations Which Prejudiced Mr. Espinal** ...............................70

    **B. Disclosure of the Entirety of the
       Grand Jury Proceedings to Defense Is Warranted** ...........................................73

**CONCLUSION** ...................................................................................................75

## TABLE OF AUTHORITIES

**Constitutional Provisions**

U.S. CONST. AMEND. VI ..................................................................................42, 43, 48, 57, 76

**Rules and Statutes**

18 U.S.C. §2518(1)(c)..................................................................................................66, 67

18 U.S.C. § 2518(10)(a)....................................................................................................66

18 U.S.C. § 3500 .................................................................................................. *in passim*

Fed. R. Crim. P. 6(e)(3)(E)(ii) ..........................................................................................73

Fed. R. Crim. P. 16 ......................................................................................................44, 50

Fed. R. Evid. 404(b)...........................................................................................................39

**Federal Cases**

*Bank of Nova Scotia v. United States,*
    487 U.S. 250 (1988)....................................................................................70, 72

*Brady v. Maryland,*
    373 U.S. 83 (1963) ...................................................................... *in passim*

*In re Contempt Finding in United States v. Stevens,*
    744 F.Supp.2d 253 (D.D.C. 2010) ...................................................................56

*Franks v. Delaware,*
    438 U.S. 154 (1978)..................................................................... *in passim*

*Giglio v. United States,*
    405 U.S. 150 (1972)..................................................................... *in passim*

*Gov't of Virgin Islands v. Fahie,*
    419 F.3d 249 (3d Cir. 2005)..............................................................................50

*In re Grand Jury Subpoena,*
    103 F.3d 234 (2d Cir. 1996)..............................................................................73

*Kyles v. Whitley*,
514 U.S. 419 (1995) ...................................................................................52

*Leka v. Portuondo*,
257 F.3d 89 (2d Cir. 2001) ..............................................51, 58, 62, 63

*Massiah v. United States*,
377 U.S. 201 (1964) ........................................................... *in passim*

*Montejo v. Louisiana*,
566 U.S. 778 (2009) ...................................................................................43

*United States v. Acquest Devel.*,
932 F.Supp.2d 453 (W.D.N.Y. 2013) ....................................................72

*United States v. Avellino*,
136 F.3d 249 (2d Cir. 1998) ...................................................................51

*United States v. Chapman*,
524 F.3d 1073 (9th Cir. 2008) ...............................49, 51, 53, 54

*United States v. Falso*,
544 F.3d 110 (2d Cir. 2008) ...................................................................67

*United States v. Hogan*,
712 F.2d 757 (2d Cir. 1983) ...................................................................27

*United States v. Jackson*,
345 F.3d 59 (2d Cir. 2003) .....................................................................53

*United States v. Leeper*,
No. 06-CR-58A, 2006 WL 1455485 (W.D.N.Y. May 22, 2006) ..................69, 70, 72

*United States v. Lyons*,
352 F.Supp.2d 1231 (M.D. Fla. 2004) ...................................................65

*United States v. Omni. Intern. Corp.*,
634 F.Supp. 1414 (D. Md. 1986) ...........................................................50

*United States v. Payne*,
63 F.3d 1200 (2d Cir. 1995) ...................................................................52

*United States v. Peralta*,
763 F.Supp. 14 (S.D.N.Y. 1991) ...........................................................74

*United States v. Quinn,*
    537 F.Supp.2d 99 (D.D.C. 2008) ..................................................................65

*United States v. Rajaratnam,*
    719 F.3d 139 (2d Cir. 2013)........................................................................67

*United States v. Rajaratnam,*
    No. 09-CR-1184 (RJH), 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010 ............67

*United States v. Soliman,*
    No. 06-CR-236A, 2008 WL 4490623 (W.D.N.Y. Sept. 30, 2008) ....................75

*United States v. Spadoni,*
    No. 00-CR-217 (EBB), 2011 WL 2532067 (D. Conn. June 24, 2011) .............50

*United States v. Stevens,*
    771 F.Supp.2d 556 (D. Md. 2011) .................................................................74

*United States v. Stevens,*
    08-CR-231 (EGS) (D.D.C.) ...........................................................55, 56, 57, 75

*United States v. Turner,*
    No. 14-CR-43 (ER), __ F. Supp. 2d __, 2014 WL 2453329 (S.D.N.Y. June 2, 2014) .....49

*United States v. Twersky,*
    No. 92-CR-1082, 1994 WL 319367 (S.D.N.Y. June 29, 1994).........................74

*United States v. Voigt,*
    89 F.3d 1050 (3d Cir. 1996).........................................................................49

*United States v. Wang,*
    No. 98-CR-199 (DAB), 1999 WL 138930 (S.D.N.Y. Mar. 15, 1999) .................49, 64, 65

*United States v. Williams,*
    504 U.S. 36 (1992).....................................................................................69

## PRELIMINARY STATEMENT

The Government has engaged in flagrant and intentional misconduct that, but for our repeated inquiries, would not have come to light and would have resulted in the Government continuing this "win at any cost" prosecution. The *Brady* violations, *Massiah* violations, and the rampant and repeated intentional misrepresentations by the Government that have permeated this case from its inception make any remedy short of dismissal insufficient to correct the harm to Mr. Espinal, to deter future prosecutions from engaging in the same unlawful tactics, and to prevent this type of injustice from happening again.

For the last three years, the Government's central theory of this prosecution has been that Mr. Espinal laundered money derived from Manuel Rodriguez's marijuana trafficking. The Government, in its applications for search warrants, wiretaps and in court conferences, has been insistent that Mr. Espinal knowingly used third parties, "straw investors" and "intermediaries" who wrote checks to him or his companies in exchange for "dirty" cash to make it appear that they were investing in properties owned by Mr. Espinal and Rodriguez (*e.g.*, Fly Fisherman's Heaven ("FFH") and Washington Heights Parking).[1] The Government, since the date of Mr. Espinal's arrest, has alleged that these "straw investors" were entities controlled by ███████

███████████████████████████████████████████████████████

███████████████████.[2] The Government also has claimed time and time again in court appearances, motions and affidavits, that Mr. Espinal's money laundering scheme included

---

[1]  Fly Fisherman's Heaven was owned by both Mr. Espinal & Rodriguez; Washington Heights Parking was owned solely by Mr. Espinal.

[2]  *See, e.g.,* Affidavit of Special Agent Daniel Callaghan in Support of Application for a Search Warrant, dated August 7, 2014 (hereinafter, the "Callaghan Garage SW Aff."), at ¶ 14 (attached hereto as **Exhibit LL**), Affidavit of Special Agent Jason Samuels in Support of Search Warrant, dated December 8, 2011 (hereinafter, the "Samuels Office SW Aff."), ¶ 15  (attached hereto as **Exhibit II**).

paying cash to a contractor ████████████ who was hired to work on the FFH property in order to hide the source of the illicit money.  Further, based upon its intention to call a money laundering expert to testify that money launderers typically engage in structuring cash deposits, it is clear that the Government intends to argue that ██████ and the alleged "straw investors" engaged in a pattern of depositing cash in increments of less than $10,000 to demonstrate that it was Mr. Espinal's intent to avoid banking reporting requirements.  Having now reviewed the onslaught of exculpatory material that the Government has intentionally withheld for three years, it is clear that, in addition to violating its *Brady* obligations, the Government's entire case has been exposed as a sham.

Because of the Government's repeated representations and stated theory of the prosecution, the defense has spent the last three years preparing to defend against these specific allegations, fully expecting that the critical Government witnesses, the "straw investors" as well as the contractor, ██████, would be trial witnesses against Mr. Espinal.  That is where the defense stood until August 25, 2014, just two weeks before the trial was scheduled to begin.  Shockingly, everything changed on that day.  That is when the Government provided us with the 3500 material for the "lay-witnesses" and we discovered that the Government had no intention of calling as witnesses **any** of the alleged "straw investors" or the contractor.  The only witnesses who were going to be called by the Government who were associated in any way with alleged "straw investors" were ███████████████████████████████████████████████ ██████ - *none* of whom, based upon the 3500 material, had any knowledge of or involvement in the discussions between Mr. Espinal and the alleged "straw investors" regarding the payment of monies to FFH or Washington Heights Parking.  Additionally, none of these witnesses had any

knowledge of the source of money that any alleged "straw investors" used to cover checks made payable to FFH or Washington Heights Parking.

These stunning revelations on the eve of trial immediately raised red flags and caused us to suspect that the Government may not have satisfied its *Brady* obligations.  How could it be that **not one** alleged "straw investor" would be called as a Government witness?  How could the Government expect to prove that these individuals were even "straw investors" without calling them or someone who was privy to their discussions with Mr. Espinal?  It was an inescapable conclusion that these alleged "straw investors" and the contractor who performed the construction work at the FFH site must **not** have provided the Government with incriminating evidence against Mr. Espinal when they were interviewed or testified in the Grand Jury and very well may have provided exculpatory evidence.  Recent Government disclosures have confirmed our worst suspicions.  The Grand Jury testimony of ████, one of the alleged "straw investors," and the contractor, ████, leave no doubt that the Government intentionally withheld *Brady* information and, time and time again, has misrepresented the facts and evidence in this case in search warrant affidavits, applications for wiretaps, motions and in court conferences.  This was the reason why, at the August 27, 2014 appearance before the Court, Mr. Gottlieb stated as follows:

> Not included in any of the 3500 materials, your Honor, were any materials pertaining to ████████████████
> ████  Your Honor, these are individuals who in all the months leading up to today, in all the motions that both your Honor and the Court has heard prior to this, these are individuals who the government has alleged time and time again in their moving papers with regard to warrants and otherwise were involved in some way in the money laundering and elicit proceeds in connection with Fly Fisherman's Heaven, which is what this is all about.  First your

3

> Honor, we want to be sure that we have received all the 3500
> material and that they're not being called as witnesses.

(8/27/14 Tr. at 11-12).[3]  Upon inquiry by the Court, AUSA Sarah Paul confirmed that the

Government did not intend to call any of those individuals.  (8/27/14 Tr. at 14).  Having not

received any 3500 material regarding these individuals, we then made a specific *Brady* demand:

> Second, we want to make a specific Brady request that the
> government turn over any Brady material in connection with any
> of those individuals, specifically is the government aware of any
> statements, information, documents or any other materials that
> suggest that those individuals' activities, such as writing checks in
> connection with Fly Fisherman were not part of a money
> laundering scheme.  Because up to now they have been part of the
> discussion.  So we want to be sure that if the government, for
> whatever reason they decided not to call these individuals, came
> into any possession of materials information that would be Brady
> with regard to that, that it be turned over immediately. . . . If all of
> these individuals are alleged to be part of some sort of money
> laundering scheme and we don't have any Brady material to that
> effect, we just want to be certain that there is no such Brady
> material.

(8/27/14 Tr. at 12-13).  In response to this specific *Brady* demand, AUSAs Paul and Amy Ely

each stated that any *Brady* material was "previously produced" by "the assistant who was

primarily handling those matters at the time." (8/27/14 Tr. at 13 (AUSA Ely) and 14 (AUSA

Paul)).  AUSA Paul then stated, "Now that we know about this issue we'll go back to see what

was produced.  If there's any Brady that hasn't been provided, we'll provide it right away."

(8/27/14 Tr. at 14).

Immediately following the August 27, 2014 court appearance, we had a telephone

conference with AUSAs Ely and Paul who directed us to two separate letters from the

---

3    References made herein to the transcripts of these proceedings will be "[date of appearance] Tr. at [page
     number]."

4

Government dated March 16, 2012, and November 21, 2012, copies of which are attached hereto as **Exhibits S** and **T**, respectively.[4] AUSA Ely then sent us an email with attached copies of the two aforementioned letters. (Attached hereto as **Exhibit U** is a copy of the August 27, 2014 email from AUSA Ely).

In the March 16, 2012 letter, signed by AUSAs McCallum, Paul and Ely, the Government disclosed the following *Brady/Giglio* information:

> █████████████████ have stated, in substance and in part, that various funds they provided to FlyFisherman's Heaven LLC and to Jose Espinal and various other companies with which Espinal is affiliated constituted loans to Espinal. ███████ have further stated that they received no cash repayments for those loans, either in cash or otherwise, and that they received no cash payments for work performed at 131st Street townhouse.

> █████████ has stated, in substance and in part, that he believed all cash he was paid in connection with developing the FlyFisherman's Heaven acreage in Sullivan County was from Espinal, and had no awareness that Manuel Rodriguez was Espinal's partner.

(Ex. S).

In its November 21, 2012 letter, signed by AUSAs McCallum and Ely, the Government made the following sparse *Brady/Giglio* disclosure:

> ████████, who testified in the grand jury pursuant to a grant of immunity, has stated in sum and substance and in part that a substantial portion of the money that he and companies controlled by him paid to the defendant, to ████████, and to others whom the defendant identified in or about the first half of 2010 constituted repayment of a $100,000 loan the defendant had secured through a mortgage on 871 Bruckner Blvd.

---

4    Because of the volume and nature of the exhibits, they will not be labeled chronologically throughout this motion. Rather, the exhibits have been organized in separate volumes, submitted herewith, based upon the general type of document. An index of exhibits has been provided within the exhibit volumes.

(Ex. T).  At no time did the Government make any mention of the existence of additional *Brady*

material in either our telephone conversation or the follow-up email.  Moreover, despite AUSA

Paul's statement on the record that if any *Brady* material had not been turned over, it would be

provided "right away," the Government did not notify us of any additional *Brady* material

following the August 27, 2014 court appearance.

After the Government confirmed during the court conference of August 27, 2014, that

neither ██████████████████████ were being called by the Government, the defense

served them with trial subpoenas.  Within a few days, we were contacted by each of their

attorneys.  It was during these telephone conversations that we learned that ██████ incredibly had

**never** spoken with the Government and that ██████ had testified before the Grand Jury that **all**

**monies he paid to FFH** had been the **repayment for loans** Mr. Espinal had given him.  This is

far different than the sparse description provided by the Government in its November 21, 2012

*Brady* letter.

Finding it impossible to believe and completely implausible that the "key witnesses" had

not made exculpatory statements that went beyond the Government's bare bones synopses

provided in its March 16, 2012 and November 21, 2012 letters, on September 2, 2014, we filed a

letter motion with the Court requesting that the Government be ordered to disclose the Grand

Jury testimony of these witnesses.  Shortly after emailing the letter to the Government, AUSAs

Ely and Paul sent us an email indicating that we could discuss our Grand Jury request the next

night.  (Attached hereto as **Exhibit V** is a copy of the Government's September 2, 2014 email).

The following evening, we had a conference call with AUSAs Ely and Paul.  On the call

from our firm were Robert Gottlieb, Celia Gordon, Justin Heinrich and Ravi Kantha.  AUSA

Paul began the call by stating that we should have called them to discuss this issue instead of involving the Court. AUSA Ely then stated that she was not sure how much we were charging our client to write these letters to the Court, but it would be much more "efficient" if we would call them to discuss things first. Following a heated exchange regarding her inappropriate comment, Ms. Gordon explained that we saw no purpose in speaking with them further regarding the issue of the Grand Jury testimony as they had made clear that they had already satisfied their *Brady* obligation. AUSA Paul then stated that they had decided to provide us with copies of the Grand Jury testimony of ███████████████, but made clear that the Government did not view the testimony as *Brady*, and stated that they were turning it over simply because "it was not worth the fight."

When we received the Grand Jury testimony the next day, on September 4, 2014, we were stunned. The testimony of both ███████████████, as discussed in detail below, is so clearly *Brady* that it is unfathomable to think that the Government made a **conscious choice to withhold this material** – material which it has had since 2011 and 2012. It is equally unbelievable that the Government had the audacity to state that the testimony of these witnesses is not *Brady* when even the most objective reading of the testimony screams *Brady*.

The cavalier attitude of the Government regarding its *Brady* obligations raised serious concerns as to what other exculpatory material lay within its possession that it has intentionally withheld over the last three years. On September 17, 2014, two days before the defense motion to dismiss the indictment and other remedies was due, our suspicions were confirmed when we received yet one more production of documents described by the Government as "3500 materials." In their letter, dated September 17, 2014, AUSAs Ely and Paul state:

7

...enclosed pleased find a CD labeled "9/17/2014 3500 Materials," which contains 3500 and Giglio materials for a number of potential witnesses.   Please note that the potential witnesses include ████████████████████████████████, who the Government is presently *contemplating* calling to testify at trial.

(Attached hereto as **Exhibit Y** is a copy of the Government's September 17, 2014 letter) (emphasis added).  It is difficult to adequately describe the range of emotions our team experienced when reading through these "3500/Giglio materials."  It became instantly apparent that the Government could not possibly intend to call these witnesses – all of whom clearly and unambiguously contradict the Government's "theory" of money laundering in this case – and all of whom the Government had indicated it had no intention of calling just two weeks before the trial was scheduled to begin on September 8, 2014.  The materials turned over are unmistakably *Brady*.  Any attempt by the Government to claim otherwise is absurd considering that the Government also informed us in its letter of September 17, 2014, that it also had decided not to proceed to trial on Counts One (substantive RICO) and Counts Six and Seven (obstruction counts involving ██████████████████).  (*See* Ex. Y).  The timing of turning over this *Brady* information and the decision to dismiss three counts is not sheer coincidence.  It is proof of the unmistakable nexus between the *Brady* information and the impact that this exculpatory evidence has on the Government's attempt to convict Mr. Espinal of these charges.

### ***BRADY* VIOLATIONS**

The attempts by the Government to characterize the aforementioned documents turned over on September 17, 2014, and the Grand Jury testimony turned over on September 4, 2014, as anything but *Brady* material is misconduct in and of itself.  Consider the following exculpatory statements made by ██████████████████ three years ago, included in the most recent

8

production.  The Government has always identified these individuals as "straw investors" and "intermediaries through whom Mr. Espinal laundered drug money," but the following was just turned over to the defense on September 17, 2014:

1.  ██████████████████

    **PROFFER NOTES:**          **NOVEMBER 29, 2011**[5]
    **PRESENT FOR GOV'T:**      **AUSAs McCallum & Paul**
                                **Agents Samuels & Callaghan**

    ████████████████████████████████████████████████████

    ████████████████████████████████████████████████████

    ██████████████████████████████████████████

    ██████████████████████████

    ████████████████

    ██████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████████

2.  ████████████████████

    **PROFFER NOTES:**          **NOVEMBER 29, 2011**[6]
    **PRESENT FOR GOV'T:**      **AUSAs McCallum & Paul**
                                **Agents Samuels & Callaghan**

    ████████████████████████████████████████

    ██████████████████████

_____

[5] ████████████████████████████████████████.

[6] ████████████████████████████████████████.

9



This detailed exculpatory information provided by ████████████ was provided to the Government in **November 2011**, yet the Government did not provide the defense with any *Brady* disclosure until four months later, on March 16, 2012, in a letter containing the few sentences as detailed above. (Ex. S). It is readily apparent that those few sentences fell **far short** in detailing the extensive exculpatory statements made by the witnesses.

What is especially disturbing is that in August 2012, the Government superseded the indictment and added a charge of obstruction based upon the theory that Mr. Espinal created a false promissory note in response to a subpoena the Government served on ████████ ████████ to make it appear as if the money they gave to FFH and Washington Heights Parking were loans. (*See, e.g.,* Indictment, Counts 37 and 38).[7] How could the Government, in light of

---

7       These counts from the S31 Indictment are now Counts 6 and 7, for purposes of Mr. Espinal's trial.

the statements that had already been made by ███████████████ about having loaned

the money to Mr. Espinal and having not received any cash from Espinal, now charge him with

creating a false loan agreement to cover up the alleged money laundering scheme? The

Government not only ignored the exculpatory information but then chose not to provide the

defense with any of the aforementioned information **from November 2011** regarding: (1) the

need for a promissory note in 2011; (2) the expected percentage on the loan to Washington

Heights Parking; (3) the fact that if the loan was not paid back Espinal was supposed to give

them a contract to pay back; (4) the fact that ███████████ had paperwork; and (5) that Mr.

Espinal never paid back the loans. (Exs. G, J).

Moreover, as stated above, even after a clear and specific *Brady* demand with respect to

these individuals, the Government represented to this Court on August 27, 2014, that all *Brady*

material had previously been provided, making reference to the March 16, 2012 letter.

Astonishingly, it was not until September 17, 2014, nine days after the trial had been scheduled

to commence, that the Government suddenly turned over what it brazenly characterized as "3500

materials," but which was unmistakably *Brady*. Had we not requested time to file this motion to

dismiss, Mr. Espinal would have gone to trial having never received this information. Had we

not been granted time to file this motion to dismiss and had the Government not been compelled

to turn over the *Brady* information pertaining to this loan agreement, Mr. Espinal would have

stood trial on the two counts that the Government now has decided to dismiss. This type of

prosecutorial misconduct cannot be ignored and it cannot be condoned.

We also now know that neither ███████████████ testified before the Grand

Jury and that the Government did not speak with either of these alleged "straw investors" again

11

until September 11 and 16, 2014,[8] just a few days ago and after Mr. Espinal's trial was scheduled

to begin. Based upon what we now know these witnesses said in **2011**, **before** Mr. Espinal was

indicted, it is disturbing that the Government has continued to argue – as recently as a few weeks

ago – that Mr. Espinal laundered Rodriguez's drug money by giving cash to ███████████

███████ in exchange for checks made payable to FFH. It is equally disturbing that the

Government managed to indict him and argue that he obstructed justice by creating a phony

promissory note reflecting that the money was for loans, when the Government knew from the

individuals involved in the preparation of the loan note, that the document was, in fact, real,

accurate, and when the Government had absolutely no evidence to the contrary.

Furthermore, based upon the proffer notes from the Government's meetings with

███████████████████ just a few days ago, **following our last court conference**, these

witnesses again have repeated their statements that the money they loaned to Mr. Espinal was

above-board, legitimate and that the promissory note that was the basis for the obstruction charge

was true and also legitimate. This is further confirmation that these witnesses contradict the

Government's brazen statements that it has continually made in sworn affidavits and in court

conferences about these witnesses serving as "straw investors." The fact that when the

Government finally turned over this *Brady* information, the AUSAs still failed to acknowledge

their blatant and intentional misconduct by claiming that these documents were simply

3500/*Giglio* material, and that they claim that they are "contemplating" calling these people as

trial witnesses, speaks volumes about the Government's continued intention to deny and cover-

---

8        Attached hereto as **Exhibit H** is a copy of the ██████ Proffer notes, dated September 11, 2014; **Exhibit I** is a copy of the ██████ Proffer notes, dated September 16, 2014; **Exhibit K** is a copy of the ████████ Proffer notes, dated September 11, 2014; and **Exhibit L** is a copy of the ████████ Proffer notes, dated September 16, 2014.

up its failure to comply with the constitutional requirement that *Brady* mandates.

3. ██████████

    **PROFFER NOTES:**       **SEPTEMBER 11, 2014**
    **AUSAs PRESENT:**     **SARAH PAUL & AMIE ELY**

4. ██████████

    **PROFFER NOTES:**       **SEPTEMBER 16, 2014**
    **AUSAs PRESENT:**     **SARAH PAUL & AMIE ELY**

5. ██████████████

**PROFFER NOTES:**        **SEPTEMBER 11, 2014**
**AUSAs PRESENT:**        **SARAH PAUL & AMIE ELY**

6. ██████████████

**PROFFER NOTES:**        **SEPTEMBER 16, 2014**
**AUSAs PRESENT:**        **SARAH PAUL & AMIE ELY**

And there was more *Brady* material contained in the disclosure of September 17, 2014. In addition to ████████████████████, another of the alleged "straw investors," spoke with the Government first in December 2011. As with the others, ████████ did not testify in the Grand Jury and the Government previously informed us that it was not calling ████ as a witness at the trial. The Government informed us and the Court that it had decided to call ████ ████████████, a witness with no first-hand knowledge as to the circumstances of

██████████ check written to FFH.   The reason behind the decision not to call ████████ became

evident when we received his purported "3500 material" on September 17, 2014.  Like ██████

█████████████, this alleged "straw investor" also informed the Government in December

2011 that Mr. Espinal asked him for a loan to FFH and that he took three months to pay it back.

██████ previously undisclosed exculpatory statements in 2011 are as follows:

7.   ████████████
   **PROFFER NOTES:      DECEMBER 2, 2011**[9]
   **PRESENT FOR GOV'T:  AUSA McCALLUM
                         AGENT SAMUELS**

████████████████████████████

███████████████████████████████

███████████████████████████

██████████████████

Until September 17, 2014, we had not received any *Brady* materials or disclosures with

respect to ████, despite the fact that he had made the aforementioned exculpatory statements in

2011.  Additionally, the Government spoke with ████ again in July 2014, two months before the

trial was scheduled to begin on September 8, 2014.  During that proffer, he repeated his

statements that the money he gave to Espinal was a **loan**.  He made the following statements:

---

9       Attached hereto as **Exhibit P** is a copy of the ████ Proffer notes, dated December 2, 2011.

8.    ███████████

PROFFER NOTES:        JULY 10, 2014[10]
PRESENT FOR GOV'T:    AUSA PAUL
                      AGENT CALLAGHAN

███████████████████████████

██████████████████████████████████

███████████████████████████

█████████████████████████

███████████████████

As recent as the August 27, 2014, court conference, when the Government argued that it should be permitted to call a money laundering expert, the Government alleged that these individuals were "third party nominees," through whom Mr. Espinal laundered Rodriguez's drug money.  (8/27/14 Tr. at 8).  It is both disturbing and inexcusable that the Government, in possession of these exculpatory statements from the people directly involved in the transactions in question, represented to the Court on August 27, 2014 that all *Brady* material had already been produced.  (8/27/14 Tr. at 13-14).

Turning to the two witnesses who the Government has informed us it still does <u>not</u> intend to call at trial, ████████████, and whose Grand Jury testimony we received on September 4, 2014 – when the Government finally agreed to turn over their Grand Jury testimony, the prosecutors boldly stated to us that they "did not view the testimony as *Brady*" and that they were only turning it over "because it's just not worth fighting over."

First, with respect to ██████, the contractor who was hired to clear the land involved with the FFH property and prepare it for building, the Government has consistently alleged that Mr.

---

10    Attached hereto as **Exhibit Q** is a copy of the ████ Proffer notes, dated July 10, 2014.

Espinal paid ████ in cash as a way to avoid detection of Rodriguez's "dirty" drug money, and that he structured his payments to ████ in an effort to avoid the bank's reporting requirements. ████, however, completely contradicted this "theory" in his Grand Jury testimony when he stated as follows:

9. ████████████████
   **GRAND JURY TESTIMONY, 12/08/11[11]**
   **(present during testimony: AUSAs McCallum and Paul)**

████████████████████

████████████████████████

████████

████████████████

████████████

████████

████████████

████████████

████████

████████████████████████

████████████████

████

---

11     Attached hereto as **Exhibit B** is a copy of ████ Grand Jury testimony, dated December 8, 2011.



▮▮▮▮▮ testimony could not have been clearer and any more exculpatory. ▮▮▮▮ was the one who insisted that Mr. Espinal pay him in cash and ▮▮▮▮ was the one who dictated how much Mr. Espinal was to pay him and how frequently. The Government's repeated statements over the past three years in court pleadings and in court conferences regarding Mr. Espinal's cash payments to ▮▮▮▮, implying that he paid cash to ▮▮▮▮ in small increments in order launder

18

Rodriguez's money and avoid bank reporting requirements were completely false and the Government was well aware of that **even before Mr. Espinal was indicted**. ███████ testified in the Grand Jury a second time in February 2012, after Mr. Espinal was indicted, and his testimony was no less clear at that time. Of note, both AUSA Ely and AUSA Paul were present for one of each of ██████ Grand Jury appearances.

**10.** ████████████

**GRAND JURY TESTIMONY, 2/16/12[12]**
**(present during testimony:  AUSAs McCallum and Ely)**

████████████████████████

████████

███████████████████

██████████████

██████████████████

██████████████████████████████

██████████

█████████████████████████████████████

███████████████████████

██████████████████

███████████████

████████████████████

---

12       Attached hereto as **Exhibit C** is a copy of ███████ Grand Jury testimony, dated February 16, 2012.

19



As stated above, the only *Brady* disclosure with respect to ▮▮▮▮ prior to receipt of his

Grand Jury testimony was in the aforementioned letter of March 16, 2012, wherein both AUSAs

Ely and Paul, in addition to AUSA McCallum, state:

> Finally, please be advised that ▮▮▮▮▮▮▮▮ has stated, in substance and in part, that he believed all cash he was paid in connection with developing the FlyFisherman's Heaven acreage in Sullivan County was from Espinal, and had no awareness that Manuel Rodriguez was Espinal's partner.

(Ex. S).

In light of ▮▮▮▮ Grand Jury testimony, it is unfathomable how the Government could

have made an **intentional** "decision" to withhold this testimony from the defense. (9/5/14 Tr. at

24). Moreover, it is quite disturbing that just weeks ago, the prosecutors charged with trying this

case stated that, in their opinion, ▮▮▮▮ testimony is not *Brady*.

11. ███████████
    **GRAND JURY TESTIMONY, 8/21/12**[13]
    **(present during testimony: AUSA McCallum)**

With respect to ██████, another of the alleged "straw investors," his testimony, like

████████ testimony, directly contradicts what the Government has alleged since even before

██████ testified in the Grand Jury.  In an affidavit in support of a search warrant of Mr. Espinal's

office, dated December 8, 2011, Special Agent Jason Samuels, the lead agent on this case, swore

to the following facts regarding the alleged "straw investors":

> Rodriguez and Espinal, either themselves or through
> intermediaries, funneled the cash proceeds from Rodriguez's
> marijuana business into accounts held by certain "investing"
> companies or accounts held by their affiliates or owners, and the
> "investing" companies then wrote checks to FFH.

(Ex. II, ¶ 13).  ████████ Grand Jury testimony made clear that Agent Samuel's sworn statement

could not have pertained to him, his partner █████ or any of their companies.  ██████ testified

that he and ██████ were looking for opportunities to buy property and Mr. Espinal agreed to sell

him a property.  ████████further testified that Mr. Espinal agreed to loan him the down payment of

$20,000 as well as hold a mortgage for $180,000 and a second mortgage for $100,000 for the full

purchase price of $300,000.  (Ex. A, at 101-102).  ██████ testified that Mr. Espinal loaned him

$29,000 in cash for the down payment and closing costs three or four weeks before the closing

which took place on November 6, 2009.  (Ex. A, at 103-104).  ██████ **stated very clearly that**

**after receiving that money from Mr. Espinal, he never again received cash from him – and**

**that by June 2010 he had paid off the entirety of the $100,000 mortgage from money he**

**borrowed from people, having nothing at all to do with Mr. Espinal.**

---

13    Attached hereto as **Exhibit A** is a copy of ████████ Grand Jury testimony, dated August 21, 2012.

Specifically, ████████ testified:

████████████████████████████████████

███████

████████████████████

██████████████████████████

████████████

████████████████████████████████████████████

████████████████████████████

██████████████████████

███████████████████████████████████████████████████

█████████

████████████████████████████

███████████████████

██████████████████████████████████████████████

███████████

██████████████████████████████████████████████

████████████████████████████████

███████████████████

██████









26





provide an abundance of detailed exculpatory evidence to the Grand Jury that far surpassed the few paltry sentences provided in the Government's letters in 2012. It would be a gross understatement to say that the intentional withholding of this testimony shocks the conscience. It is a clear, intentional constitutional and ethical violation for which there must be equally significant consequences.

To have learned of all of these exculpatory statements from the most essential witnesses in the case, on the eve of trial in 2014, when the Government has repeatedly represented in sworn affidavits and affirmations dating back to 2010 that these individuals were "straw investors" who wrote checks in exchange for Rodriguez's drug money, is beyond the realm of comprehension.

Even with this now unmistakably clear, the Government appears intent on proceeding with this prosecution based on the same central theory of the crimes that are discredited by the evidence that has been in the Government's possession for three years.

28

## PERSISTENT, INTENTIONAL MISREPRESENTATIONS

To understand the extent of the Government's *Brady* violations, and the resultant harm to the defense because of this misconduct, it is important to detail the intentional misrepresentations that have been made by the Government to both the defense and to the Court dating back to 2010 and continuing until now.  The following are sworn statements that have been made by the Government with respect to these "straw investors" and Mr. Espinal's alleged money laundering:

1. **AFFIDAVIT IN SUPPORT OF APPLICATION FOR AUTHORIZATION TO INTERCEPT WIRE (MR. ESPINAL'S CELL PHONE), 9/23/10 SWORN TO BY SPECIAL AGENT JASON SAMUELS**[14]

> Between on or about March 8, 2010, and on or about May 26, 2010, Jose M. Espinal signed five checks totaling approximately $147,000 on accounts held in his name or in the name "Washington Heights Parking, LLC," a business of Espinal's. Although it therefore appears, based on a review of records of the Flyfisherman's Heaven Account, that Espinal personally contributed approximately $147,000 toward the purchase of the Flyfisherman's Heaven Property, **a review of records for Espinal's accounts show that this is not the case.** Before Espinal issued these five checks to Flyfisherman's Heaven, LLC, Espinal had received checks from several entities and individuals that also contributed money directly to Flyfisherman's Heaven, LLC, including checks totaling approximately $60,000 from four entities – "West 164 Corp.," "871 Bruckner Blvd. Corp.," "M 2 N Corp.," and "Summit Deli Grocery Corp." – for which ▮▮▮▮ ▮▮▮▮ is a signatory on the bank accounts. (Two of these entities also issued payments totaling approximately $29,000 to ▮▮▮▮ ▮▮▮▮.) Each of these four ▮▮▮▮ entities also issued checks directly to Flyfisherman's Heaven, LLC. It therefore appears that most, if not all, of the funds Espinal contributed to the Flyfisherman's Heaven Account were not actually Espinal's funds. Approximately $60,000 of these funds had been provided to him by ▮▮▮▮▮▮▮; for the reasons set forth below, **I believe that these funds actually belonged to Rodriguez.** Based on a review of bank records, Rodriguez did not contribute any funds to the

---

[14] A copy of Agent Samuels' Affidavit in Support of Application for Authorization to Intercept Wire, dated September 23, 2010, is attached hereto as **Exhibit HH.**

29

Flyfisherman's Heaven Account on any bank account held in his name.

Four checks totaling $50,000 from various entities, all signed by ▇▇▇▇ and all dated March 8, 2010. One of the checks signed by ▇▇▇ bears the name "871 Bruckner Boulevard Corp.," an entity discussed in more detail below. ▇▇▇ also issued several checks totaling approximately $60,000 to Espinal. The accounts on which ▇▇▇ issued these checks had been funded largely through cash deposits.

(Ex. HH, ¶ 34(a) - (b)) (emphasis added).

Agent Samuels' conclusion that Mr. Espinal did not "personally contribute" $147,000 to FFH is simply false. As Agent Samuels notes, the bank records reflect that Mr. Espinal issued checks to FFH from himself or his company, Washington Heights Parking. However, the fact that Mr. Espinal received and deposited checks from other entities prior to him personally writing the checks out of his bank accounts does not change the fact that Mr. Espinal personally contributed funds towards FFH. Once the checks from ▇▇▇ were deposited in Mr. Espinal's account, they became his funds. If Agent Samuels' misleading statement were true, then no one could write a check and state that he was "personally" providing funds. Funds from which checks are drawn have to originate from somewhere, for instance, a paycheck from an employer, a loan from a bank or a third-party, or a gift from a relative.

Moreover, Agent Samuels identifies no evidence to support his faulty conclusion that the funds that were used to fund the ▇▇▇ checks were in any way connected to Rodriguez's drug proceeds. His conclusion is based solely upon his review of the bank records and his strained interpretation of phone calls between Mr. Espinal and Rodriguez, and nothing more. This is a wholly insufficient basis to warrant his misleading conclusion.

A deed dated November 5, 2009, shows that Disoni, LLC, an entity controlled by Espinal, sold a property located at 62 East 131st Street in New York City, New York (the "131st Street Property"), to 62 East Realty Corp., an entity controlled by Rodriguez for $495,000.  Both Rodriguez and Espinal signed the Real Property Transfer Report that was publicly filed in connection with that transaction.

A deed dated November 6, 2009, shows that 152nd Realty Corp., an entity controlled by Espinal, sold a property located at 5051-5055 Broadway in New York City, New York, to 215 Broadway Realty Corp., an entity  controlled by Rodriguez for $400,000.  Both Rodriguez and Espinal signed the Real Property Transfer Report that was publicly filed in connection with this transaction.

A deed dated November 6, 2009, shows that Valdesia Holding Corp. sold a property located at 871 Bruckner Boulevard in the Bronx, New York, to 871 Bruckner Boulevard Corp., for $200,000.  ██████████ signed the Real Property Transfer Report that was publicly filed on behalf of 871 Bruckner Boulevard Corp.; the lawyer who represented Bruckner Boulevard Corp. in connection with this real estate transaction was the same lawyer . . . who represented Espinal in connection with the investigation of Miguel Martinez described below in paragraphs 36 to 38 and the same lawyer who represented ███████████ in her effort to recover the $25,000 law enforcement officers seized from Rodriguez in December 2009, as described above in paragraph 31.  Based on all of the facts set forth herein, **I believe that ██████ purchase of this property was related to Rodriguez's purchase of the two properties described above in paragraph 35(a) – (b)**.

(Ex. HH, ¶ 35(a) – (c)) (emphasis added).

Agent Samuels' erroneous and misleading conclusion that "██████ purchase" of 871 Bruckner Boulevard was related to Rodriguez's purchases is based solely on unfounded supposition.  Simply because the sale of 871 Bruckner Boulevard from Valdesia Holding Corp. to 871 Bruckner Boulevard Corp. occurred on or near the same dates as the two real estate sales involving Rodriguez does not mean that all three sales are related.  Other than the dates of the transaction, Agent Samuels fails to describe any connection between the three sales.

31

**I further believe that Espinal works closely with** ██████ **to launder Rodriguez's cash proceeds.** As set forth above in paragraph 34(b), ████ deposited large amounts of cash into several bank accounts on which he then issued checks to help pay for the Flyfisherman's Heaven Property, which Espinal and Rodriguez own jointly. As set forth below, Espinal is in frequent phone contact with ████. **I believe that Espinal has worked closely with** ████ **and that Espinal may have directed** ████ **to deposit substantial amounts of cash – which I believe were drug proceeds – into purported business bank accounts, and then used those funds to purchase real estate.**

(Ex. HH, ¶ 45(b)) (emphasis added).

Again, he bases his conclusion solely on a review of bank records and telephone records. However, it is impossible for anyone, by reviewing these kinds of bare-bones documents, to reach the misleading conclusions that Agent Samuels consistently reached throughout his affidavit, including, among other things, the relationships between Mr. Espinal, Rodriguez and ████, Mr. Espinal's purported "direct[ion]" of ████, and the alleged illegitimate sources of cash payments.

2. **AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT FOR ET MANAGEMENT (MR. ESPINAL'S OFFICE), 12/8/2011 SWORN TO BY SPECIAL AGENT JASON SAMUELS**

Meanwhile, FFH set up a bank account, with Rodriguez and Espinal as the two signatories, and arranged to have the account funded through checks **from what appeared to be arm's length investors**. In March 2010, the funds were then paid out, in the form of a cashier's check signed by Espinal, to complete the down payment on the purchased property. In fact, **the "investing" companies were themselves funded by Rodriguez's money**.

For example, **Rodriguez and Espinal**, either themselves or through intermediaries, **funneled the cash proceeds from Rodriguez's marijuana business into accounts held by certain "investing" companies or accounts held by their affiliates or owners, and the "investing" companies then wrote checks to FFH**. Specifically, large installments of cash were deposited in the

32

> 'investors' accounts right around the time that they were funding
> FFH.  This cash would go into the accounts and then right back out
> of the accounts in the form of checks to FFH.
>
> Wiretapped telephone calls between Rodriguez and Espinal make
> clear that Rodriguez, whose only significant source of income was
> narcotics trafficking, was **the sole source** of funding for the FFH
> project.

(Ex. II, ¶¶ 12-13, 16) (emphasis added)).  Based upon the 3500 material we have received, it is

clear that the statements made by Agent Samuels – that the "investing" companies were "funded

by Rodriguez's money," that Mr. Espinal funneled drug proceeds through these "investing"

companies, and that wiretapped conversations "made clear" that Rodriguez was the "sole

source" of the funding for the FFH project – are completely false and blatant misrepresentations

made to the Court in an effort to obtain a search warrant of Mr. Espinal's business.  We now

know that the Government **did not and still does not** have any evidence that the money paid to

FFH by these "investors" was money from Rodriguez.

Furthermore, there is not one wiretap conversation between Rodriguez and Mr. Espinal in

which it is "made clear" that Rodriguez was the sole source of funding for the FFH project as the

Government alleges.  In fact, based upon an earlier wiretap application sworn to by Agent

Samuels on September 23, 2010 (Ex. HH, ¶ 44), we know the exact conversation to which the

agent is referring when he refers to Rodriguez being the "sole source" of funding.  During that

conversation Rodriguez states that he is the only one with "money stuck on both sides."

(Transcript of August 11, 2010 intercepted telephone conversation between Rodriguez and Mr.

Espinal, at 3, attached hereto as **Exhibit FF**).  The Government consistently and mistakenly

argues that Rodriguez's statement meant that he was the only one with money in the FFH project

when a complete reading of the transcript establishes that Rodriguez was "very clearly" stating

that he was the only one with money **in both** FFH **and** the building located on 131st Street that he had purchased from Mr. Espinal prior to the FFH project (a property that was the source of much aggravation and many of the wiretapped telephone conversations). In fact, during the entire conversation, while Mr. Espinal is trying to discuss FFH with him, Rodriguez keeps bringing the conversation back to his frustration and anger about the 131st Street building. Unlike Rodriguez, Mr. Espinal's money was invested **only** in the FFH project.

As the Court will see, the Government's intentional misrepresentations continued, even after witnesses contradicted the Government's theory in proffer statements and Grand Jury testimony.

### 3. AFFIDAVIT IN SUPPORT OF SEARCH WARRANT FOR SAFE DEPOSIT BOX, 12/12/11 SWORN TO BY SPECIAL AGENT DANIEL CALLAGHAN

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT FOR TWO LAPTOP COMPUTERS AND CELL PHONE, 12/20/11 SWORN TO BY SPECIAL AGENT JASON SAMUELS

These search warrant applications contain substantially the same language as that quoted above with some additional "facts." Notably, in a clear reference to ████████, the contractor at the FFH property, both Agents Callaghan and Samuels state the following in their subsequent affidavits in support of search warrants:

> Other wiretapped telephone calls . . . and other evidence, including bank records supplied by the contractor who began development of the FFH land tract in Sullivan County after its purchase by FFH, show that ESPINAL and Rodriguez paid the contractor for his services by delivery, through ESPINAL, of large amounts of cash.

(Ex. KK, ¶ 14 [Callaghan]; Ex. JJ, ¶ 16 [Samuels]). While on its face there is nothing false contained in the aforementioned paragraph, the clear but **completely false** implication of this

34

statement is that it was Mr. Espinal and Rodriguez's joint decision to pay ███ in cash as part

of the money laundering conspiracy. **Agents Samuels and Callaghan failed to disclose to the**

**Court that ███ had a few days earlier testified before the Grand Jury that it was *he* who**

**insisted that Mr. Espinal pay him weekly, in cash, and in amounts determined by ███.**

(Ex. B, at 22-25).

 Additionally, based upon the 3500 material, we now know that as of the agents'

December 2011 search warrant applications, the Government had already spoken to

███████████ – three of the five alleged "straw investors." In fact, Agent

Samuels was himself present at all three of these proffers and knew that each of these witnesses

had said that the money they gave to Mr. Espinal was repayment of legitimate loans. Agent

Callaghan was also present for the proffer of █████. Both of these agents knew, at the time

they swore to their affidavits, that the statements of each of these witnesses completely

contradicted the Government's theory that Mr. Espinal had laundered Rodriguez's cash through

these individuals.

 ███ did not testify before the Grand Jury until August 2012, and the Government has

not provided us with any proffer notes or 302s, both of which it must have.[15] Based upon

███ testimony, however, it is clear that had Agent Samuels spoken with ███ prior to

swearing to his affidavit, ███ too would have informed the Government that the monies he

paid to Mr. Espinal were repayment of a loan and that the sources of the funds were various

individuals having nothing to do with Mr. Espinal. That leaves only ██████ – who we now

know has **never spoken with the Government.** Not a single alleged "straw investor" had or has

---

15 In light of ███ Grand Jury testimony, it is apparent that if he did in fact speak with the Government
prior to his testimony, the Government has again violated its *Brady* obligations.

ever told the Government that Mr. Espinal gave them cash in exchange for checks.

So – on what reliable information could these agents have based their sworn statements to the Court?  None.

**4. GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTIONS TO SEVER, 11/15/13 <u>AFFIRMATION BY AMIE N. ELY, AUSA</u>**

> Espinal and Manuel [Rodriguez] 'cleaned' cash obtained from the sale of marijuana by members of the Rodriguez Enterprise **by funneling the cash through intermediaries who had legitimate sources of income**; those intermediaries then wrote checks to 'invest' in properties controlled by Espinal and Manuel.

[Dkt. No. 1307, at 17].

Inexplicably, despite the fact that the Government was aware that not one of these alleged "intermediaries" had confirmed its "theory" of money laundering, the prosecutors continued to make these flagrant misrepresentations and have continued to do so in their motions *in limine*, in their application for a search warrant for Mr. Espinal's garage as recently as last month, and in their argument regarding the money laundering expert just a few weeks ago.  Specifically, they have stated as follows:

**5. GOVERNMENT'S MOTIONS *IN LIMINE*, 7/7/14 <u>AFFIRMATION BY SARAH E. PAUL, AUSA. & AMIE E. ELY, AUSA</u>**

> Beginning in 2009, Espinal played a key role in laundering the Rodriguez Enterprise's money through real estate in the greater New York City area.  Espinal accepted delivery of large amounts of cash from one or more members of the Rodriguez Enterprise, including from CW-1.  Espinal then concealed the source of that cash while using it to make investments in real estate, most notably, a tract of land in upstate New York which Espinal co-owned with Rodriguez through an LLC called 'Fly Fisherman's Heaven.'  To mask Rodriguez's involvement, **Espinal and others 'papered over' the transactions to make it appear as though other individuals were the true source of the funds**.

(Dkt. No. 1560, at 7).

6. **AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT FOR GARAGE FLOOR, 8/7/14 SWORN TO BY SPECIAL AGENT DANIEL CALLAGHAN**

> In fact, the 'investing' entities were not investors at all, and **were themselves funded by Rodriguez's money**.

(Ex. LL, ¶ 12).

7. **COURT APPEARANCE, 8/27/14 STATEMENT BY AMIE E. ELY, AUSA**

> Your Honor, one of the things that the expert will bring to the table is the usual use of third party nominees, the ability to use people who are not directly associated with a defendant to write checks to conceal the source of the income. As we noted in our papers, **some of the entities who wrote the checks that were used to launder Rodriguez's cash were individuals with whom Jose Espinal was already doing business**, to explain to the jury that this isn't just the normal flow of cash between two entities who are already dealing with each other."

(8/27/14 Tr. at 8).

Having listened to the Government repeat the above statements since 2010, it was shocking to hear that it was not calling as witnesses even one of these "straw investors" or "intermediaries" through whom Mr. Espinal had allegedly "funneled" Rodriguez's drug money. We now know the Government **never** intended on calling any of these witnesses at trial. Equally as disturbing is, as mentioned above, the Government's most recent attempt to mask its additional, obvious *Brady* violations by claiming that the materials disclosed just days ago are "3500/*Giglio*" materials being turned over only because they are suddenly "contemplating" calling ███████████████████ as witnesses. "Disingenuous" does not go far enough in describing the Government's attempt to cover up its failure to have turned over this *Brady*

information when required to do so.  The Government's continued failure to admit its blatant and intentional misconduct is reprehensible and must not be condoned.

**8.  THE IMAGINARY TRAP DOOR SAFE IN THE GARAGE**

As a further example of the Government resisting disclosure of materials and information to which the defense is clearly entitled, the Court will recall the Government's application on August 8, 2014, for a warrant to search the floor of the garage attached to Mr. Espinal's residence.  The Government sought access to a "trap safe" purportedly located in Mr. Espinal's garage.  The Court authorized the search.  No "trap safe" was found.  That same night, however, the Government contacted Your Honor to obtain a telephonic warrant for a free-standing safe that agents had located in Mr. Espinal's garage, which Your Honor also authorized.

Following the execution of these search warrants, defense counsel contacted the Government and requested that it disclose the underlying application materials regarding these two search warrants.  The Government refused, which prompted us to seek the Court's intervention.

In resisting disclosure, the Government misleadingly maintained during oral argument before the Court that the search warrants "relate[d] to an ongoing investigation [for bankruptcy fraud] for which no indictment has been returned[.]"  (8/20/14 Tr. at 7).  Although the Government conceded that the instant case constituted "part of [its] probable cause for the initial warrant," the Government's clear implication was that the primary focus of the search warrant application materials was unrelated to this case but related to allegations of bankruptcy fraud. The Court pointed out that the Government specifically sought out Your Honor to sign the warrant because the "principal thrust of the application was to obtain evidence in furtherance" of

the crimes charged here. (8/20/14 Tr. at 8).

Critically, the Government also asserted that the search warrant applications did not constitute 3500 material notwithstanding the fact that the applying agent – Agent Callaghan – would be a Government witness at Mr. Espinal's trial. (8/20/14 Tr. at 7). The Government maintained that because Agent Callaghan would only testify with respect to events occurring on or before December 9, 2011, the date Mr. Espinal was arrested, his affidavit in support of a search warrant in 2014 was not 3500 material. (8/20/14 Tr. at 5-7). After the receiving a copy Agent Callaghan's affidavit on August 21, 2014, it became clear that the Government was engaged in yet additional efforts to mislead the Court. Agent Callaghan's affidavit is replete with allegations and purportedly factual recitations that are directly related to Mr. Espinal's alleged conduct which is the subject of this entire prosecution.[16] For the Government to assert to the Court and to defense counsel that this search warrant application was not discoverable is truly astounding.

9.   ███████████ **LEGITIMATE BUSINESSES**

   In yet another clear misrepresentation to the Court, during the July 24, 2014 argument with respect to the Government's motion *in limine* to elicit 404(b) testimony from cooperating witness ████████ (formerly, "CW-5"), the following colloquy occurred:

   MS. PAUL:   Yes.  In a nutshell, the evidence would be this: CW-5 is a previous real estate partner of the defendant's.  They purchased a piece of property together in New Jersey.

   As part of the money that was used to purchase this property in New

---

16   *See, e.g.,* Ex. LL, ¶ 10 ("Espinal, a real estate developer, helped Rodriguez disguise his ill-gotten gains. For instance, in late 2009 and early 2010, Espinal and Rodriguez together arranged to launder Rodriguez's marijuana proceeds through an entity they created and co-owned called 'Fly Fisherman's Heaven LLC'"); ¶¶ 7 – 16 (discussing alleged facts all occurring prior to Mr. Espinal's arrest and related to the Government's allegations in **this case**).

Jersey, CW-5, who is a drug dealer contributed drug money. He gave that money. There is at least one transfer of $25,000 from CW-5 to the defendant which CW-5 personally delivered to the defendant which is drug money, proceeds of cocaine trafficking specifically.

THE COURT: CW-5 would so testify?

MS. PAUL:     He would, yes.

THE COURT: Would he testify that Mr. Espinal was made aware of the nature of the money?

MS. PAUL:     He would testify they didn't have an explicit conversation, Hey, I'm handing you drug money. It's not along those lines. But yes, he would testify –

THE COURT: It was cash?

MS. PAUL:     Yes, it's cash. Based on how it was wrapped, **based on the fact that CW-5 had no legitimate source of income, and Mr. Espinal was well aware of that**.

(7/24/14 Tr. 27-28) (emphasis added).

Defense counsel corrected the Government and informed the Court that ▮ had "very legitimate businesses" such as the music industry and telecommunications industry. (7/24/14 Tr. 30). The staggering inaccuracy of the Government's representations to the Court and the fact that the Government already knew of the inaccuracy was confirmed after receiving ▮ 3500 material on August 1, 2014. Throughout the Government's handwritten notes of meetings with ▮, it is clear that ▮ disclosed his legitimate sources of income prior to the July 24, 2014, court appearance. For instance, the notes of ▮ interviews state:



40



Accordingly, based upon these notes, the Government was aware that ▇▇ (1) had managed a building at ▇▇▇▇▇▇; (2) does concerts at various venues; (3) receives royalty checks with respect to the ▇▇▇▇▇▇▇▇▇; (4) invested his money in a building and invested in the entertainment industry; and (5) owned a gas station with a partner – of which ▇▇ specifically confirmed that Mr. Espinal was aware.  In addition to the Government's own proffer notes, ▇▇ almost 1500 intercepted and recorded calls from 2007 (many of which are in Spanish) that the Government turned over to defense on July 25, 2014, **only ten days** before the scheduled start of the trial, are replete with evidence that ▇▇ was involved in legitimate businesses, and not just drugs.  The accompanying line sheets are explicit – ▇▇ had legitimate sources of income.[17]  Thus, for the Government to have made the representation to the Court that ▇▇ "had no legitimate source of income, and Espinal was well aware of that," is a further demonstration of the Government's willingness to disregard the evidence in its efforts to prevail.

---

17      Attached hereto as **Exhibit GG** are selected linesheets from ▇▇ intercepted calls provided to defense by the Government, which include references to ▇▇ legitimate business endeavors.  *See, e.g.,* Ex. GG, at 1 (2/22/07 phone call between ▇▇ **and Mr. Espinal** ▇▇▇▇▇▇▇▇); *id.* at 3 (2/26/07 phone call between ▇▇▇▇ ▇▇▇▇▇▇▇▇)).

## ADDITIONAL *BRADY* NOT TURNED OVER

The *Brady* violations in this case are clear and intentional.  The Government has demonstrated in this case time and again that it cannot be trusted to uphold its *Brady* obligations.  There is no basis to believe that the Government has now turned over **all** *Brady* materials.  Accordingly, we respectfully request that the Court issue an order compelling the Government to turn over all *Brady* information, whether in oral or written form.  We further respectfully request that the Court order the Government to turn over all 302s and other law enforcement reports, all proffer notes and all Grand Jury minutes to the defense.  Based upon the flagrant misconduct in this case, we expect that additional *Brady* information exists.

### *MASSIAH* VIOLATION

On September 4, 2014, during a late night phone call with AUSAs Ely and Paul, they disclosed to the defense team that they would be sending us a letter later that evening.  We asked them to describe the general nature of the letter; they refused and indicated that they needed to speak with a supervisor before they sent the letter.  Approximately an hour later, we received the letter.  What we read truly was astounding and shocking.  The letter disclosed for the first time that after Mr. Espinal had been indicted in this case, after this law firm was retained and appeared in court on behalf of Mr. Espinal, and after a member of this law firm was present with Mr. Espinal at two proffer sessions with the Government, the Government violated Mr. Espinal's Sixth Amendment right to counsel by asking ████████████, an individual who did business with Mr. Espinal, to speak to him while wearing a recording device.  The letter states:

> On or about January 23, 2012, ████████████, whom the Government intends to call to testify as a witness, **was asked by the Government** to wear a recording device during a conversation between ████████ and the defendant, Jose Espinal.  Because Espinal was represented by counsel at that time, a "wall" AUSA and

"wall" agents were assigned to handle the matter. Our understanding, up until yesterday, was that although ███████ had been asked to wear the recording device, no recording had actually been made of any conversation between ███████ and Espinal. Yesterday, ███████ informed us that HSI agents outfitted him with a recording device and that he then wore that device during a conversation between him and Espinal (the undersigned AUSAs had not previously discussed this matter with ███████).

(Government letter to defense, dated September 4, 2014, attached hereto as **Exhibit W**). The

Government sought to elicit these statements from Mr. Espinal notwithstanding the fact that Mr.

Espinal had already been indicted, arraigned and represented by counsel, a clear and flagrant

violation of Mr. Espinal's Sixth Amendment rights pursuant to *Massiah v. United States*, 377

U.S. 201 (1964).

It is fundamental constitutional law that once adversarial proceedings have been initiated,

"the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical'

stages of the criminal proceedings," which includes interrogation by the Government. *Montejo*

*v. Louisiana*, 566 U.S. 778, 786 (2009).   Incredibly, the Government intentionally and

shamelessly disregarded these Constitutional protections and then waited almost three years to

disclose this to the Court and to defense counsel.

In its letter, the Government disclosed that "a 'wall' AUSA and 'wall' agents were

assigned to handle the matter."  (Ex. W).  Presumably, the Government took such steps because

it knew that it was about to violate Mr. Espinal's rights by speaking with Mr. Espinal outside the

presence of counsel.  Such a "wall," however, is pure fiction.  Erecting such a theoretical "wall"

does not negate the constitutional violation that occurred here.  The Government did not seek to

elicit statements from Mr. Espinal regarding another investigation; it sought statements directly

related to these proceedings, which is exactly what *Massiah* and its progeny prohibit.

43

Within minutes after receiving the Government's letter, defense counsel requested that the Government disclose the names of the Assistant United States Attorneys and agents who were involved in this blatant violation of Mr. Espinal's rights. The following morning, AUSA Ely responded that

> While we do not believe that the identity of either the AUSA involved in the decision to initiate the contact between ████████ and Espinal, or the AUSA who was the "wall" assistant is relevant, the AUSA who obtained authorization for the meeting was Sarah McCallum, and the "wall" AUSA was Jessica Lonergan. The agent who was in charge of the meeting was Special Agent Daniel Callaghan.

(AUSA Ely email to defense, dated September 5, 2014, attached hereto as **Exhibit X**). So with this information in hand, we were told that the very AUSA who was present at the proffer sessions with Mr. Espinal and his defense counsel is the one who orchestrated this constitutional violation.

On September 17, 2014, nine days after the trial was scheduled to commence, the Government turned over what the prosecutors have called "3500 materials" and additional Rule 16 discovery. Those documents reflect that the Government recently re-interviewed ████████ on three separate occasions and questioned him about his controlled conversation with Mr. Espinal and the recording of that conversation. During his September 12, 2014 interview, ████████ stated that "[h]e was picked up in the van by agent and told to go into his office and ask him about or bring up the subject of his situation. (Which he interpreted to be Espinal's case)."[18]

In those same documents were notes of Agent Callaghan's interview on September 15,

---

[18]   Attached hereto as **Exhibit DD** is a copy of the Government's interview notes of ████████, dated September 12, 2014. Attached hereto as **Exhibits BB** and **CC** are copies of the Government's interview notes of ████████, dated September 3 and 4, 2014, respectively.

2014, concerning his recollection of what transpired with ███████. Conveniently, he states that he "doesn't remember being asked to assist or the event itself."[19]

On September 19, 2014, the Government informed us that they had finally located the recording of the aforementioned conversation between ███████ and Mr. Espinal. As it turns out, prior to ███████ meeting with Mr. Espinal, there was additional contact made by ███████ with Mr. Espinal. **Agent Callaghan and three other agents participated in a controlled and recorded telephone call initiated by ███████ to Mr. Espinal under the direction of Agent Callaghan to arrange the subsequent meeting.** (*See* Government letter to defense, dated September 19, 2014, attached hereto as **Exhibit Z**). **How is it that Agent Callaghan has no recollection of this matter?**

There can be no excuse for the failure of the Government to have provided this information of ███████ recording of conversations at the Government's behest prior to September 19, 2014. The AUSA and agents are still involved in this case. There must be agent notes, 302s and other documents memorializing the conversations that the Government had with ███████ both before and after he met with Mr. Espinal. In fact, in its most recent production, the Government provided a copy of a notebook page containing the following notations, clearly written by either an agent or an AUSA:

**1526 – Call made to Espinal**

**1536 – C1 enters business office**

**1552 – C1 leaves office**

**1557 – C1 - debriefing**

---

19    Attached hereto as **Exhibit EE** is a copy of the Government's interview notes of Agent Callaghan, dated
      September 15, 2014.

(handwritten notes, dated January 23, 2012, attached hereto as **Exhibit AA**).  It is clearly written on the notepad that ████████ was "debrief[ed]."  There must be notes and 302s of this debriefing by the so-called "wall" prosecutors and agents.  There must be notes and 302s pertaining to the recording of the two conversations.  How is it that this entire subject conveniently was omitted from the 3500 materials that already had been turned over in connection with ████████ expected testimony?

It is disingenuous for the Government to disclaim knowledge about the recording when the recording was made at the Government's direction and a special process called a "wall" was put in place to deal with the conversation and recording.

It has become clear that the Government has continuously misrepresented its knowledge of the *Massiah* violation.  Moreover, it defies common sense that the first time ████████ was debriefed by the Government regarding the substance of his conversation with Mr. Espinal occurred just the other day, on September 4, 2014, more than two and a half years after the conversation occurred and more than 2 years after ████████ testified in the Grand Jury about the recorded conversation.  ████████

In the Government's September 4, 2014 letter disclosing the *Massiah* violation, it represented that its "understanding, up until yesterday [*i.e.*, September 3, 2014], was that although ████████ had been asked to wear the recording device, no recording had actually been made of any conversation between ████████ and Espinal."  ████████  The Government echoed this representation before the Court on September 5, 2014:

> THE COURT: I mean not disclosing until yesterday that there had been apparently a recording made of a conversation with a defendant?  You don't know whether it exists?  I mean you have made diligent efforts?  I don't know what that means.  But when did you learn about this recording?  When did

the two of you learn about the recording?

MS. ELY:      Yesterday, your Honor.

(9/5/14 Tr. at 24-25).

A review of ███████ Grand Jury testimony from February 8, 2012, belies the

Government's representation to the Court.  According to the transcript, although AUSA Sarah

McCallum questioned ███████ in the Grand Jury, AUSA Sarah Paul was also present.  (*See*

Grand Jury testimony of ███████, dated February 8, 2012, at cover page, attached hereto

as **Exhibit D**).

███████████████████████████████████████████

███████████████████

███████████████████████████████████████████

████████████████

███████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████

██████████████████.

If Ms. Paul was in fact present during ███████ testimony, at which he disclosed that

"everything was being recorded" between him and Mr. Espinal, Ms. Paul has certainly been on

notice since February 8, 2012, that there may be a recording.  Moreover, because ███████

disclosed the probable existence of a recording in his Grand Jury testimony, occurring more than

two and a half years ago, it is reasonable to conclude that both AUSAs Paul and Ely have been in

possession of copies of his Grand Jury testimony since well before September 4, 2014.

47

Moreover, although the Government disclosed that Agent Daniel Callaghan was the "wall" agent with whom ████████ conducted this mission, ████████ testified that he contacted "Jason" the detective. (*Compare* Ex. X [Gov't 9/5/14 email to defense counsel] *with* Ex. D at 76 ██████████████████. It is likely that ████████ was referring to Special Agent Jason Samuels, who has been involved in this investigation and is also an announced Government witness at Mr. Espinal's trial.

The Government's flagrant disregard for Mr. Espinal's Sixth Amendment right to counsel and its continued denial of its intentional misconduct warrants a dismissal of this indictment.

## ARGUMENT

### I. THE INDICTMENT MUST BE DISMISSED BECAUSE OF PERVASIVE AND EGREGIOUS PROSECUTORIAL MISCONDUCT

Nothing short of a dismissal of the indictment will rectify the rampant intentional prosecutorial misconduct that has occurred in this case. The culmination of the Government's misconduct in the form of multiple *Brady* and *Massiah* violations and numerous oral and written misrepresentations to the Court have irreparably undermined the ability of Mr. Espinal to receive a fair trial and to mount a defense. The Government's cavalier attitude towards its responsibilities under the laws and Constitution of this country and the resulting prejudice that has flowed to Mr. Espinal as a result of the Government's wonton conduct warrant this exceptional relief.

#### A. The Applicable Law

It is well-established that courts may dismiss an indictment where prosecutorial misconduct is so egregious that it violates a defendant's right to due process. *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008); *United States v. Voigt*, 89 F.3d 1050, 1064-65 (3d Cir. 1996) (government conduct that "shocks the conscience" may violate defendant's due process rights); *United States v. Wang*, No. 98-CR-199 (DAB), 1999 WL 138930, at *37 (S.D.N.Y. Mar. 15, 1999) (dismissing indictment prior to trial for due process violation due to Government's failure to provide "material" information until the eve of trial and its delay in disclosing that its key witness would not be a trial witness).

A court may also dismiss an indictment based upon prosecutorial misconduct pursuant to the court's supervisory powers, even where the prosecutorial misconduct does not rise to a due process violation. *United States v. Chapman*, 527 F.3d at 1084; *see also United States v. Turner*,

No. 14-CR-43 (ER), -- F.Supp.2d --, 2014 WL 2453329, at *22 (S.D.N.Y. June 2, 2014) (Ramos,

J.) (noting that the court has the "authority to dismiss the indictment" pursuant to the supervisory

powers doctrine, but declining to do so "absent demonstrable prejudice, or substantial threat

thereof") (quoting *United States v. Morrison*, 449 U.S. 361, 365 (1981)); *United States v.*

*Spadoni*, No. 00-CR-217 (EBB), 2011 WL 2532067, at *1 (D. Conn. June 24, 2011) ("A district

court may dismiss an indictment . . . under its supervisory power if warranted by the

government's pervasive and repetitive misconduct."). Invocation of the court's supervisory

powers to dismiss an indictment fulfills three separate goals: "deterring illegal conduct by

government officials, protecting and preserving the integrity of the judicial process, and

implementing a remedy for violation of recognized rights." *United States v. Omni Int'l Corp.*,

634 F.Supp. 1414, 1436 (D. Md. 1986) (citations omitted).

　　　　Here, the culmination of the Government's repeated and intentional misconduct – the

misrepresentations, the *Brady* violations, and the *Massiah* violations – warrant nothing less than

a dismissal of the indictment with prejudice. However, it is the Government's flagrant failure to

comply with its *Brady* obligations which conclusively necessitates the dismissal of the

indictment.[20]

　　　　The legal and constitutional principles governing the Government's obligations pursuant

to *Brady* are firmly established.

> To the extent that the prosecutor knows of material evidence favorable to the
> defendant in a criminal prosecution, the government has a due process obligation
> to disclose that evidence to the defendant.  Information coming within the scope
> of this principle . . . includes not only evidence that is exculpatory, *i.e.,* going to

---

[20]　　Dismissals for prosecutorial misconduct are not limited to *Brady* violations. *See Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 258 (3d Cir. 2005) ("A trial court need not rely on *Brady* to justify dismissal of an indictment as a remedy for improper prosecutorial conduct; it may also remedy Rule 16 discovery violations under its supervisory powers.").

the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.,* having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.

*United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (internal citations omitted). "This rule . . . implements the prosecution's 'special role' in the search for truth in criminal trials." *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001) (citations omitted). ". . . Brady violations are just like other constitutional violations.  Although the appropriate remedy will usually be a new trial, . . . a district court may dismiss the indictment when the prosecution's actions rise . . . to the level of flagrant prosecutorial misconduct." *Chapman*, 524 F.3d at 1086 (9th Cir. 2008) (internal citations omitted).

### B. The Government Has Repeatedly and Intentionally Failed to Produce *Brady* Information.

As discussed at length above, the Government has knowingly and willfully suppressed significant amounts of exculpatory *Brady* information, including:

- the Grand Jury testimony of █████████;
- the Grand Jury testimony of █████████;
- proffer notes of ████████;
- proffer notes of ████████████; and
- proffer notes of █████████.

The Government's conduct here was not negligent; it was not a mistake.  The Government conceded it made the **<u>intentional</u>** decision to withhold much of this material from the defense.  At the September 5, 2014, court appearance, the following colloquy occurred:

MS. ELY:    Your Honor, just to start with the disclosures, we made disclosures in 2012 that set forth the substance of the testimony in the grand jury.

Defense counsel didn't request any additional information at that time.[21] We're not –

THE COURT: I haven't seen the grand jury excerpts.

MS. ELY:    Certainly.  And we –

THE COURT: Stop.  They certainly sound like they are exculpatory, and I am very troubled that they're not produced until last night.

MS. ELY:    Your Honor, we produced them.  **It was our view that when the disclosures were made in 2012 that those outlined the substance**.

THE COURT: But, I mean, it's the government's position that it was enough just to give a paragraph or one sentence explaining it and not producing the transcripts themselves.

MS. ELY:    Your Honor, **that was the decision that was made at the time**.  We have now produced those transcripts.  Defense counsel clearly has adequate time to review them.

THE COURT: I don't know if that's true.

(9/5/14 Tr. 23-24) (emphasis added).

The individuals for whom the Government suppressed *Brady* information are not tangential witnesses.  They are the very individuals whom for the past three years the Government has represented to the Court and defense counsel were key participants in the alleged money laundering conspiracy.  It is beyond comprehension to hear the Government state that it has complied with its *Brady* obligations.

Moreover, the Government failed to disclose the *Brady* information until after defense

---

21    That the Government would place the burden on the defense to specifically request that it comply with its *Brady* obligations is contrary to the *Brady* rule itself and indicative to how the Government has viewed its responsibilities with respect to this case.  *See Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *see also United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("Under *Brady* and its progeny, the government has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense.").  In any event, the defense has specifically demanded that the Government disclose *Brady*.  (*See* Defense Letter to Government, dated April 13, 2012, ¶¶ 27 – 47, attached hereto as **Exhibit R**).

counsel made a specific request for the disclosure of the Grand Jury testimony of non-testifying witnesses, and only after the defense learned on the eve of trial that the Government was not calling these witnesses to testify. It is clear that had defense counsel not requested the Grand Jury testimony, the Government would never have produced the transcripts. Similarly, had defense counsel not pressed this issue before the Court, the Government would never have disclosed the proffer notes of ████████████████████████. Regardless, however, of whether the Government chose to call these individuals to testify at trial, the Government is still required to disclose this information to defense.

> It is thus clear that *Brady* and its progeny may require disclosure of exculpatory and/or impeachment materials whether those materials concern a testifying witness or a hearsay declarant. **A contrary conclusion would permit the government to avoid disclosure of exculpatory or impeachment material simply by not calling the relevant witness to testify.**

*United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003) (emphasis added). That is exactly the type of gamesmanship which the Government has engaged in here. The Government did not intend on calling any of these individuals as witnesses at trial under the mistaken belief that it would not have to disclose what it knew to be substantial exculpatory information in its possession. This blatant misconduct cannot go unpunished.

1. *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008)

The Ninth Circuit's decision in *United States v. Chapman* is particularly instructive here. 524 F.3d at 1073. In *Chapman*, while in the midst of trial, the prosecution began questioning one of its witnesses regarding a prior conviction which had never been disclosed to the defense. *Id.* at 1078. After defense counsel brought this to the court's attention, the Government represented to the court that it had already disclosed the materials to the defense. When pressed

by the court to provide proof of its disclosure, the Government offered, in lieu of providing such proof, to make a copy of all of the material and provide it to defense "in an abundance of caution."[22]  *Id.*  The Government thereafter provided approximately 650 pages of documents related to numerous Governmental witnesses, consisting of rap sheets and plea and cooperation agreements.  *Id.* at 1079.  Based upon this late disclosure of *Brady* and *Giglio* information, the defendant filed motions for a mistrial and a dismissal of the indictment, both of which the court granted.  The Government appealed.  *Id.* at 1079-80.

On appeal, the Ninth Circuit affirmed the trial court's dismissal of the indictment **with prejudice**.  *Id.* at 1084.  In particular, the Court found no distinction between an intentional withholding and a reckless withholding of information from defense for purposes of whether the conduct was "flagrant prosecutorial misconduct."  *Id.* at 1085.  The Court held that "[i]n this case, the failure to produce documents and to record what had or had not been disclosed, along with the affirmative representations to the court of full compliance, support the district court's finding of 'flagrant' prosecutorial misconduct even if the documents themselves were not intentionally withheld from the defense."  *Id.*

The Government's conduct here, however, is even far more egregious than that presented in *Chapman*.  At the outset, the materials the Government has suppressed for over two years is not just impeachment evidence – as it was in *Chapman* – but rather it is pure exculpatory evidence of the very crimes with which Mr. Espinal is charged.  Moreover, the Government here conceded that it intentionally withheld this information from the defense.  This was not even

---

22    The Government here, in similar fashion, disclosed the ███████████ Grand Jury testimony not out of an abundance of caution, but "because it was just not worth the fight."  Additionally, the Government has now disclosed the proffer notes of ████████████████, as "3500 material" and not for what it obviously is – *Brady* information.

reckless conduct; it was intentional. If dismissal of the indictment was warranted in *Chapman*, dismissal of the indictment here is required.

    2.   *United States v. Theodore Stevens,* 08-CR-231 (EGS) (D.D.C.)

    Close parallels can be drawn between the conduct and the behavior of the Government in this case with that of the prosecutors in the highly publicized Senator Ted Stevens case. In *Stevens*, not only did the prosecutorial misconduct in the form of multiple *Brady* violations and misrepresentations to the Court result in **the Government** moving to set aside the jury verdict and dismissing the indictment with prejudice, but the Court *sua sponte* ordered an investigation into the conduct of the prosecutors who had been in charge of Senator Stevens' prosecution.

    Senator Stevens had been indicted for failing to report certain benefits and other things of value from, among others, VECO Corporation ("VECO") and VECO's chief executive officer, Bill Allen. Most significantly, the Government alleged that Senator Stevens had received more than $250,000 in free renovations and repairs from VECO that he never disclosed on Financial Disclosure Forms he filed annually with the United States Senate.

    Despite numerous requests by the defense for *Brady* information and despite numerous assurances by the Government to the Court that it had complied with its *Brady* obligations, several months after a jury found Senator Stevens guilty, it was discovered that the Government had, in fact, utterly failed to discharge its discovery obligations. This discovery was made after the Government replaced the entire prosecution team with three new prosecutors in direct response to the Court's order of contempt against three of the trial prosecutors for failing to comply with an order to produce information related to a complaint filed by an FBI agent which "raised serious allegations of prosecutorial and governmental misconduct in the investigation and

trial of Senator Stevens." *In re Contempt Finding in United States v. Stevens*, 744 F.Supp.2d 253, 255 (D.D.C. 2010).

After less than two months of involvement with the case, the newly assigned prosecutors uncovered a vast array of previously undisclosed *Brady* information. As a result of their discoveries, the Government moved to set aside the jury verdict and dismiss the indictment.

The events leading up to the dismissal – both pre-and post-trial – involved a vast array of defense demands for the production of *Brady* material and the Government's numerous excuses for why information was not timely produced or why it should not be produced. On the day that it granted the Government's motion, the Court set forth the litany of Governmental misconduct that occurred during the proceedings, much of which mirrors the conduct in this case. Specifically, the Court stated:

> Again and again, both during and after the trial in this case, the Government was caught making false representations and not meeting its discovery obligations. And each time those false representations or unmet obligations came to light, the Government claimed that it had simply made a good faith mistake, that there was no ill intent and/or that the Court had already taken steps to address the problem and therefore there was no need for court action.

(*United States v. Stevens*, transcript of proceedings, dated April 7, 2009, at 3-5, copy attached hereto as **Exhibit MM**).

In this case, the Government engaged in the following misconduct:

- it failed to disclose the ▮▮▮▮▮▮▮▮▮ Grand Jury testimony because it did not believe it was *Brady*;

- the Government provided woefully insufficient "summaries" to convey *Brady* information;[23]

- it failed to disclose notes of meetings with critical witnesses it represented would not be trial witnesses, when those notes contained obvious exculpatory information;

- it engaged in obvious gamesmanship by later disingenuously disclosing those same notes, on the eve of trial, not as *Brady*, but as purported 3500 material and going so far as saying the Government is "contemplating" calling the witnesses as trial;

- the Government made a concerted effort to undermine the attorney/client relationship and Mr. Espinal's Sixth Amendment rights by actively seeking to elicit incriminating statements post-indictment using a lay witness as the Government's agent; and

- it consistently and erroneously represented to the Court that it fully complied with its *Brady* and other discovery obligations.

Much like what developed over time in the *Stevens* case, we fully anticipate that the more documents that are turned over by the Government, the more *Brady* information will be uncovered. This has been the history of this case. However, the significance and extent of the Government's misconduct to date is more than sufficient to justify the immediate dismissal of the indictment.

---

23  The *Stevens* Court specifically cautioned against the use of summaries for purposes of disclosing *Brady* information. "I, therefore, urge my judicial colleagues on every trial court everywhere to be vigilant and to consider entering an exculpatory evidence order at the outset of every criminal case, whether requested to do so or not, and to require that the exculpatory material be turned over in a useable format because as we've seen in this case, the use of summaries is an opportunity for mischief and mistake[.]" (Ex. MM, at 7-8).

### C. The Government's Flagrant Misconduct Has Prejudiced Mr. Espinal

The Government's untimely *Brady* disclosures, gamesmanship and other misconduct here cannot be remedied absent an outright dismissal. "The opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought." *Leka*, 257 F.3d at 103. Here, the Government has deprived Mr. Espinal of the ability to effectively and adequately utilize this newly disclosed information at trial. It has been almost three years since Mr. Espinal was indicted. The defense has been working and investigating this case for that entire time without the benefit of *Brady* information that strikes at the heart of this entire prosecution.

The fact that the Government waited close to three years to disclose the exculpatory information in its possession to the defense has severely prejudiced Mr. Espinal's ability to present a defense at trial. At the outset, Mr. Espinal and his defense counsel have operated upon the erroneous but logical assumption that the Government would be calling as witnesses the various "straw investors" and the contractor employed to develop the FFH property, all of whom the Government has repeatedly alleged were inextricably intertwined with the money laundering scheme. It was not until right before trial that the Government revealed its intentions not to call one "straw investor" or the contractor.

Typical with the practice of withholding and then disclosing exculpatory information belatedly and in piecemeal fashion, the Government once again, this past week, on September 17, 2014, turned over another large production to the defense. As set forth above, this production contained additional significant *Brady* information. Again, this most recent production crystallizes the fact that the Government does not have a single witness to support its

58

theory that Mr. Espinal laundered money through "straw investors" who were paid cash in exchange for writing checks to real estate ventures. Indeed, each witness with whom the Government spoke or who testified in the Grand Jury destroyed the Government's theory of prosecution, exculpated Mr. Espinal, and yet, this truth was merely swept aside in cursory fashion in two woefully insufficient *Brady* letters to the defense in 2012, with respect to ██████████████████████████, and not at all with respect to ████████ exculpatory statements to the Government.

The prejudice of these last-minute disclosures at this late stage is immeasurable. For example, these disclosures have caused numerous delays in these proceedings. It should be noted that this trial was originally scheduled for April 28, 2014. After this case was transferred to Your Honor, trial was adjourned to August 4, 2014. Then, after late Government disclosures of voluminous 3500 material, much of which was in Spanish, the Court adjourned the trial to September 8, 2014. And still, after additional untimely *Brady* disclosures prompted by demands by the defense, the Court was forced to adjourn this trial to October 14, 2014. These two most recent delays have been caused solely by the Government's inexcusable behavior.

These late disclosures have rendered it all but impossible for the defense to effectively investigate and use information. For example, ████████████, in his lengthy and exculpatory Grand Jury testimony from 2012, identified a list of individuals from whom he legitimately received cash that he then deposited in the bank accounts from which he drew the checks that he provided to Mr. Espinal. (*See, e.g.,* Ex. A, at 133-38). This testimony directly contradicts and undermines the Government's central theory that intermediaries received Rodriguez's drug proceeds in exchange for checks which it has espoused from its very first pre-indictment wiretap

59

warrant application in September of 2010. However, more than two years after ███████

testimony, on the eve of trial, the defense suddenly learned of these individuals who must be

interviewed by the defense and who certainly would be considered as potential defense

witnesses. Since learning of these names on September 4, 2014, our investigator has been

making diligent efforts to locate these key individuals.

Of course, had the Government timely disclosed this exculpatory information three years

ago, the defense would have had more time and greater opportunity to track down these

witnesses. However, even if the defense can locate these witnesses, the more than three-year

delay will most certainly have affected the witnesses' memories – especially with respect to the

limited and specific question of the timing of cash payments to ██████ back in the spring of 2010

– more than four years ago.

Additionally, the prejudice of the Government's decision to withhold this information is

exacerbated by the decision by ███████████████████████, to invoke his Fifth

Amendment right against self-incrimination if called to testify at trial. Despite numerous

attempts at locating ██████, the defense only learned of his intention to invoke that right very

recently, when his attorney contacted us in response to our recently issued trial subpoena.

Shockingly, ██████ attorney informed us that the Government had never even spoken to ██████.

Accordingly, the Government's failure to disclose the information relating to ██████ has

effectively prevented the defense from properly investigating this aspect of the case and has

robbed him of effectively presenting his defense.

Perhaps the most burdensome prejudice exists in the defense's inability to prepare for

trial in the face of constantly changing charges, case theories, and witness lists and the "drip by

drip" disclosure of some, but not all, of the exculpatory information.  Rather than spending time

preparing for trial, the defense has spent more than a month receiving and then reviewing a

constant flow of *Brady* information and requesting additional *Brady* information that has existed

and has been in the Government's possession for years but still had not been provided.  The

defense has been forced to consistently divert its attention from important trial preparation to

address the endless flood of exculpatory material being given to Mr. Espinal three years after the

Government obtained it.  This waste of investigative and legal resources complicates and

interferes with Mr. Espinal's ability to have his defense properly prepare for his trial.  In fact,

planning for the actual trial has become all but impossible.  We have been unable to determine

who the witnesses at trial will be.  We have prepared for trial based on the Government's

constant stated theory of "straw investors" only to uncover the fact that there are no "straw

investors," a fact that the Government knows, as they have been told that by the alleged "straw

investors" themselves.  And each time the Government has suddenly and belatedly produced

more *Brady* information, the defense has been forced to derail its preparation, modify its

approach to the trial, and conduct additional investigation.

   Indeed, as noted above, just a few weeks ago, the Government represented to the Court

that it would not be calling ███████████████████████████████████████████.

(8/27/14 Tr. at 11-14).  On September 17, 2014, however, we received notice that the

Government is now "contemplating calling [these witnesses] to testify at trial."  (Ex. Y).

Moreover, in that same letter, the Government informed the defense, three years after Mr.

Espinal was indicted, that it would not be proceeding to trial on Count One (RICO) and Counts

Six and Seven (the November 2011 obstruction).  (Ex. Y).  Throughout our trial preparation, the

defense has expected to face these charges at trial and we have spent enormous resources and time analyzing the relevant evidence and witnesses preparing to defend against these now dismissed charges. Doesn't the Government's decision not to proceed with three counts of the Indictment, only after being forced to turn over *Brady* information, relevant to those counts, confirm the undeniable truth that the Government withheld *Brady* and now knows it had no choice but to dismiss those counts?

As set forth above, the Government's theory throughout this case has been that Mr. Espinal allegedly laundered Rodriguez's money by accepting checks from "straw investors" in exchange for payments of Rodriguez's cash. Yet, the Government's latest *Brady* production confirmed that the Government does not have a single witness who can corroborate those unfounded suspicions. Instead, after spending countless hours reviewing bank records, discovery materials, and attempting to speak to relevant witnesses, we have now learned over the past three weeks that █████████████████████████ all informed the Government that they never received cash from Mr. Espinal in exchange for their payments relating to the Fly Fisherman's Heaven property. No continuance can cure this prejudice. No adjournment is lengthy enough to rectify three years of misleading Government submissions and outright lies. The Government's untimely disclosures are simply "too little, too late." *Leka*, 257 F.3d at 100. The Government's flagrant *Brady* violations have forced the defense to essentially "start fresh" on innumerable occasions and reconsider every document, piece of evidence, and witness statement in light of these recent disclosures.

The fact that the defense has been able to uncover these egregious violations prior to trial should not absolve the Government of its misconduct nor should it deprive Mr. Espinal of a

proper remedy. We are already more than two weeks past the date the trial was supposed to have commenced. The delay was caused for no other reason than the Government's misconduct. Indeed, it is more than probable that we have just begun to scratch the surface of what information the Government has improperly withheld from the defense. We do not presume that, as of the date of this filing, the Government now has fully complied with its *Brady* disclosure obligations. Accordingly, here, the only appropriate remedy is a dismissal. Relevant authority within this Circuit supports this conclusion.

In *Leka v. Portundo*, the Second Circuit reversed a denial of a writ of habeas corpus because the prosecution had failed to timely disclose *Brady* information regarding a non-testifying eyewitness – an off-duty police officer – whose description of the events – a murder – differed significantly from the testifying eyewitnesses, and, in particular that he would not identify the defendant as the culprit. 257 F.3d at 107. Three days prior to the commencement of trial and nine days before opening statements, the prosecution disclosed the police officer's name and that he would not identify the defendant. *Id.* at 99. Defense scrambled to speak with the police officer, but the defense investigator employed tactics offensive to the police officer and was thereafter barred from contact. *Id.* at 101. Trial proceeded and neither party called the police officer as a witness. The defendant was convicted.

On appeal, the prosecution argued that because it had disclosed the information on the eve of trial, the defense had sufficient time to utilize that information. *Id.* at 100. The Second Circuit thoroughly dismissed this contention and held that such "disclosure was too little, too late." *Id.* (citation omitted).

First, although the Court noted that the disclosure permitted the defense enough time to

interview the police officer, the defense investigator "bungled the contact." However, the Court noted that "the prosecution is in no position to fault the defense for cutting corners when the prosecution itself created the hasty and disorderly conditions under which the defense was forced to conduct its essential business." *Id.* at 101.

Second, the Court held that disclosure on the eve of trial impairs the opportunity to use it effectively. *Id.* at 101. By the time trial is about to begin, the defense has presumably shifted the focus from investigation to preparation for trial. Disclosing additional evidence immediately prior to trial impairs the ability to utilize it. "The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case." *Id.*

Third, new information "tend[s] to throw existing strategies and preparation into disarray." *Id.* By the time trial is about begin, trial strategies have generally gelled. The production of additional information, especially exculpatory information, creates havoc in the trial preparation process. Counsel may have to completely rethink and retool its strategies in order to assimilate the new information. This provides the Government, who has had this information for significantly longer than the defense, with a manifestly unfair advantage.

Similarly, in *United States v. Wang*, the prosecution had built its case around an informant who had recorded numerous conversations with the two defendants. 98-CR-199 (DAB), 1999 WL 138930 (S.D.N.Y. Mar. 15, 1999). These recordings constituted the primary evidence against the defendants. After learning in June or July of 1998 that the informant had significant credibility issues, including prior criminal conduct, the Government "cut off all contact" with the informant. *Id.* at *33. The Government, however, failed to disclose any of the

credibility issues to the defense.  From the onset of the case, the defense had operated under the mistaken belief that the informant would be a witness at trial.  *Id.* at *34.

      Trial was scheduled to begin on February 1, 1999.  However, on January 11, 1999, the Government made an *ex parte* application to the court requesting a determination that the information affecting the informant's credibility was not subject to disclosure pursuant to *Brady*.  After an *in camera* review, the court ordered the production of the information to defense.  The Government complied on January 25, 1999.  *Id.* at *1.  It was through this disclosure that the defense first learned of the informant's credibility issues and that the Government was not calling the informant as a trial witness.  *Id.* at *31.  After the disclosure, the defendants learned that the informant had left the country and was unavailable as a witness.  *Id.* at *45.  The defendants thereafter moved to dismiss the indictment – pre-trial – which the court granted.  In its decision, the court admonished the Government for its untimely disclosure of what was clear *Brady* information:

> When material information is disclosed on the eve of trial, seven months after the Defendants' request and at least six months after the Government came into possession of the information, such delay severely limits the ability of defense counsel to investigate and present a defense at trial.  Without question, had the Government not sought the Court's guidance with respect to disclosing the Risenhoover Information to defense counsel, in January 1999, neither the Defendants nor the Court would be aware of these facts.

*Wang*, 1999 WL 138930, at *37; *see also United States v. Quinn*, 537 F.Supp.2d 99, 115, 122 (D.D.C. 2008) (reversing conviction where Government failed to disclose that a key witness would not be testifying at trial until after trial commenced and never disclosing that the key witness became a target); *United States v. Lyons*, 352 F.Supp.2d 1231 (M.D. Fla. 2004) (dismissing indictment based upon numerous *Brady* and *Giglio* violations).

It is the Government's unconscionable conduct alone that has created this never ending

moving target and yet, it is Mr. Espinal who has suffered as a result. This cannot go unpunished.

Principles of justice demand that Mr. Espinal be afforded an appropriate remedy. Here, the only

appropriate remedy is the dismissal of the indictment with prejudice.

### D. Because of the Confirmed Flagrant Misrepresentations Made Within the Various Wiretap and Search Warrant Applications, All Seized and Recorded Materials, and the Fruits Thereof, Must Be Suppressed, or a *Franks* Hearing Must Be Held.

Throughout the course of these proceedings, there have been at least five applications for

search and wiretap warrants that the Government has submitted (collectively, the "Warrant

Applications")[24], all of which were approved by various judges of this Court and all of which

contain misleading and reckless misstatements or material omissions. Accordingly, based upon

these significant affirmative misrepresentations and material omissions that have been set forth

in great detail above, we respectfully request that the Court suppress any and all evidence the

Government obtained as a result of the execution of those warrants as well as any subsequent

evidence located as fruits of the poisonous tree. In combination therewith, we respectfully

request that the Court order a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).[25]

---

24    These applications include (1) Agent Samuels' Affidavit in Support of Wiretap Authorization, dated September 23, 2010 (Ex. HH); (2) Agent Samuels' Affidavit in Support of Search Warrant for ET Management, dated December 8, 2011 (Ex. II); (3) Agent Callaghan's Affidavit in Support of Search Warrant for Safe Deposit Box, dated December 12, 2011 (Ex. KK); (4) Agent Samuels' Affidavit in Support of Search Warrant for Two Laptops and Cell Phone, dated December 20, 2011 (Ex. JJ); and (5) Agent Callaghan's Affidavit in Support of Search Warrant for the floor of Mr. Espinal's Garage, dated August 7, 2014 (Ex. LL).

25    Mr. Espinal previously moved to suppress the wiretap intercepts of his cell phone based upon the Government's failure to sufficiently allege "necessity" requirement of 18 U.S.C. §2518(1)(c). [Dkt. No. 735]. Mr. Espinal also joined in Rodriguez's motion to suppress Rodriguez's cellular phone intercepts, as an aggrieved party as defined by 18 U.S.C. § 2518(10)(a). The Court denied both motions. [Dkt. No. 869]. As set forth herein, Mr. Espinal renews his motion to suppress on the basis that this newly disclosed *Brady* and other information upon which this motion is based was not available at the time of his initial motion –

A defendant challenging search and wiretap warrants is entitled to a *Franks* hearing where he "makes a 'substantial preliminary showing' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155-56).

> Where a defendant makes a preliminary showing that the government's affidavit misstated or omitted material information, *Franks* instructs a district court to hold a hearing to determine if the misstatements or omissions were made intentionally or with reckless disregard, and if so, determine *de novo* whether, "after setting aside the falsehoods, what remains of the warrant affidavit is insufficient to support a finding of probable cause." *United States v. Coreas*, 419 F.3d 151, 155 (2d Cir. 2005). "Omissions from an affidavit that are claimed to be material are governed by the same rules." *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985). . . . "The ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support probable cause."[26]
> *United States v. Canfield*, 212 F.3d at 718 (internal quotation marks omitted).

*United States v. Rajaratnam*, No. 09-CR-1184 (RJH), 2010 WL 4867402, at *7 (S.D.N.Y. Nov. 24, 2010).

As set forth in detail above (*see* pp. 29-36, *supra)*, each of the Warrant Applications contained false statements and misrepresentations beginning with Agent Samuels' affidavit in support of a wiretap authorization request, dated September 23, 2010.  In this initial affidavit, Agent Samuels made statements regarding ███████████, one of the purported "straw investors,"

---

because the Government suppressed it.

26    The analysis is the same regardless whether the misstatements or omissions affected the Court's determination of probable cause (in the case of search warrant or wiretap authorization applications), or the determination of necessity (in the case of wiretap authorization applications pursuant to 18 U.S.C. § 2518(1)(c)).  *See United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013).  Here, the Government's misrepresentations and omissions have clearly affected probable cause determinations, and we also suspect that they affected the necessity determinations with respect to the wiretap warrant application.  A full *Franks* hearing to address both determinations is accordingly warranted here.

that were false and for which he had no evidence to support.  Without speaking with ████ ████, or anyone with knowledge as to his bank accounts or bank transactions, Agent Samuels made the following false statements:

- That a review of Mr. Espinal's bank records show that the $147,000 paid to the Flyfisherman's Heaven Property **did not come from Mr. Espinal**.

- That the funds that ████████ gave to Mr. Espinal actually **belonged to Rodriguez**.

- That ████████ purchase of 871 Bruckner Boulevard "**was related to Rodriguez's purchase of" two other properties** because the sale of 871 Bruckner occurred on the same day or within one day of the other two properties.

- That Mr. Espinal **"works closely with** ████████ **to launder Rodriguez's cash proceeds,"** and that Mr. Espinal "may have directed ████ to deposit substantial amounts of cash – which [Agent Samuels] believes to be drug proceeds – into purported business bank accounts, and then used those funds to purchase real estate."

Agent Samuels had **no evidence** on which to base these statements.  In fact, as we now know based upon their Grand Jury testimony and proffer notes, ████████, along with all of the other alleged "straw investors" wrote checks to Mr. Espinal, FFH or Washington Heights Parking through legitimate means, having nothing at all to do with Rodriguez.  Even more egregious, however, is that as the Government's investigation of Mr. Espinal proceeded, and the Government became aware of the exculpatory statements of each of the alleged "straw investors," the Agents ignored those statements and instead chose to continue regurgitating the

68

same false statements contained in Agent Samuels' September 23, 2010 affidavit.

The Government's misrepresentations and omissions have so permeated the Warrant Applications that there can be no question that these misrepresentations and omissions influenced the individual courts which authorized the various warrants. Accordingly, a *Franks* hearing is warranted.

## II.   THE INDICTMENT MUST BE DISMISSED BECAUSE OF PROSECUTORIAL MISCONDUCT WITH RESPECT TO THE GRAND JURY PROCEEDINGS

The Government's recent *Brady* disclosures as well as the totality of the produced 3500 materials demonstrate a reprehensible lack of governmental investigation with respect to this prosecution. These disclosures, which include some portions of Grand Jury testimony reveal that the Grand Jury presentations leading to the various indictments against Mr. Espinal[27] were misleading and replete with unfair prejudicial testimony. All defendants have a Fifth Amendment right to due process which requires that "an indictment issue from an independent and unbiased grand jury." *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485, at *2 (W.D.N.Y. May 22, 2006). The Government here denied Mr. Espinal these protections.

Courts have recognized that where an indictment is based on prosecutorial and government misconduct, courts are not powerless to remedy such conduct. The Court may invoke its supervisory power to "dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" *United States v. Williams*, 504 U.S. 36, 46 (1992) (quoting

---

27   Mr. Espinal was originally indicted in December 2011. Two subsequent superseding indictments followed thereafter.

69

*United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring in judgment)).  The

misconduct occurring in the Grand Jury must have prejudiced the defendant.  *Bank of Nova*

*Scotia v. United States*, 487 U.S. 250, 263 (1988).  "The prejudicial inquiry must focus on

whether any violations had an effect on the grand jury's decision to indict.  If violations did

substantially influence this decision, or if there is grave doubt that the decision to indict was free

from such substantial influence, the violations cannot be deemed harmless."  *Id.*

### A. The Grand Jury Was Unduly Influenced by the Government's Misleading Presentations Which Prejudiced Mr. Espinal

> [T]here remain certain limitations on the presentation that a prosecutor may make to the
> grand jury. . . .  In fact the gain in prosecutor's influence over grand juries is all the more
> reason to insist that these limitations be observed strictly.  Due process considerations
> prohibit the government from obtaining an indictment based on known perjured
> testimony.  Courts have also held that a prosecutor may not make statements or argue in a
> manner calculated to inflame the grand jury unfairly against an accused.  Under the
> applicable guidelines prosecutors have an ethical obligation strictly to observe the status
> of the grand jury as an independent legal body.  In short, a prosecutor as an officer of the
> court is sworn to ensure that justice is done, not simply to obtain an indictment.

*United States v. Hogan*, 712 F.2d 757, 759-60 (2d Cir. 1983) (internal citations omitted); *see*

*Leeper*, 2006 WL 1455485, at *5 ("Whether derived from the constitution or from its

supervisory authority, it is clear that this Court has authority to dismiss an indictment where it

was issued in violation of the Fifth Amendment's guarantee of an unbiased and independent

grand jury.").

    For instance, based upon our review of the limited portions of the Grand Jury testimony

provided to us,[28] the Government demonstrably presented ███, an alleged "straw investor," as

---

28    The Government has provided defense with copies of the following Grand Jury testimony:

- Special Agent Jason Samuels:  December 8, 2011; February 7, 2012, and July 26, 2012
- ███:  December 8, 2011
- ███:  December 22, 2011

someone whom the AUSA questioning him did not believe.  Her questions clearly were intended to convey that impression to the Grand Jury.  We implore Your Honor to review both days of ████ Grand Jury testimony.  It will become clear that the overarching tone of the AUSAs questioning was that of skepticism at best.  This infected the Grand Jury's perception of ████, who clearly provided exculpatory testimony with respect to Mr. Espinal.

A further evaluation of the Grand Jury testimony that the Government has disclosed reflects the unfair and undue influence that Agent Samuels had on the Grand Jury.

Agent Samuels testified on December 8, 2011, the day Mr. Espinal was first indicted.  Agent Samuels was asked to identify certain checks that were made payable to FFH or Washington Heights Parking from various entities owned or controlled by the following groups of people: (1) ████████; (2) ████████████; and (3) ██████.  (Ex. E, at 38-44).  This same testimony was reread during one of Agent Samuels' subsequent appearances before the Grand Jury.  (*See* Ex. F, at 25).

As set forth in detail herein, the Government's theory of this case from the beginning of this prosecution has consistently been that these individuals acted as "straw investors" in order to launder Rodriguez's drug proceeds.  Again, not one so-called "straw investor" testified prior to the first indictment.  Instead, the Government relied on Agent Samuels to lay out the Government's theory of the case against Mr. Espinal by identifying checks and then reciting hearsay conversations he had with individuals associated with the "straw investors."  What is striking is that Samuels was not asked one question about what the "straw investors" had told

---

- ████████: December 22, 2011; February 8, 2012
- ████████: August 16, 2012; August 21, 2012
- ████████: December 8, 2011; February 16, 2012

71

him or other Government agents. The reason for this convenient omission is now clear. By the time of the Grand Jury presentation, Samuels and other agents already had spoken to the "straw investors," and had heard them exculpate Mr. Espinal. To ask him questions about those conversations would have prevented the Government from obtaining the indictment it so desperately sought. The Government presented no testimony from anyone who had any personal and direct knowledge of the conversations between these individuals and Mr. Espinal, but instead left it to Agent Samuels to convince the Grand Jury that the transactions between the "straw investors" and Mr. Espinal was part of a money laundering scheme. It is fundamentally unfair that the Government proceeded with this theory in the Grand Jury having the exculpatory information in its possession but depriving the Grand Jury of its existence. This misconduct goes far beyond merely not disclosing information. The Grand Jury presentation in this case is part of a widespread pattern of Government misconduct that has been continuous from the first Grand Jury presentation of evidence pertaining to Mr. Espinal until today. That misconduct unfairly tainted the entire presentation and, as a result, the Grand Jury's independence was severely undermined.

Without question, the Government's undue and improper influence on the Grand Jury prejudiced Mr. Espinal. *Bank of Nova Scotia*, 487 U.S. at 263. After hearing the questioning of ████ – who provided exculpatory testimony – by the AUSA, during which the AUSA clearly conveyed her doubts as to ████ credibility, coupled with the misleading testimony of Agent Samuels, the Grand Jury was improperly influenced to return the three indictments in this case. This violated Mr. Espinal's Fifth Amendment rights, and as such, the indictment must be dismissed. *See Leeper*, 2006 WL 1455485, at *5; *see also United States v. Acquest Devel.*, 932

F.Supp.2d 453, 460 (W.D.N.Y. 2013) (dismissing indictment for prosecutorial misconduct in Grand Jury where Government disclosed to Grand Jury that a judge had already found the existence of probable cause with respect to several crimes which were then included in the indictment).

**B. Disclosure of the Entirety of the Grand Jury Proceedings to Defense Is Warranted**

Pursuant to Rule 6(e)(3)(E)(ii) of the Federal Rules of Criminal Procedure, a trial court may order the disclosure of the Grand Jury minutes "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the Grand Jury." It is well-settled that a court may order the disclosure of Grand Jury minutes where a defendant has shown a "particularized need" that outweighs the secrecy protections afforded Grand Jury proceedings. *In re Grand Jury Subpoena*, 103 F.3d 234, 239 (2d Cir. 1996).

Here, Mr. Espinal's "particularized need" is manifest. As set forth in detail above, the litany of prosecutorial misconduct, whether intentional or reckless, is disturbing. The fact that the Government resisted the disclosure of the Grand Jury testimony of ████████████, despite the obvious *Brady* implications, renders it doubtful that the Government has complied with its *Brady* obligations. The disclosure of the entirety of Grand Jury transcripts is accordingly warranted here to ensure that the defense has been provided with all material and information to which he is entitled.

Additionally, based upon the misconduct described above, it is likely that the Government engaged in further misconduct in Grand Jury proceedings to which the defense currently does not have access. Although we respectfully submit that the level of Grand Jury misconduct described herein is already sufficient to warrant the dismissal of the indictment, in

73

the event that the Court does not dismiss, the disclosure of the remainder of the transcripts from the Grand Jury proceedings is warranted in order for the defense to supplement this motion with examples of additional misconduct, as necessary.

Moreover, it is further likely that the Government erroneously instructed the Grand Jury. A prosecutor must provide the Grand Jury with "sufficient information concerning the relevant law 'to enable it intelligently to decide whether a crime has been committed.'" *United States v. Twersky*, No. 92-CR-1082, 1994 WL 319367, at *4 (S.D.N.Y. June 29, 1994) (quoting *People v. Calbud, Inc.*, 49 N.Y.2d 389, 395 (1980)). A court may dismiss an indictment where it finds that the jury instructions were misleading "due to mistakes or omissions." *Id.*; *see also United States v. Stevens*, 771 F.Supp.2d 556, 568 (D. Md. 2011) (dismissing indictment where the Government provided erroneous instructions to the Grand Jury); *United States v. Peralta*, 763 F.Supp. 14, 21 (S.D.N.Y. 1991) (dismissing indictment for improper Grand Jury instructions use of inaccurate hearsay testimony).

As the Court is well-aware, the Government has consistently argued for an erroneous interpretation of the law with respect to the requirement that a defendant charged with RICO and RICO conspiracy must be generally aware of the general nature of the conspiracy. Where, as here, the charged enterprise and/or conspiracy includes elements of violence, the Government must establish that the defendant was generally aware of the violent nature of the conspiracy. In light of the Government's repeated insistence that Mr. Espinal did not have to be aware of the general violent nature of the enterprise, it is likely that the Government incorrectly charged the Grand Jury.

In light of the foregoing, Mr. Espinal has demonstrated a "particularized need" for the

disclosure of the Grand Jury minutes, including instructions. *See, e.g., United States v. Soliman,* No. 06-CR-236A, 2008 WL 4490623, at *6 (W.D.N.Y. Sept. 30, 2008) (granting defendant's request for disclosure of Grand Jury instructions to defense to identify whether prosecutorial misconduct occurred).

## **CONCLUSION**

The prosecutorial misconduct that has permeated this case from its initial stages cannot be excused. The Government's conduct has been not just reckless, but intentional. Moreover, despite the fact that there have been flagrant violations of Mr. Espinal's constitutional rights, the Government incredibly continues to pretend that no such violations have occurred. As the *Stevens* Court stated on the record during its oral decision granting the Government's motion to dismiss the indictment, "The fair administration of justice depends on the Government meeting its obligations to pursue convictions fairly and in accordance with the Constitution. . . . The importance of these obligations cannot be overstated." Quoting the Supreme Court in *Strickler v. Green,* the court also stated:

> 'Within the federal system, for example, we have said that the United States Attorney is the representative, not of an ordinary party to a controversy but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' We must never forget the Supreme Court's directive that a criminal trial is a search for the truth.

(Ex. MM, at 7) (quoting 527 U.S. 263, 281 (1999) (quoting *Berger v. United States,* 295 U.S. 78, 88 (1935))).

The Government has wholly failed in its obligations in this case. Instead of searching for the truth, it has willfully ignored it at every turn. The harm caused to Mr. Espinal's constitutional right to present a defense cannot be overstated and cannot be remedied by anything

short of a dismissal.

Because of the Government's continuous and intentional misconduct throughout these proceedings, we respectfully request that the Court:

(1) Dismiss the indictment with prejudice for the flagrant prosecutorial misconduct by repeatedly failing to disclose *Brady* information, violating Mr. Espinal's Sixth Amendment right to counsel, and making numerous misrepresentations to the Court;

(2) In the event that the Court does not dismiss the indictment, order an evidentiary hearing to consider dismissal and any other appropriate sanctions. In connection therewith, defense should be entitled to all communications and information with respect to all witnesses, regardless of whether the Government intends to call the witness at trial;

(3) Dismiss the indictment with prejudice for the extensive prosecutorial misconduct which unduly influenced the Grand Jury proceedings in violation of Mr. Espinal's Fifth Amendment rights;

(4) Issue an order compelling the Government to disclose to defense the entirety of the Grand Jury minutes, including legal instructions, with respect to each indictment relevant to these proceedings;

(5) Order a *Franks* hearing to address the gross misstatements and omissions contained in the wiretap and search warrant applications and to assess the evidence which must be suppressed as a result of those misstatements and omissions;

(6) Order the Government to disclose to defense all *Brady* information whether such information has been transmitted orally or in writing or in electronic format;

(7) Order the Government to disclose to defense all agent reports, 302s, prosecutor notes, and Grand Jury testimony related to any witness, regardless of whether the Government intends to call the witness to testify at trial; and

(8) Any such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 24, 2014

Respectfully submitted,

GOTTLIEB & GORDON LLP

/s/ Robert C. Gottlieb (RG1930)
By: Robert C. Gottlieb

Robert C. Gottlieb
Celia A. Gordon
Justin F. Heinrich
Ravi Kantha
111 Broadway, Suite 701
New York, New York 10006
(212) 566-7766
*Attorneys for Jose Espinal*

TO:     Amie Ely, AUSA (via hand delivery)
        Sarah Paul, AUSA (via hand delivery)

## AFFIRMATION OF SERVICE

Ravi Kantha, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Attorney associated with the law firm, Gottlieb & Gordon LLP, attorneys for Defendant Jose Espinal in *United States v. Jose Manuel Espinal,* Indictment Number 10-CR-905 (DC).

That on September 24, 2014, I caused one copy of the within Motion to Dismiss and accompanying Volumes I, II, III and IV of Exhibits, to be personally delivered to:

Amie Ely, Esq.
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
1 Saint Andrews Place
New York, New York 10007

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:                              New York, New York
                                    September 24, 2014

                                    Ravi Kantha