UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

UNITED STATES OF AMERICA,

                :

-v-

                :    **Ind. No. S31 10-CR-905 (DC)**

JOSE ESPINAL,

                :

          Defendant.   :

------------------------------------------------------------ x

## <u>DEFENDANT JOSE ESPINAL'S</u><br><u>REPLY IN SUPPORT OF MOTION TO DISMISS</u>

GOTTLIEB & GORDON LLP
111 Broadway, Suite 701
New York, New York 10006
(212) 566-7766

*Attorneys for Jose Espinal*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION..................................................................................................................1

ARGUMENT .........................................................................................................................3

   I. <u>THE GOVERNMENT SUPPRESSED EXCULPATORY INFORMATION</u> .............3

      A. **THE BUSINESS RELATIONSHIP BETWEEN MR. ESPINAL
         AND THE EXCULPATORY WITNESSES DOES NOT
         NULLIFY THE GOVERNMENT'S REQUIREMENT TO
         DISCLOSE EXCULPATORY INFORMATION**.....................................................6

      B. **MR. ESPINAL HAD NO KNOWLEDGE REGARDING
         THE SOURCE OF THE FUNDS PROVIDED TO HIM
         BY ANY OF THE ALLEGED "STRAW INVESTORS"**................................12

      C. **THE GOVERNMENT WITHHELD
         ADDITIONAL *BRADY* MATERIAL** ...................................................................12

          1. <u>GRAND JURY TESTIMONY OF</u> ▆▆▆▆
             <u>REGARDING</u> ▆▆▆▆▆▆ <u>(8/21/12)</u>..........................................14

          2. <u>GRAND JURY TESTIMONY OF</u>
             ▆▆▆▆▆▆▆ <u>(9/6/12)</u>.....................................................15

          3. <u>GRAND JURY TESTIMONY OF</u>
             ▆▆▆ <u>(9/11/12)</u>...........................................................16

          4. <u>GRAND JURY TESTIMONY OF</u> ▆▆▆
             <u>REGARDING</u> ▆▆▆▆▆ <u>(8/21/12)</u> ......................................17

          5. <u>GRAND JURY TESTIMONY OF</u>
             ▆▆▆▆▆ <u>(9/20/12)</u> ...............................................18

           6. <u>GRAND JURY TESTIMONY OF</u> ▆▆▆
             <u>REGARDING</u> ▆▆▆▆▆▆▆▆ <u>(8/21/12)</u> ........................20

           7. <u>GRAND JURY TESTIMONY OF</u>
             ▆▆▆▆▆▆ <u>(9/6/12)</u> ...........................................21

8. GRAND JURY TESTIMONY OF ██████ REGARDING RENTAL INCOME (8/21/12)...................23

9. GRAND JURY TESTIMONY OF ████████ (2/14/12) ...............................24

D. **THE GOVERNMENT'S SUMMARY *BRADY* DISCLOSURES WERE MISLEADING, INACCURATE AND OMITTED CRITICAL EXCULPATORY INFORMATION** ...........................26

1. ████████ .................................................27

2. ████████ ...............................................28

3. ████████████ ......................................31

E. **THE DEFENSE RELIED UPON THE GOVERNMENT'S MISLEADING REPRESENTATIONS REGARDING THE RELEVANT *BRADY* INFORMATION** ...............................33

II. **THE GOVERNMENT'S MISCONDUCT IN THIS CASE WARRANTS A *FRANKS* HEARING** .........................................40

III. **THE GOVERNMENT HAS CONTINUED TO MISREPRESENT MR. ESPINAL'S PROFFER NOTES** ...................44

A. ████████ ..............................................44

B. ████████ ................................................46

C. ████████████ .............................47

IV. **THE GOVERNMENT VIOLATED *MASSIAH*** ...............................50

V. **THE MISCONDUCT IN THE GRAND JURY WARRANTS THE DISMISSAL OF THE INDICTMENT** .........................57

VI. **THE TOTALITY OF THE GOVERNMENT'S MISCONDUCT WARRANTS THE DISMISSAL OF THE INDICTMENT** .........................59

# TABLE OF AUTHORITIES

**Rules and Statutes**

Fed. R. Crim. P. 6(e)(3)(E)(ii) ..............................................................58

**Federal Cases**

*Bank of Nova Scotia v. United States,*
    487 U.S. 250 (1988)..............................................................57-58

*Banks v. Dretke,*
    540 U.S. 668 (2004)..........................................................33, 36, 38

*Brady v. Maryland,*
    373 U.S. 83 (1963)...................................................... *in passim*

*DiSimone v. Phillips,*
    461 F.3d 181 (2d Cir. 2006)..................................................27

*Gantt v. Roe,*
    389 F.3d 908 (9th Cir. 2004) .............................................11, 34

*Harris v. United States,*
    9 F.Supp.2d 246 (S.D.N.Y. 1998) .........................................33

*In re Grand Jury Subpoena,*
    103 F.3d 234 (2d Cir. 1996)..................................................58

*Jefferson v. United States,*
    730 F.3d 537 (6th Cir. 2013) ...............................................33

*Kuhlmann v. Wilson,*
    477 U.S. 436 (1986)..........................................................11, 56

*Maine v. Moulton,*
    474 U.S. 159 (1985)...............................................................55

*Massiah v. United States,*
    377 U.S. 201 (1964)...............................................................56

*United States v. Anzeulotto,*
    No. 93-CR-1316, 1996 WL 31233 (E.D.N.Y. Jan. 19, 1996) ....................34-36

iv

*United States v. Beras,*
  131 Fed.Appx 313 (2d Cir. Mar. 31, 2005) ........................................................41

*United States v. Brown,*
  650 F.3d 581 (5th Cir. 2011) ...........................................................................36

*United States v. Diaz,*
  922 F.2d 998 (2d Cir. 1990) ............................................................................33

*United States v. Finnerty,*
  Nos. 05 Cr 393, 397 (DC), 2006 WL 2802042 (S.D.N.Y. Oct. 2, 2006) ................... 58-59

*United States v. Gil,*
  297 F.3d 93 (2d Cir. 2002) ........................................................................... 10-11

*United States v. Grossman,*
  843 F.2d 78 (2d Cir. 1988) .........................................................................32, 39

*United States v. Henry,*
  447 U.S. 264 (1980) .................................................................................. 55-56

*United States v. Hogan,*
  712 F.2d 757 (2d Cir. 1983) .............................................................................58

*United States v. Howard,*
  998 F.2d 42 (2d Cir. 1993) ..............................................................................41

*United States v. Jacques,*
  684 F.3d 324 (2d Cir. 2012) .............................................................................54

*United States v. Leeper,*
  No. 06-CR-58A, 2006 WL 1455485 (W.D.N.Y. May 22, 2006) ...............................57

*United States v. LeRoy,*
  687 F.2d 610 (2d Cir. 1983) .............................................................................33

*United States v. Mechanik,*
  475 U.S. 66 (1986) ........................................................................................58

*United States v. Olsen,*
  737 F.3d 625 (9th Cir. 2013) (Kozinski, J., dissenting) ........................................63

*United States v. Oshatz,*
  700 F.Supp. 696 (S.D.N.Y. 1988) .....................................................................32

*United States v. Pannell,*
 510 F. Supp.2d 185 (E.D.N.Y. 2007) ..............................................................56

*United States v. Poindexter,*
 No. 88-0080, 1990 U.S. Dist. LEXIS 2023 (D.D.C. Mar. 5, 1990) ...................36

*United States v. Restrepo,*
 547 Fed.Appx. 34 (2d Cir. Nov. 27, 2013) ......................................................33

*United States v. Shaffer,*
 789 F.2d 682 (9th Cir. 1986) ......................................................................34, 36

*United States v. Shamsideen,*
 No. 03-CR-1313, 2004 WL 1179305 (S.D.N.Y. Mar. 31, 2004) .......................32

*United States v. Stevens,*
 771 F.Supp.2d 556 (D. Md. 2011) ..................................................................58

*United States v. Tavera,*
 719 F.3d 705 (6th Cir. 2013) ............................................................ 36, 38-39

*United States v. Thomas,*
 981 F.Supp.2d 229 (S.D.N.Y. 2013) ................................................................34

*United States v. Tracy,*
 No. 94-CR-142S, 1995 WL 522807 (W.D.N.Y. Aug. 24, 1995) .......................41

*United States v. Triumph Capital Group, Inc. et al.,*
 544 F.3d 149 (2d Cir. 2008).......................................................................... 8-10

*United States v. Upton,*
 856 F.Supp. 727 (E.D.N.Y. 1994) ..................................................................32

*United States v. Williams,*
 504 U.S. 36 (1992)..........................................................................................58

*United States v. Zagari,*
 111 F.3d 307 (2d Cir. 1997)............................................................................33

**Additional Materials**

Department of Justice, Office of Professional Responsibility Report,
*United States v. Theodore F. Stevens, Crim. No. 08-231 (D.D.C. 2009),*
dated August 15, 2011 ............................................................................ 10-11

United States Attorneys' Manual, § 9-5.001 .................................................40

# INTRODUCTION

The Government's response to Mr. Espinal's motion to dismiss the indictment is shocking in its breadth of misrepresentations and its continued refusal to acknowledge the pervasive *Brady* and *Massiah* violations. The Government's disregard for its constitutional obligations and defendants' rights is reflected in its dismissive attitude toward the defense motion to dismiss as being "primarily designed to shift the focus away from the charges against Espinal" and that "the defense has focused its efforts on levying personal attacks on prosecutors." (Gov't Opp. 3, 66). Nothing is further from the truth. Rather, these two false statements speak volumes about the Government's indifference with respect to its *Brady* obligations, its unwillingness to acknowledge even the most obvious of wrongdoing, and its failure to accept responsibility for its own misconduct. It is because of this troubling attitude in the face of overwhelming evidence of prosecutorial misconduct, an attitude that reflects an unjustified mission to obtain a conviction rather than to serve the interests of justice, that dismissal of the indictment is the most appropriate sanction.

While the Government advises the Court in its response that the issues raised by the defense have now received "close attention within this Office," it has become apparent that the Office's "close attention" has resulted in a decision simply to defend egregious constitutional violations. Knowing the distinguished history and reputation of the Southern District's United States Attorney's office, this decision is surprising and difficult to understand. Because the Government refuses to acknowledge any wrongdoing whatsoever, we submit that a clear and unequivocal message now must be sent to the Government that there are serious repercussions for the type of persistent prosecutorial misconduct that has been uncovered in this case.

1

Not only has the Government continued to justify its past violations of *Brady* and *Massiah*, but astonishingly, on the very day the Government served its opposition to the motion to dismiss, once again, it turned over to the defense **additional *Brady* materials** – this time, the 2012 Grand Jury testimony of previously unknown witnesses. Thus, the Government's pattern of turning over *Brady* information, long after it was known to the Government and long after the trial in the case had been scheduled to commence, continued, but, still, without acknowledgment that the materials constituted *Brady* information.

The Government's response not only fails to acknowledge any wrongdoing, but reflects an audacity and arrogance that claims that its paltry, incomplete and misleading *Brady* notices contained in its two 2012 letters to defense counsel are "reflective of the Government's strong interest in making disclosures that not only satisfy the requirements of *Brady* [], but go sufficiently beyond the minimum required, in order to avoid or minimize litigation issues and unnecessary delay." (Gov't Opp. 2). In light of what we subsequently have learned about the withheld exculpatory information, the Government's self-serving "pat on its own back" is nothing if not offensive.

## ARGUMENT

## I.   THE GOVERNMENT SUPPRESSED EXCULPATORY INFORMATION

As the Court is aware, in 2012, the Government made two separate disclosures to the

defense which it characterized as *Brady* disclosures.  First, in a letter to defense counsel dated

March 16, 2012, the Government stated, in pertinent part:

> In addition, **pursuant to its obligations under *Brady v. Maryland*,** 373 U.S. 83 (1963), and/or *Giglio v. United States*, 405 U.S. 150, 154 (1972), and in an abundance of caution, the Government hereby advises you that ▮▮▮▮▮▮▮▮▮▮▮ ...
>
> Finally, please be advised that ▮▮▮▮▮▮▮▮▮▮ ...

(Ex. S)[1] (emphasis added).  In its second letter, dated November 21, 2012, the
Government stated, in pertinent part:

> In addition, **pursuant to its obligations under *Brady v. Maryland*,** 373 U.S. 83 (1963), and/or *Giglio v. United States*, 405 U.S. 150, 154 (1972), and in an abundance of caution, the Government hereby advises you that ▮▮▮▮▮▮▮▮▮▮▮ ...

(Ex. T) (emphasis added).  Astonishingly, the Government now argues that it was not obligated

to make any of the aforementioned *Brady* disclosures because Mr. Espinal "already knew about

the people whom he recruited to help him launder Manuel Rodriguez's drug money." (Gov't

Opp. 4).  Putting aside the fact that the Government continues to make bold misstatements as to

Mr. Espinal's criminal culpability despite clear evidence to the contrary, the Government also

ignores the fact that **prior to filing its response**, it had acknowledged that the aforementioned

---

[1] References to the exhibits attached to Mr. Espinal Motion will be "Ex. ___."  The additional exhibits attached hereto will commence with "Exhibit NN", which is where the exhibits left off in Mr. Espinal's Motion.  References to the exhibits attached to the Government's opposition will be "Gov't Ex. ___."

information was *Brady* material. Specifically, at the August 27, 2014 Court appearance, the following statements were made with respect to *Brady*:

MR. GOTTLIEB: ...If all these individuals are alleged to be part of some sort of money laundering scheme and we don't have any Brady material to that effect we just want to be certain that there is no such Brady material.

THE COURT: Is that it or is there another matter?

MR. GOTTLIEB: There is another issue.

THE COURT: Okay, let's deal with this one.

MS. ELY: Your Honor, if defense counsel had reached out to us rather than coming to the Court we would most likely be able to provide them with the Bates numbers in which these materials were produced in 2012 and 2013. I will confirm that another assistant was primarily responsible for the production at that time, but we would have been able to –

THE COURT: There were materials previously produced?

MS. ELY: Yes, your Honor.

. . . . .

THE COURT: ...So then the last part of that is a suggestion perhaps that you're not calling some of them because there may be something exculpatory in the nature of Brady.

MS. PAUL: That's what Ms. Ely was referring to that was previously produced

|              |                                                                 |
|--------------|-----------------------------------------------------------------|
|              | by the assistant who was on this case.                          |
| THE COURT:   | It was previously produced.                                     |
| MS. PAUL:    | That's our understanding. Now that we know about this issue     |
|              | we'll go back and look to see what was produced. **If there's any** |
|              | **Brady that hasn't been provided, we'll provide it right away.** |

(8/27/14 Tr. 13-14). At no time during this conference did the Government make the absurd argument that it now makes – that the 2012 disclosures did not constitute *Brady* material.

Moreover, during the next court conference on September 5, 2014, following the Government's production of the ███████████████████████████████████████, the Government made the following statements:

| MS. ELY:    | Your Honor, just to start with the disclosures, we made disclosures in 2012 that set forth the substance of the testimony in the grand jury. Defense counsel didn't request any additional information at that time. We're not – |
|-------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| THE COURT:  | I haven't see the grand jury excerpts.                                                                                                                                                                                             |
| MS. ELY:    | Certainly, And we –                                                                                                                                                                                                                |
| THE COURT:  | Stop. They certainly sound like they are exculpatory, and I am very troubled that they're not produced until last night.                                                                                                           |
| MS. ELY:    | Your Honor, we produced them. It was our view that when the disclosures were made in 2012 that those outlined the substance.                                                                                                       |
| THE COURT:  | But, I mean, it's the government's position that it was enough just to give a paragraph or one sentence explaining it and not producing the transcripts |

themselves.

MS. ELY:     Your Honor, that was the decision that was made at the time. We have

now produced the transcripts. Defense counsel clearly has adequate time

to review them.

(9/5/14 Tr. 23-24).   At no point during this conference did the Government argue that it had no

obligation to turn over even the brief and inadequate exculpatory disclosures made in its March

and November 2012 letters.

### A.    THE BUSINESS RELATIONSHIP BETWEEN MR. ESPINAL AND THE EXCULPATORY WITNESSES DOES NOT NULLIFY THE GOVERNMENT'S REQUIREMENT TO DISCLOSE EXCULPATORY INFORMATION

The Government's contention that it was under no obligation to disclose any of the

exculpatory information that is at the core of the instant motion because Mr. Espinal knows the

individual witnesses and the substance of what they might say is without merit.[2] (Gov't Opp. 56-

59). This Court must reject an interpretation of the law that would permit the Government to

avoid its *Brady* obligations in every case simply because the defendant was aware of the identity

of witnesses or was aware of the facts about which the witnesses might testify. Such an

interpretation is contrary to Supreme Court precedent and would eviscerate the Constitutional

protections that *Brady* and its progeny established. In fact, this interpretation, if it had been

adopted by the *Brady* Court, would have resulted in a decision that permitted the Government to

have suppressed the exculpatory information that resulted in the *Brady* ruling. Indeed, the

resounding similarity of the facts underlying the *Brady* decision with the facts and circumstances

---

[2]     As discussed at length below, last week the Government made yet another disclosure containing *Brady* material. This material consisted of exculpatory Grand Jury testimony of witnesses who were unknown to Mr. Espinal. Additionally, Mr. Espinal was not aware of the substance of the exculpatory testimony of these witnesses.

here is determinative on this point.

In *Brady*, the defendant – John Brady – had been convicted of first degree murder and sentenced to death. *Brady v. Maryland*, 373 U.S. 83, 84 (1963). At his trial, he conceded he was guilty of the murder but insisted that his co-defendant (who had been tried separately) was the one who actually killed the victim. Prior to trial, defense counsel requested that the prosecution disclose all of the co-defendant's prior statements. The prosecution complied, but failed to disclose one statement in which the co-defendant admitted being the actual killer. *Id.* at 84.

In its seminal decision, the Supreme Court held that the suppression of this exculpatory statement violated the defendant's due process rights under the Fourteenth Amendment. *Id.* at 86. The Supreme Court explicitly held that the prosecution *suppressed* the statement. It did not matter that the defendant knew the identity of the co-defendant; it did not matter that the defendant knew what the co-defendant would say; it did not matter that the defendant and the co-defendant were conspirators. The Supreme Court did not impose a burden on the defendant to speak with his co-defendant to ascertain the substance of what was told to the Government. Clearly, in *Brady*, the Supreme Court was concerned that the co-defendant had provided exculpatory information to the prosecution and that exculpatory information was never disclosed to the defense.

There is no difference between the facts of *Brady* and the facts here. Like Brady, Mr. Espinal knows the identities of **some** of the individuals for whom the Government disclosed exculpatory information ███████████████████████████████████; like Brady, Mr. Espinal has his own knowledge of **some** (but not all) of the exculpatory information these witnesses provided to the Government. And like Brady, Mr. Espinal did not know that these

witnesses in fact told the Government this information and that the Government failed to disclose it.

In a recent Second Circuit opinion, authored by the Honorable John Gleeson, sitting by designation, the Court found that the Government violated its *Brady* obligations based upon facts strikingly similar to the case at bar. *United States v. Triumph Cap. Group, Inc.*, 544 F.3d 149 (2d Cir. 2008). In *Triumph*, the Defendant, Charles Spadoni, was general counsel for an investment corporation, Triumph Capital Group, Inc., that handled some of Connecticut's state pension funds. He had been convicted of racketeering, racketeering conspiracy, bribery, wire fraud, and obstruction of justice related to consulting contracts given to associates of the state deputy treasurer. *Id.* at 152-53. The charges stemmed from allegations of a campaign contribution bribe between Paul Silvester, Deputy Treasurer of the State of Connecticut, and Spadoni. *Id.* Silvester, who had been an interim Treasurer, decided to run for a full term and needed to raise campaign funds. Silvester was friends with Spadoni and had helped get him hired as Triumph's general counsel. When Silvester decided to run, Spadoni, on behalf of Triumph, agreed to raise money for the Connecticut Republican Party, who in turn, agreed to contribute 70% of the monies raised by Triumph to Silvester. This circumvented the state law prohibiting investing firms doing business with the Treasurer's Office from contributing to the race for Treasurer. Silvester lost the election, but agreed to invest $150 million of state pension funds with Triumph before he left office. Before the agreement was finalized, Silvester asked Spadoni to pay two of his associates a finder's fee even though they had not acted as finders in connection with the deal. *Id.* at 153.

Following his conviction, Spadoni's counsel learned that Silvester's attorney had met

with the government in an attorney proffer and conveyed to the government the substance of notes written by Silvester with respect to **his conversations with Spadoni** regarding the finder's fee. *Id.* at 157. Silvester's notes, given to the defense by Silvester after the trial, indicated that Spadoni said that "he would not pay any finder or offer employment to anyone connected to Silvester in exchange for the deal" and that he could not advise his boss to agree to a "quid pro quo." *Id.* Silvester's notes further indicated that "he would be as helpful as possible after [Silvester] left office, but that it would have to be arm's length and make sense for Triumph." *Id.*

Spadoni moved for a new trial based in part on claims that the government suppressed this exculpatory evidence in violation of *Brady*. In response to Spadoni's *Brady* motion, the Government produced, for the first time, notes taken by an agent during the attorney proffer which contained the same exculpatory statements contained in Silvester's notes. In denying the *Brady* motion, the district court found that the agent's proffer notes were not materially different from Silvester's statements in a disclosed FBI report or testimony before the Grand Jury or at trial. *Id.* at 158. The Second Circuit disagreed and ordered a new trial. *Id.* at 152.

In its decision, the Second Circuit pointed out that there was a critical difference between the agent's notes and Silvester's later statements in that the proffer notes supported an alternative version of the conversation between Silvester and the defendant regarding the finder's fees, "**one entirely at odds with the government's theory of the case at trial**." *Id.* at 162 (emphasis added). The Court further stated, "[b]y suppressing [the agent's] notes of that proffer, the government deprived Spadoni of exculpatory evidence going to the core of its bribery case against him." Moreover, the Court made a point of noting that the evidence regarding Spadoni's

intent was "far from overwhelming." *Id.* (citing *United States v. Gil*, 297 F.3d 93, 103-04 (2d Cir. 2002) ("Where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin.")).

The facts in this case regarding the Government's suppression of *Brady* material are precisely the same as in *Triumph*. In *Triumph*, not only were the exculpatory statements made by an individual known to the defendant and with whom he conducted business, but the substance of his statements pertained to a conversation he had directly with the defendant. Moreover, as in *Triumph*, the exculpatory materials that have been withheld by the Government in this case are entirely at odds with the Government's theory of the case – precisely why we were surprised when the Government informed us on the eve of trial that it was not intending on calling any of the alleged "straw investors." There is no distinction between what the Second Circuit found to be clear *Brady* information in *Triumph* and the exculpatory information the Government intentionally withheld in this case. Further, as in *Triumph,* the evidence against Mr. Espinal is razor thin, thus heightening the materiality of its being withheld.

Similarly, in the Senator Theodore Stevens case, one of the withheld pieces of information related to Rocky Williams, a non-testifying witness, who provided statements to the Government regarding conversations he had with Senator Stevens. The conversation in question related to Senator Stevens' statements to Williams that he "wanted to make sure that he paid for the renovations [to his home], and therefore wanted to have a contractor he could pay." Department of Justice, Office of Professional Responsibility Report, dated August 15, 2011 ("OPR Report")[3], at 350. Senator Stevens' intent to pay for the renovations himself (as opposed

_____

[3]     A copy of this report, detailing OPR's investigation of alleged prosecutorial misconduct with respect to the

to receiving them for free, which the Government had alleged), was a key issue at trial. After

Senator Stevens' case was dismissed upon motion by the Government, the Department of

Justice's Office of Professional Responsibility ("OPR") conducted its own investigation of the

trial prosecutors' conduct. OPR determined that the failure of the Government to disclose

Williams' statements was a clear violation of "the government's constitutional *Brady*

obligations." OPR Report at 352. Again, notwithstanding the fact that Senator Stevens was

present for the conversation with Williams, and obviously would have known about the

substance of what he said to Williams, OPR, in accordance with the clear direction of *Brady*,

determined that the Government's failure to disclose this information violated its *Brady*

obligations. *See also United States v. Gil*, 297 F.3d 93, 96, 106 (2d Cir. 2002) (Government

suppressed exculpatory memo detailing a meeting **between the defendant** and the author which

was consistent with the defendant's defense); *Gantt v. Roe*, 389 F.3d 908 (9th Cir. 2004)

(holding that the Government suppressed information notwithstanding that "the defense could

and should have discovered it itself"); *Wilson v. Beard*, 589 F.3d 651, 663 (3d Cir. 2009)

(Government suppresses *Brady* information by not disclosing Government witness' criminal

history even though the history may be publicly available).

    That Mr. Espinal knew of the identities of these individuals whose statements the

Government failed to disclose, or the general substance of what they might say to the

Government, if questioned, is wholly irrelevant. *Brady* and its progeny place the burden

squarely on the Government to disclose exculpatory evidence to the defense, regardless of what

the Government believes the defendant knows or should know. This obligation must be strictly

---

prosecution of the Senator Stevens case, is available at www.leahy.senate.gov/imo/media/doc/052412-081511Report.pdf.

11

complied with, certainly in a case such as the instant one where the withheld exculpatory **information bears directly on guilt or innocence**, and creates significant doubt about the Government's entire theory of money laundering.

## B. MR. ESPINAL HAD NO KNOWLEDGE REGARDING THE SOURCE OF THE FUNDS PROVIDED TO HIM BY ANY OF THE ALLEGED "STRAW INVESTORS"

The Government argues that it "believes and has always believed that the pretrial disclosures made in this case were fully adequate to advise Espinal of any exculpatory information or witnesses who may have exculpatory information **otherwise unknown to Espinal, at a time when the defense was able to pursue that information in a timely manner.**" (emphasis added) (Gov't Opp. 2). This statement could not be further from the truth.

While Mr. Espinal knew the identity of the individuals from whom he received checks related to FFH, **he certainly did not know, nor did he have any reason to know, the source of those funds**, aside from the fact that they did not come from him. Certainly ▮▮▮▮ testimony regarding the names of individuals who were the sources of the funds and that none of the individuals had any connection to Mr. Espinal, was clear *Brady* material, unknown to Mr. Espinal, that should have been turned over **at that time, in 2012.**

## C. THE GOVERNMENT WITHHELD ADDITIONAL *BRADY* MATERIAL

Equally as troubling was to learn just last week that in 2012, the Government also was in possession of the Grand Jury testimony of a number of these sources of funds, all of whom corroborated ▮▮▮▮ testimony, and **none of whom had any connection to Mr. Espinal**.

On October 10, 2014, the Government served the defense with its opposition to the instant motion. When informed by e-mail that the opposition papers were ready to be served, the

12

Government also informed us that, once again, there were additional materials that they were going to produce. This time, the Government's explanation for the production was simply "to avoid any further disruptions." (Gov't Opp. 3). The Government did not describe the nature of the materials that were going to be produced. We received the production on Saturday, October 11, 2014, and it included interview notes and Grand Jury testimony for additional, previously unidentified prospective witnesses whom the Government informed us it does not intend to call as trial witnesses. Astonishingly, this most recent production yet again contained additional, intentionally withheld *Brady* material.

As the Court will recall, ████████████████████████████████

████████████████████████████████████████████████████████

One issue raised in the instant motion was that, in addition to providing this exculpatory testimony, ██████ provided the specific names of a number of individuals who had either loaned ██████ money to pay Mr. Espinal or had loaned ██████ money to pay back those individuals. During the September 5, 2014 conference before the Court, Mr. Gottlieb, ████████████████████ ████████████, described how ██████ obtained the cash to fund his checks to FFH ████████. Specifically, Mr. Gottlieb stated:

> ██████████ says the money that he is paying to Fly Fisherman Heaven and to other related Espinal companies was not based on cash received from Espinal or drug individuals, your Honor. In fact, they gave a list, specific names, and the reasons why they went to these specific individuals, who then loaned them money, and they then used that money, or they paid that money to ██████, and it was that money they used to pay the checks to Fly Fisherman. Now, they also talked about receiving cash from people having nothing to do with Mr. Espinal or Mr. Rodriguez.

(9/5/14 Tr. 13). The Government did not respond to Mr. Gottlieb's statements regarding other

individuals who █████████████████████████████████████████

Unbelievably, as indicated above, included in this most recent production of documents was the 2012 Grand Jury testimony of **four** individuals, **four sources of** ██████████, each of whom corroborated the statements made by █████████████████. Despite its knowledge that these witnesses had provided exculpatory evidence to the Grand Jury and had confirmed that █████ source of money to cover his checks to FFH and █████ was legitimate and not from either Mr. Espinal or Rodriguez, the Government remained silent in Court. Even when Mr. Gottlieb specifically directed the Court's attention to █████ having testified about the specific sources of the money he paid to FFH and █████, the Government remained silent.

What follows is the most recent *Brady* information received last week, in pertinent part, from the testimony of these witnesses:







Based upon the Grand Jury testimony ███████████, we now know that within weeks of ████████ Grand Jury testimony, the Government had corroborated his statements regarding the cash he received from ████████ to repay Mr. Espinal.  The Government, however, chose to withhold this exculpatory material from the defense until the day it filed its opposition papers to

---

the motion to dismiss – and again refused to acknowledge it as *Brady* material.







Q: 

Despite the fact that ▮▮▮▮ corroborated ▮▮▮▮ testimony and provided exculpatory evidence regarding the cash paid to ▮▮▮ at the time ▮▮▮ wrote checks to FFH and ▮▮▮, the Government deliberately chose to conceal this evidence from the defense.

In addition to borrowing cash from individuals having nothing to do with Mr. Espinal in order to repay his loans from Mr. Espinal, ▮▮▮ also borrowed money to repay those individuals. One such person was ▮▮▮▮▮▮.



21





, provides direct evidence that, contrary to the Government's repeated representations, ████ was not given Rodriguez's drug money in exchange for the checks he wrote to FFH and ████. These witnesses clearly establish that Mr. Espinal was not the source of any of the money that ████ paid to FFH and was not laundering money through ████ There is no excuse, and no lawful basis for the Government's flagrant disregard of its obligation to turn over this very clear *Brady* material.

████ further testified that in addition to borrowing money, he also used rental income to pay back the people who had loaned him money to pay Mr. Espinal. Specifically, ████



At the time ▮▮▮ testified before the Grand Jury the Government had already questioned ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, who testified before the Grand Jury on February 14, 2012. ▮▮▮▮▮▮ testimony, in fact, corroborated ▮▮▮ statements with respect to receiving cash through rental income. Specifically, ▮▮▮▮ testified:

Additionally, ▮▮▮▮▮▮ also testified that he personally delivered cash to Mr. Espinal on four occasions, between June and August 2011, on behalf of ▮▮▮ as repayment for ▮▮▮▮▮ had borrowed from Mr. Espinal. (Ex. RR, at 26-28). This again corroborates that ▮▮▮▮▮▮▮▮ had a history of borrowing money from Mr. Espinal and

---

[8] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

undermines the Government's erroneous theory that Mr. Espinal simply used ████████ to launder Rodriguez's drug money.

The testimony of these four witnesses, all of whom corroborated ██████ testimony and provided independent exculpatory evidence, constitutes clear, unequivocal *Brady* material. The Government has stated all along that the money that Rodriguez (via Mr. Espinal) was the source of the cash that was deposited into ██████ accounts prior to his writing checks to FFH and ██████ As with all of the alleged "straw investors," this goes directly to the heart of the Government's theory regarding Mr. Espinal's alleged money laundering. Now, in addition to ██████ stating unequivocally that NONE of the money used to write checks to FFH and ██████ came from Mr. Espinal or Rodriguez, we now have the specific sources of those funds, individuals unknown to Mr. Espinal, testifying under oath that they gave cash to ██████ In view of this additional, intentionally withheld *Brady* material, the Government's one sentence *Brady* disclosure dated November 21, 2012, omitting any of this information, is even more disturbing. (Ex. T).

There is nothing to support the Government's suggestion that Mr. Espinal knew or could have known about the exculpatory information provided by the individuals who testified in the Grand Jury confirming that they were the legitimate sources of ██████ funds. The fact that Mr. Espinal had a business relationship with ████ does not impute all of ██████ knowledge to Mr. Espinal, as the Government implies. Mr. Espinal was not aware of those individuals; the Government has no information to the contrary.

The seriousness of the Government's failure to disclose this exculpatory information is exacerbated by the Government's repeated representations of its theory that Mr. Espinal

laundered Rodriguez's drug money through "straw investors" – including ▮▮▮ – while all the time having in its possession clear exculpatory evidence to the contrary in both Grand Jury testimony and proffer statements. Knowing full well that this evidence was contrary to its theory of the case, the Government continued to espouse its theory as fact without disclosing the existence of exculpatory testimony to the contrary.

### D. THE GOVERNMENT'S SUMMARY *BRADY* DISCLOSURES WERE MISLEADING, INACCURATE AND OMITTED CRITICAL EXCULPATORY INFORMATION

In its response, and from the onset of this case, the Government repeatedly assured the Court and defense that it would both comply with its *Brady* obligations and that it had fully discharged those obligations, when, in fact, it had done neither. In its very first discovery letter to defense, dated January 13, 2012 (almost three years ago), the Government represented that it

> recognizes its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. To date, the Government is unaware of any Brady material regarding your client, but will provide timely disclosure if any such material comes to light. The Government will provide material under Giglio v. United States, 405 U.S. 150, 154 (1972), and its progeny, in a timely manner.

(A copy of the Government's letter to defense, dated January 13, 2012, is attached hereto as **Exhibit UU**). To re-read the Government's assurance that it is "unaware of any *Brady*" information as of the date of the letter in light of what we now know is especially troubling. Based on the *Brady* information recently turned over, the Government's statement was a blatant misrepresentation. As set forth above, prior to the January 13, 2012 notice, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ all had supplied the Government with clear *Brady* information. The Government did not disclose the totality of that *Brady* information until it disclosed ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, more than two and a half years later, and the

Government's interview notes of ████████████████ on September 17, 2014.

To the extent that the Government now suggests that it was not obligated to disclose this exculpatory material because it believed the witnesses were lying, this argument has been squarely rejected by the Second Circuit. *See DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006) ("[I]f there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel-and not of the prosecution to exercise judgment in determining whether the defendant should make use of it."). Pursuant to *Brady*, the Government was required to disclose all exculpatory information in its possession. For almost three years, the Government failed to satisfy those requirements.

The Government's violation of its constitutional mandate to disclose exculpatory information was not remedied by its two subsequent minimal summary *Brady* letters, dated March 16, 2012, and November 21, 2012. Based upon what has now been disclosed to the defense, those summaries were grossly incomplete and misleading. As such, the summaries continued the Government's misconduct.

    1. ████████████████

    With respect to ██████ the Government disclosed on November 21, 2012, that

    ████████████, who testified in the grand jury pursuant to a grant of immunity, has
    stated in sum and substance and in part that a **<u>substantial</u>** portion of the money
    that he and companies controlled by him paid to the defendant, ████████████
    ████████ and to others whom the defendant identified in or about the first half of
    2010 constituted repayment of a $100,000 loan the defendant had secured through
    a mortgage on 871 Bruckner Blvd.

(Ex. T) (emphasis added).

Here, the Government misled the defense on several key points. First, ██████ did not testify that a "substantial" portion of the money he repaid to Mr. Espinal constituted a repayment

of the $100,000 loan, but that **all** of the money he paid constituted the repayment of the $100,000 loan. (Ex. A, at 119). Based upon the Government's disclosure, the defense was left with the erroneous impression that although ██████ had testified that some of the money he paid to ██████ and others was not repayment of a loan, the clear implication was that ██████ had testified that at least some of the money was Rodriguez's drug proceeds.

Significantly, the Government's disclosure omitted the fact that ██████ testified at length and in great detail regarding the **sources** of all of the funds that he used to repay Mr. Espinal – information about which, as discussed above, Mr. Espinal would have no reason to know. Not one of those sources included Rodriguez or Mr. Espinal as part of the money laundering conspiracy alleged by the Government.[9]

    2. ██████████████

On March 16, 2012, the Government disclosed the following with respect ██████ ██████:

> ██████████ has stated, in substance and in part, that he believed all cash he was paid in connection with developing the FlyFisherman's Heaven acreage in Sullivan County was from Espinal, and had no awareness that Manuel Rodriguez was Espinal's partner.

(Ex. S).

Here, the Government misled the defense with this disclosure because it omitted a key point of his testimony, namely that ██████ directed Mr. Espinal to pay him cash and in what increments. From the onset of this case, the Government's theory of money laundering included the payment of cash in small amounts to various individuals, including ██████, the contractor

---

[9] As discussed above, at the time of this disclosure, the Government was in possession of the Grand Jury testimony of a number of the sources of the monies ██████ paid with respect to FFH, all of which the Government intentionally withheld.

performing work at FFH. The Government's attempt now to deny that this was part of its money laundering theory as it pertains to ██████ is contrary to what is clearly conveyed in the search warrant affidavits of both Agents Callaghan and Samuels, who stated the following:

> Other wiretapped telephone calls . . . and other evidence, including bank records supplied by the contractor who began development of the FFH land tract in Sullivan County after its purchase by FFH, show that ESPINAL and Rodriguez paid the contractor for his services by delivery, through ESPINAL, of large amounts of cash.

(Ex. KK, ¶ 14 [Callaghan]; Ex. JJ, ¶ 16 [Samuels]). **What possible reason would the agents have made this statement but to convey the point that both Mr. Espinal and Rodriguez engaged in money laundering by paying ██████ in "large amounts of cash?"** While on its face, there is nothing false contained in the aforementioned paragraph, it is clear that the agents were inviting the Court to conclude that it was Mr. Espinal and Rodriguez's joint decision to pay ██████ in cash as part of the money laundering conspiracy. What is disturbing is to have learned that at the time of these search warrant applications, both Agents Samuels and Callaghan were aware that ██████ had testified before the Grand Jury that it was *he* who insisted that Mr. Espinal pay him weekly, in cash, and in amounts determined by ██████. (Ex. B, at 22-25). This testimony was never provided to any court for consideration of any search warrant applications.

The Government's intention to proceed on the theory of money laundering based on the payments in cash and in small amounts is further underscored by both its August 8, 2014 letter to the defense providing expert notice as to its money laundering expert, Agent Stephen Robinson, as well as its response to our motion to preclude this expert. The Government stated that Agent Robinson would provide testimony regarding the meaning of financial structuring, as well as the methods by which it is accomplished. (*See* Government's letter to defense, dated August 8,

2014, attached hereto as **Exhibit VV**, and Government's Opposition to Defendant's Motion *in Limine* to preclude Government Expert [Dkt No. 1603]).

Although the Government confirmed that it would not call ▓▓▓ as a witness, it did mark his bank records as a trial exhibit. Obviously, there would be no relevance to ▓▓▓▓ bank records to show that Mr. Espinal "endeavored to hide Rodriguez's true involvement in the deal from ▓▓▓..." as now alleged by the Government. (Gov't Opp. 22). Furthermore any suggestion that the Government only intended to prove that Mr. Espinal endeavored to hide Rodriguez's involvement from ▓▓▓ is undermined by even a cursory review of the numerous wiretapped telephone conversations that reflect the constant communication between ▓▓▓ and Rodriguez and the many references to Rodriguez in conversations between Mr. Espinal and ▓▓▓. It is readily apparent that the Government's intention all along has been to use ▓▓▓▓ bank records to show a pattern of small cash deposits in conjunction with the testimony of Agent Robinson regarding the meaning and methods of financial structuring, to prove that Mr. Espinal was laundering Rodriguez's money through ▓▓▓.

What is beyond comprehension and inexcusable is that had the defense not insisted that ▓▓▓ Grand Jury testimony be turned over, the Government would have presented a false theory of money laundering to a jury, all the while knowing that ▓▓▓ was the one who insisted on cash payments and in what denominations.

The Government now has the audacity to state that it "voluntarily agreed to provide the Grand Jury transcripts" because "the trial was quickly approaching." (Gov't Opp. 51). That is not the reason. The Government well knew that an *in camera* inspection of the records would have resulted in it being ordered to turn them over to the defense. The only reason the

30

Government has now altered its theory of the case is because it would otherwise have to admit both that it intended to present false evidence at trial and that it failed to produce *Brady* information as required.

One need only refer to the Government's *Brady* disclosure of March 16, 2012, to confirm that the Government's intention had never been to argue only that Mr. Espinal attempted to conceal Mr. Rodriguez's involvement from ███. If that were the case, then ███ claimed lack of awareness as to Rodriguez's involvement would be inculpatory rather than exculpatory. Yet, the Government disclosed that information as *Brady* in March 2012. (Ex. S).

The Government's attempt to claim that ███ Grand Jury testimony is not *Brady* because the defense was merely "speculating" as to the Government's theory is yet another example of its refusal to acknowledge any wrongdoing in connection with its *Brady* obligations.

3. ████████████████████████████████

Also in its March 16, 2012 letter to defense, the Government disclosed the following with respect to ████████████████████████:

> [The Government hereby advises you that ████████████████████
> ███ have stated, in substance and in part, that various funds they provided
> to Fly Fishermen's Heaven LLC and to Jose Espinal and various other companies
> with which Espinal is affiliated constituted loans to Espinal. ████████████
> ███ have further stated that they received no repayments for those loans,
> either in cash or otherwise, and that they received no cash payments for work
> performed at 131st Street townhouse.

(Ex. S).

Here, the Government misled the defense with this disclosure because the Government omitted and ignored additional clearly exculpatory information in its possession since November 2011: (1) ███ told Mr. Espinal that they needed a promissory note in 2011 (which until

31

recently, the Government alleged that Mr. Espinal created in an attempt to obstruct its investigation); (2) the expected interest rate on the loan to Washington Heights Parking was 5%; (3) if the loan was not paid back, Espinal was supposed to give them a contract to pay back; (4) ███████████ had paperwork relating to these transactions; and (5) Mr. Espinal never paid back the loans. (Exs. G and J).

All of this information is relevant and exculpatory and yet, the Government thought it was suitable to provide the defense with a two-sentence summary omitting all of that information. More disturbing, until recently, the Government maintained that Mr. Espinal had created a fake promissory note in an effort to obstruct justice. It did so despite possessing information from the individuals involved that they requested the note, not Mr. Espinal, and that the promissory note was indeed legitimate. Furthermore, the Government has consistently alleged that Mr. Espinal utilized ████████████████████ as alleged "straw investors," which is contradicted by both documentary evidence and these individuals' statements. These false and misleading representations, therefore, call into question how the defense ever could have understood the relevance of these sparse and incomplete disclosures.

Critically, in none of the cases cited by the Government did the Government mislead the defense to the extent found here by providing inaccurate or incomplete *Brady* disclosures. Rather, in those cases, the Government simply disclosed that the defendant may want to speak with a particular witness because that witness may provide exculpatory information (*see, e.g., United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988); *United States v. Shamsideen*, No. 03-CR-1313, 2004 WL 1179305, at *5 (S.D.N.Y. Mar. 31, 2004); *United States v. Upton*, 856 F.Supp. 727, 751 (E.D.N.Y. 1994); *United States v. Oshatz*, 700 F.Supp. 696, 698 (S.D.N.Y.

1988)); or the Government provided no disclosures at all with respect to the challenged information (*see, e.g., United States v. Restrepo*, 547 Fed.Appx. 34, 42-43 (2d Cir. Nov. 27, 2013); *United States v. Zagari*, 111 F.3d 307, 320 (2d Cir. 1997); *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990); *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1983); *Harris v. United States*, 9 F.Supp.2d 246, 276 (S.D.N.Y. 1998)). But in the instant case, as discussed herein, the Government did provide disclosures, disclosures upon which the defendant was entitled to rely, and further represented that it was aware of its *Brady* obligations and was discharging them accordingly. The fact that the Government provided specific and substantive disclosures and that those disclosures were misleading and incomplete clearly distinguishes Mr. Espinal's case from the facts of the authorities cited by the Government.

### E. THE DEFENSE RELIED UPON THE GOVERNMENT'S MISLEADING REPRESENTATIONS REGARDING THE RELEVANT *BRADY* INFORMATION

A defendant may reasonably rely on the Government's *Brady* disclosures in making strategic trial and investigative decisions. Accordingly, where the Government has disclosed *Brady* information and represents that there is no additional *Brady* information, the defendant "cannot be faulted for relying on that representation." *Banks v. Dretke*, 540 U.S. 668, 694 (2004); *see also Jefferson v. United States*, 730 F.3d 537, 545-46 (6th Cir. 2013) (rejecting district court's determination that because the defendant suspected that there were undisclosed promises between the Government and trial witnesses, his "failure to seek information from the cooperating witnesses themselves or their acquaintances or his failure to seek sentencing records – which the prosecutor had sealed – rendered his diligence insufficient;" the Government repeatedly maintained that it had disclosed all *Brady* information and the defendant was entitled

to rely on those representations); *Gantt v. Roe*, 389 F.3d 908, 913 (9th Cir. 2004) (holding that the Government had suppressed exculpatory information and noting that the defendant had relied "on affirmative representations by the prosecution that it was keeping the defense apprised of developments in the investigation").

Similarly, the Government's disclosures may not be misleading. *See United States v. Anzeulotto*, No. 93-CR-1316, 1996 WL 31233, at *5 (E.D.N.Y. Jan. 19, 1996); *see also United States v. Thomas*, 981 F.Supp.2d 229, 240 (S.D.N.Y. 2013) (holding that where the Government provided inaccurate information, it was not the defendant's duty to "fact-check" the Government as that "would turn due process on its head"). If the Government discloses exculpatory material, but then informs the defendant that it will not be helpful to the defense at trial, it has, in effect, nullified its initial disclosure. *See id.* (internal citations omitted); *see also United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (holding that the Government's disclosures were inadequate and misleading under *Brady* because the Government told the defendant that the information would be of no value to the defense).

Accordingly, here, because the Government notified the defense as early as January 13, 2012, that it was aware of and would comply with its *Brady* obligations, and the Government subsequently disclosed *Brady* information (albeit incomplete and misleading), the defense reasonably relied on the Government that those disclosures were the totality of the exculpatory information in the Government's possession.

Over the course of these proceedings, the Government has consistently asserted its theory of its case in open court and in court filings that Mr. Espinal laundered Rodriguez's drug money through "straw investors" and the contractor, ███████ It was entirely reasonable for the defense

to trust that the Government had a good faith basis, based on evidence, for its theory of the crime. It was entirely reasonable for the defense to conclude that individuals were cooperating with the Government and would be called to testify that they were the "straw investors" used by Mr. Espinal to launder Rodriguez's money. Our suspicions appeared to be confirmed when the Government notified us that ███ had testified in the Grand Jury with a grant of immunity, and that the Government had met with ██████████████.

Everything changed, however, on the eve of trial, August 25, 2014, after 3500 material was turned over to the defense and we learned that none of the "straw investors" were going to be called as Government witnesses. Everything changed once we subsequently learned why none of the "straw investors" were going to testify; they had exculpated Mr. Espinal and the Government hid that from the defense.

The Government's misleading and incomplete *Brady* disclosures also serve to nullify the effects of those disclosures. *See Anzeulotto*, 1996 WL 31233, at *5 (holding that government's *Brady* disclosure to the defense were inadequate when it provided misleading description of the contents of tapes which it disclosed to the defense). Here, as set forth above, not only did the Government provide a misleading and insufficient summary description of the *Brady* information; it omitted significant exculpatory statements from Grand Jury testimony and interview notes. Additionally, the Government has consistently informed the defense and the Court that it believes the witnesses relating to its *Brady* disclosures lied in the Grand Jury. Quite reasonably, the defense, in response to that representation, believed the *Brady* disclosures to be of little practical use until the 3500 material and Grand Jury testimony recently revealed otherwise. This flagrant Government misrepresentation about the usefulness of this material

negated the effect of its limited *Brady* disclosures. *See Anzeulotto*, 1996 WL 31233, at *5;

*Shaffer*, 789 F.2d at 690.

The fact that the Government chose to disclose information to the defense in summary

form rather than produce the source documents themselves demonstrates why it is wholly

inappropriate to engage in such a practice. As the *Stevens* Court noted

> I, therefore, urge my judicial colleagues on every trial court everywhere to be
> vigilant and to consider entering an exculpatory evidence order at the outset of
> every criminal case, whether requested to do so or not, and to require that the
> exculpatory material be turned over in a useable format because as we've seen in
> this case, the use of summaries is an opportunity for mischief and mistake[.]

(Ex. MM, at 7-8). *See also United States v. Poindexter*, No. 88-0080, 1990 U.S. Dist. LEXIS

2023, at *1-2 (D.D.C. Mar. 5, 1990) ("The Government is unable to cite a single decision in

which a summary of the exculpatory information has been held sufficient to meet Brady

obligations. On the contrary, it is clear that the common practice is for the government to

produce the documents themselves."); *United States v. Brown*, 650 F.3d 581, 591-92 (5th Cir.

2011) (holding that exculpatory material of two non-testifying witnesses was suppressed for

*Brady* purposes from Government's summary disclosure letters of interview notes, but finding

that the withheld evidence was not material).

To the extent that the Government suggests that Mr. Espinal had a "due diligence"

requirement to speak with these individuals based upon the Government's misleading *Brady*

disclosures, such a requirement was foreclosed by the Supreme Court. *See Banks v. Dretke*, 540

U.S. 668 (2004). The Sixth Circuit's recent holding in *United States v. Tavera* discussing *Banks*

is particularly instructive. 719 F.3d 705 (6th Cir. 2013). In *Tavera*, the Sixth Circuit flatly

rejected the same argument raised by the Government here. *Id.* at 712. In *Tavera*, the defendant

had been arrested along with several other individuals as part of a governmental sting operation related to the transport and distribution of methamphetamine. The defendant, who was legitimately employed in the construction industry, had been a passenger in a vehicle driven by Placido Mendoza. The defendant maintained that he and Mendoza were traveling to view a construction project for possible future work. Law enforcement eventually stopped and searched the vehicle and found a large quantity of methamphetamine, of which the defendant disclaimed any knowledge. *Id.* at 708.

The Government arrested the defendant, Mendoza and several other individuals. Everyone but the defendant pled guilty; the defendant went to trial and was convicted. Mendoza did not testify. After trial, the defendant learned that prior to trial, Mendoza met with the Government several times for purposes of plea agreement negotiations. During the initial meeting, Mendoza told the Government that the defendant had no knowledge of the drugs in the vehicle. At the second meeting that same day, Mendoza told the Government that the defendant knew about the drugs, but did not find out about them until they got in the vehicle that day. Mendoza steadfastly maintained that the defendant did not accompany him to count money or provide security and that there was a legitimate construction job waiting at their destination. Mendoza's plea agreement reversed his initial position, however, and stated that the defendant had knowledge of the drugs and agreed to accompany Mendoza. The Government never disclosed to the defendant or his attorney the substance of Mendoza's exculpatory statements. *Id.* at 708-10.

In holding that "[t]his particular case [was] not close," the Sixth Circuit held that the Government unconstitutionally **suppressed** this exculpatory information from the defendant. *Id.*

at 708. The Sixth Circuit rejected the Government's argument that the defendant should have

exercised "due diligence" and discovered the statements the co-defendants made to the

Government.

> This "due diligence" defense places the burden of discovering exculpatory
> information on the defendant and releases the prosecutor from the duty of
> disclosure. It relieves the government of its Brady obligations. In its latest case
> on the issue, however, the Supreme Court rebuked the Court of Appeals for
> relying on such a due diligence requirement to undermine the Brady rule.
> In Banks v. Dretke, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), the
> Court considered the Fifth Circuit's use of a due diligence requirement to dismiss
> the defendant's Brady claim. As in this case, the diligence question in Banks was
> whether the defendant "should have asked to interview" a witness who could have
> furnished the exculpatory evidence the prosecutor did not disclose. The Supreme
> Court rejected this requirement in no uncertain terms[.]
>
> . . .
>
> Prior to Banks, some courts, including the Sixth Circuit, as our dissenting
> colleague argues, were avoiding the Brady rule and favoring the prosecution with
> a broad defendant-due-diligence rule. But the clear holding in Banks should have
> ended that practice.
>
> The Supreme Court's rejection of the idea that the "prisoner still has the burden to
> discover the evidence" is based in part on the fact that the prosecution has the
> advantage of a large staff of investigators, prosecutors and grand jurors, as well as
> new technology such as wiretaps of cell phones. That is one of the reasons that
> these investigators must assist the defendant who normally lacks this assistance
> and may wrongfully lose his liberty for years if the information they uncover
> remains undisclosed. The superior prosecutorial investigatory apparatus must
> turn over exculpatory information. The Brady rule imposes an independent duty
> to act on the government, like the duty to notify the defendant of the charges
> against him.

*Id.* at 711-12.

Just as in *Brady*, the information suppressed in *Tavera* is the same type of information the

Government intentionally suppressed here. Individuals the Government alleges were Mr.

Espinal's co-conspirators provided the Government with clear exculpatory information, some of

which Mr. Espinal might reasonably have already known, yet the Government made the conscious decision not to disclose that information to defense. Like *Tavera*, this case is "not close." Mr. Espinal has no obligation to make efforts to speak with these witnesses. If the Government has exculpatory information in its possession, it must disclose that to the defense.

Under the Government's misaligned theory of *Brady*, even where the witnesses refuse to speak with defense – **as is the case here** – the Government is still not under an obligation to disclose the exculpatory information. Instead, <u>according to the Government</u>, the defense should just call these witnesses to testify at trial and see what they have to say. It is a fundamental constitutional principle that a defendant is not required to present a defense; rather, the Government bears the burden at a criminal trial of establishing every element of every charged offense beyond a reasonable doubt. The Government's arguments however, would turn those sacred principles on their head. The Government's interpretation would force a defendant charged with crimes to present witnesses at trial-without any confidence that the witnesses would testify truthfully, and not knowing what they would say, while at the same time, the Government has in its possession those very witnesses' exculpatory statements. There can be no view that this was the interpretation of the constitutional requirement to turn over exculpatory information envisioned by the Supreme Court in *Brady*.

Accordingly, disclosure of the witnesses' prior exculpatory statements in the possession and control of the Government, under facts that are present in this case, is crucial in order for a defendant to realize the guarantee of a fair trial consistent with due process of law. Witnesses' exculpatory statements can be used in many ways, not the least of which includes refreshing a witness' recollection or for impeachment. *Cf. Grossman*, 843 F.2d at 85 (noting that defendant

had waived argument that he needed Grand Jury transcripts in order to impeach non-testifying witness by not raising it below). A defendant should not be required to call a witness blind when the Government is in possession of that witness' exculpatory statements.

The interpretation advanced by the Government also conflicts with the Department of Justice's own internal policies governing the disclosure of exculpatory information. *See* United States Attorneys' Manual, § 9-5.001(B)(1) ("Recognizing that it is sometimes difficult to assess the materiality of evidence before trial, prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence.") (citing *Kyles v. Whitley*, 514 U.S. 419, 439 (1995)); § 9-5.001(E) ("Where it is unclear whether evidence or information should be disclosed, prosecutors are encouraged to reveal such information to defendants or to the court for inspection in camera and, where applicable, seek a protective order from the Court. By doing so, prosecutors will ensure confidence in fair trials and verdicts."). Here, the Government has done the exact opposite of what is set forth in its own Manual – it has intentionally withheld substantial *Brady* information for almost three years.

## II. THE GOVERNMENT'S MISCONDUCT IN THIS CASE WARRANTS A *FRANKS* HEARING

Contrary to the Government's contention, Mr. Espinal has presented sufficient evidence to establish the requisite "substantial preliminary" showing warranting a *Franks* hearing with respect to each of the Warrant Applications.[10] The breadth and scope of the recently disclosed exculpatory evidence that the Government had in its possession at the time it submitted the Warrant Applications, yet failed to disclose to the authorizing courts, wholly demonstrates that

---

[10] "Warrant Applications" refers to the search warrant and wiretap application as defined in Mr. Espinal's moving papers. (Def. Mot. 66).

the Government has engaged in a pervasive, ongoing practice of withholding key information from the Warrant Applications and inserting misinformation. (Def. Mot. 29-37; 66-69). A *Franks* hearing is thus necessary to address these inaccuracies and to make a determination regarding whether any evidence must be suppressed. We respectfully submit that, based upon what we now know, the suppression of evidence is justified in this case.

At the outset, Mr. Espinal has not waived his right to move for a pre-trial hearing with respect to this motion to suppress. Indeed, he could not have asserted the basis for relief set forth in his Motion before now. The facts giving rise to Mr. Espinal's uncovering of the inaccuracies and omissions and misleading content of the Warrant Applications were only just disclosed to the defense – through the Government's recent, but grossly untimely *Brady* disclosures. Once enough information was gathered, Mr. Espinal submitted the instant motion. The receipt of new information, which forms the basis for a motion to suppress after the motion deadline imposed by the trial court, justifies a belated motion pursuant to Rule 12 of the Federal Rules of Criminal Procedure. *See, e.g., United States v. Tracy*, No. 94-CR-142S, 1995 WL 522807, at *3 (W.D.N.Y. Aug. 24, 1995) (considering motion to suppress filed five days before trial because motion was based upon Government's disclosures of 3500 material); *United States v. Beras*, 131 Fed.Appx. 313 (2d Cir. Mar. 31, 2005) (affirming denial of Rule 12 relief but noting that "receiving the materials relevant to his . . . claim during trial might have explained his failure to file for Rule 12 relief *before* trial, it cannot explain his failure to file before the verdict . . .") (emphasis in original).[11]

---

[11]   The Government does not assert that denying to address the motion to suppress would not prejudice Mr. Espinal, the second piece of the analysis in determining whether to allow a defendant to file a motion to suppress after a deadline imposed by the court. *United States v. Howard*, 998 F.2d 42, 52 (2d Cir. 1993). Nor could the Government seriously make such an argument. A substantial quantity of the Government's

It is clear from the progression of the Government's Warrant Applications that the

Government held a certain theory regarding Mr. Espinal's purported involvement in Rodriguez's

activities and, even when faced with contrary factual information, the Government continued to

make the same misrepresentations in the Warrant Applications.

For example, in the very first Warrant Application – Agent Samuels' Wiretap Affidavit,

dated September 23, 2010 – the Government explicitly stated that it believed that ▓▓▓ was

involved in the alleged money laundering activity, notwithstanding the complete and utter

absence of evidence to support that contention. (Ex. HH, ¶ 45(b)).

In the next round of search warrants, dated December 8, 2011, December 12, 2011, and

December 20, 2011, Agents Samuels and Callaghan identified a list of individuals and

companies alleged to be the "straw investors" laundering Rodriguez's money. This list included

entities controlled by, among other individuals, ▓▓▓▓▓▓▓▓▓▓▓▓▓. (Ex. II,

¶ 15). The agents further alleged that the "sole source of funding for the FFH project" was

Rodriguez. (*Id.* at ¶ 16). The agents omitted, however, that before they submitted their

affidavits, the Government had already met with several of the alleged "straw investors" who

had informed the Government that they had loaned their own money to Mr. Espinal for the FFH

project and that Mr. Espinal had not paid them back. (*See* Exs. G, J). Accordingly, and directly

contrary to the agents' affidavits, Rodriguez could not have been the "sole source" of funding for

the FFH project. Indeed, and as set forth in detail in the Motion, the agents had absolutely no

evidence or factual support for their contentions that Mr. Espinal was laundering Rodriguez's

---

pre-marked trial exhibits include intercepted phone calls from Mr. Espinal's cell phone as well as materials
obtained pursuant to the executed search warrants. Clearly, the Government believes the evidence is useful
for its case.

drug money through these "straw investors."

Then, in the final search warrant application, dated August 7, 2014, Agent Callaghan asserted that the straw investors were "themselves funded by Rodriguez's money." (Ex. LL, ¶ 12). Yet, Agent Samuels again did not inform the Court of the contrary information provided ██████████████████████. Nor did the agent inform the Court that by this time, ████████ all of the sources of the funds ██████ used to pay Mr. Espinal, had each testified in the Grand Jury that all of the payments were legitimate. This glaring omission and misrepresentation to the Court, in light of the fact that for years the Government alleged ██████ involvement in the money laundering conspiracy, cannot go without consequence.

The Government's attempts to provide a "good faith" basis for the agents' allegations fall flat. Notably, the Government's response fails to address any of the omissions or misstatements raised by the defense in the moving papers. However, none of the witnesses upon whom the Government purportedly relied to support its conclusions in the Warrant Applications (*i.e.*, ██████████████████████) were the actual alleged "straw investors." ██████ was not associated with any of the "straw investors." ██████████████████ were only related to the "straw investor" ██████, and, in fact, they only told the Government that they received cash on behalf of ██████ from Mr. Espinal. The Government had no evidence to connect that cash with Rodriguez, and we now know that that cash came from ██████████ and not Rodriguez. (*See* Section III, B). Moreover, the Government had no basis to include allegations regarding ██████████████████████ and all of their respective entities, all of whom confirmed that were either never repaid by Mr. Espinal ████████████████ or the sources of the funds were 100% legitimate ██████. In its Warrant Applications, the Government never

disclosed any of these facts and, instead, permitted the issuing courts to consider the Warrant Applications without this critical exculpatory information.

Again, we still do not know the full extent of the Government's misconduct in this case. However, respectfully, we have presented sufficient evidence demonstrating the pervasive nature of the Government's omissions and affirmative misrepresentations to warrant a *Franks* hearing with respect to all of the Warrant Applications.

## III.    THE GOVERNMENT HAS CONTINUED TO MISREPRESENT MR ESPINALS PROFFER NOTES

Additionally, the Government repeatedly and misleadingly asserts that based upon Mr. Espinal's proffer statements, the Government's theories espoused in the Warrant Applications "are essentially correct." (Gov't Opp. 71). Yet again, the Government persists in claiming that Mr. Espinal made inculpatory statements during the proffers to justify its claim that its theory of this case has been pursued in good faith. **To be clear: Mr. Espinal did not make any inculpatory statements during his proffers**. The Government's "spin" and distortions of the proffer statements are not supported by the record. Not only are none of the statements made by Mr. Espinal inculpatory, but even the Government's paraphrasing of the proffer notes in its response demonstrates the intentional manner in which the Government has misled the defense and the Court throughout the pendency of this case.

████████████████

The Government repeatedly states that Mr. Espinal told the Government in his 12/26/11 proffer that after receiving $46,000 from ████████ "he repaid ████ with $46,000 in cash which [he] had received from Manuel Rodriguez." (Gov't Opp. 25). This is offered as part of the Government's strategy to try to convince the Court that Mr. Espinal admitted that he used

44

Rodriguez's drug money to reimburse ▮▮▮▮▮▮▮▮ for their FFH investment, and that the defense, therefore, is merely trying to dismiss an indictment against a guilty man. But just as this Court previously observed when the Government moved to introduce what it characterized as incriminating and inculpatory proffer statements, the Government, again, has misrepresented the facts. This is NOT what Mr. Espinal told the Government and the Government knows it because those alleged words are **not contained or reflected in the Government's own proffer notes**.

Specifically, the Government's notes of Mr. Espinal's 12/26/11 proffer state, "▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Gov't Ex. P). What Mr. Espinal, in fact, stated during this proffer session was that when ▮▮▮▮▮▮ asked for the return of his $146,000 (the money ▮▮▮▮ had paid toward the down payment of FFH), ▮▮▮ ▮▮▮▮ gave him (Mr. Espinal) a $46K check to pay ▮▮▮▮ (which reflected partial repayment of money owed to Mr. Espinal as a result of a previous unrelated loan), and Mr. Espinal then gave ▮▮▮ $100K (the balance of ▮▮▮▮ initial down payment, not 46K) in cash which was Rodriguez's money. The Government's notes **do not** reflect that Mr. Espinal stated that he ever gave $46K of Rodriguez's cash ▮▮▮▮▮▮ because Mr. Espinal never said that.

Furthermore, if there was any doubt about what Mr. Espinal said and intended to convey, the Government's own notes of Mr. Espinal's first proffer on 12/23/11, **just three days earlier**, reflect the following: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Gov't Ex. O). The Government not only omitted Mr. Espinal's clear and unequivocal statement from his first proffer session that he did not repay ▮▮▮ but then **added** words to what it contends Mr. Espinal said in an attempt to have this Court believe that he repaid ▮▮▮ with Rodriguez's drug money **even though those words do not appear in its own notes.** It is telling that the Government attempted to bury

the actual language of the proffer statement, which does not include any mention of paying back ███ by burying the actual language in a foot note.

What should be equally offensive to the Court is the Government's glaring omission of ████████ Grand Jury testimony on this very issue. Specifically, ██████ testified that **Mr. Espinal did not pay him any money to reimburse him for the money paid to ██████**. ████, therefore, under oath before the Grand Jury, corroborated Mr. Espinal's clear statement that he never reimbursed ████ for money paid to ████. The Government here misrepresents Mr. Espinal's statements regarding whether he paid cash to ████, just as it did in its motion *in limine* to introduce what it described as Mr. Espinal's incriminating statements about when he learned of Rodriguez's drug activity after the FFH deal.

**B.** ██████████

In addition to the Government's misstatement with respect to █████ the Government similarly misstates Mr. Espinal's statements regarding payments he made to ██████. The Government states that "$40,000-$45,000 of Espinal's cash repayments to ██████ for Fly Fisherman's Heaven consisted to money that Espinal had received from Rodriguez." (Gov't Opp. 24). However, the actual notes taken during the Espinal proffer are mentioned only in a footnote. The actual notes reflect "████████████████████████████ ████████████████████████████████ ████████████████████████████ (Gov't Ex. P).

The Government is well aware, based upon the proffer notes of ██████ (a witness they now state that they "may" call as a witness at trial), that ████ loaned Mr. Espinal $100,000 for

FFH. ███ told the Government that Mr. Espinal paid him back three months later by giving him $80,000 in cash and a $20,000 check. (Exs. P, Q). Furthermore, on October 10, 2014, at the time it served its response, the Government turned over proffer notes of ███████. (A copy of ██████████████████████, is annexed hereto as **Exhibit TT**).
███████ confirmed that Mr. Espinal borrowed $80,000 in cash from him. Based upon the proffer notes of ██████ and Mr. Espinal, it is clear that when the notes refer to paying back money ████████████████████████████████████
██████████████████████), it is referring to the repayment of the money borrowed from ██████, and not ███.

Obviously, the Government realizes that if Mr. Espinal was indeed laundering Rodriguez's money through ███, he would not have asked ████████ to loan him the $80,000, and then repay the remaining $20,000 in a check. Moreover, the Government completely omits the fact that despite being asked about Rodriguez's cash, Mr. Espinal never stated that he intentionally used Rodriguez's money in an effort to conceal its source. To the contrary, on the same page of these proffer notes it states that Mr. Espinal is not sure if Rodriguez's money was co-mingled with his own – a clear indication that Mr. Espinal's answers were not admissions of money laundering.

████████████████████

Remarkably, just as the Government misrepresented Mr. Espinal's proffer notes regarding ███ and ███, they also misrepresented what he said regarding ████████
██████. The Government asserts that Mr. Espinal stated that he repaid ████████
██████ "with a total of approximately $25,000 to $40,000 in cash, multiple installments."

47

(Gov't Opp. 24). What the notes actually reflect, and what the Government again chose only to include in a footnote is "Paid back appox 25-35K █████ gave several checks. Paid █████ through multiple transactions." (Gov't Ex. P). Contrary to what the Government has stated, Mr. Espinal did not indicate that he gave cash to █████ as repayment for the loans, nor did he admit to having repaid them with any portion of Rodriguez's money.

The Government next states that "Espinal has paid ███████████████████ █████ $220,000 in cash over the past couple of year. █████ is the person who would come most of the time to collect the cash. There was a payment of $9,000 in cash to █████ ████████████████████." (Gov't Opp. 24). Again, the Government's selective paraphrasing is grossly misleading and misrepresents what is contained in the proffer notes – the actual notes are again dropped in a footnote. What the proffer notes themselves clearly indicate is that Mr. Espinal has paid the █████████████████████████████ ████████████████ █████████████████. (Gov't Ex. P). The very next sentence indicates that Mr. Espinal had a contract with █████ ███████████████ █████████████████████ A simple reading of the proffer notes makes clear that the cash payments to which Mr. Espinal was referring related to work █████ had performed in connection with these properties and not repayment of loans.

The Government further alleges that Mr. Espinal said "he might have told █████ █████ and █████ to split the money paid to Fly Fisherman's Heaven so that it came from different bank accounts." (Gov't Opp. 24). The actual notes, again, only referenced in a footnote, state, ████████████████████████████ (Gov't Ex. P). What the Government fails to include is that in a November 29, 2011 proffer, █████

48

████████ stated, ████████████████████████████████████████████████████

████████████. Mr. Espinal had no reason to ask them to purposely write checks from separate accounts. However, it makes perfect sense for Mr. Espinal to say that he will accept checks from whatever accounts they could get money from.

Finally, the fact that Mr. Espinal received large amounts of cash from Rodriguez in and of itself is not inculpatory unless Mr. Espinal was aware that the funds were drug proceeds. Mr. Espinal did not know the source of Rodriguez's money and never informed the Government otherwise.

The Government has used these examples of purported "inculpatory" statements to justify its other misstatements and misrepresentations in search warrant applications, affidavits, and motions to the Court.[12] The Government has time and again made statements with respect to Mr. Espinal's alleged money laundering when it has had clear evidence to the contrary. In its brief it states:

> Espinal told the Government during proffer sessions that he paid these witnesses cash for checks that they wrote at his direction, and that at least some of the cash came from Manuel Rodriguez. Some of the witnesses – perhaps seeking to protect Espinal – nonetheless told the Government that Espinal had not paid them for the checks with cash. Thus Espinal's professed shock that the Government was not planning to call these individuals suggests that he was, simply put, surprised that these witnesses did not come clean with the Government and implicate him in criminal conduct which he

---

[12] The Government also mentions that, in one of the wiretap applications, Agent Samuels noted that Mr. Espinal had been a target of bribery investigations involving ████████ ▌ ████████████████████████████████. The Government fails to include in its brief that not only was Mr. Espinal not charged in either of those investigations, but the prosecutors in this case met with ████████ in June of this year to specifically ask him about his business dealings with Mr. Espinal and that ████████ stated that he never received kickbacks from Mr. Espinal. (Ex. SS). Obviously, as late as June of this year, the Government was attempting to gather whatever evidence it could to compensate for the lack of evidence it had pertaining to the instant charges. Moreover, the Government's purpose in including this information in its brief was for nothing other than to attempt to convince the Court that Mr. Espinal must be engaged in criminal activity.

had already admitted to the Government in his own proffers.

(Gov't Opp. 4).

At <u>no time</u> did Mr. Espinal ever tell the Government that <u>he paid these witnesses cash for checks.</u> Furthermore, Mr. Espinal was shocked to learn that the Government was not intending on calling any of the alleged "straw investors" when for three years the Government continuously represented that it could prove that each of these witnesses were used by Mr. Espinal to launder Rodriguez's drug money. Obviously, the defense assumed that the witnesses had lied to the Government, as that would be the only way the Government could have had evidence of something that is simply untrue. Certainly, we did not consider that the Government had, from the beginning, been aware of the truth and not only intentionally withheld it from the defense, but ignored it completely and purposely misrepresented the evidence it had not only to the defense but to the courts as well.

## IV.   THE GOVERNMENT VIOLATED *MASSIAH*

The Government's response to its alleged *Massiah* violation disregards both the facts and relevant law. Indeed, the Government's response reflects its ever-changing narrative of its own actions.[13]

The Government's opposition is yet a third version of the facts leading up to the *Massiah* violation.

---

[13] The defense will not address the Government's irrelevant point regarding the ▮▮▮▮▮▮▮▮ recording. Any investigation regarding Mr. Espinal's relationship with ▮▮▮▮▮▮ has no relevance to this case. Indeed, as the Government notes, the United States Attorney's Office in the Eastern District of New York has pursued cases against several individuals relating to ▮▮▮▮▮▮ alleged corrupt activities, but Mr. Espinal is not one of them. Indeed, ▮▮▮▮▮▮▮, a government cooperator who has already pleaded guilty, recently informed the Government that he received ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Nevertheless, the defense did not raise issues relating to that recording because, unlike the instant *Massiah* violation, it has nothing to do with this case.

1. In its initial letter to the defense disclosing the January 2012 meeting between █████ ███████ and Mr. Espinal, the Government clearly stated that ██████████ ████████████████████████████████████████████████ (9-4-14 Gov't Letter to Def., attached as Ex. W to Def. Mot. to Dismiss) (emphasis added).

2. At the September 24, 2014 court appearance, when the Court requested that Government address the *Massiah* violation, Assistant United States Attorney Sarah Paul repeatedly asserted that "[i]t was permissible **to send █████████ in" to meet with Mr. Espinal because he had been instructed not to ask about Espinal's case.** (9-24-14 Tr. at 18-19) (emphasis added).

3. Finally, in its response, the Government claims for the first time that Mr. Espinal had sought a meeting with ██████████

Most disturbing is the Government's failure to address what ██████████ clearly remembers about this unethical attempt at soliciting information from Mr. Espinal after he was indicted and represented by counsel. The only rational conclusion for this glaring omission is that the Government hopes that this Court will not realize that ██████████ contradicts everything that the Government now represents as the facts leading up to his meeting.

As set forth in the defense motion to dismiss, during meetings with the Government, **just last month,** ███████████████████████████████████████████████ ████████████████ Moreover, ████████████ informed the Government that he, in fact, asked Mr. Espinal ████████████████████████████████████████████ Perhaps most shockingly, ████████████ very clearly explained that, on that day, ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████

Incredibly, the Government omits these statements, by its own witness, from its one-page attempted justification of its conduct. (Gov't Opp. 73-74). Instead, the Government relies upon a draft transcript of a recording littered with "unintelligible dialogue" and an affidavit from one

of its agents. (Gov't Opp. 73 (citing Gov't Exs. S, U, and V)).[14] The volume of "unintelligible dialogue" due to interference in the recording only demonstrates that the Court must look to the witness' statements to determine what happened. Curiously, even though Agent Quintana claims that ████████ was told not to ask about Mr. Espinal's pending case, the wall/case agent, Daniel Callaghan, the agent who was in charge of this entire episode, now claims to have no recollection of this event. (Ex. EE). When compared to ████████ very clear recollection of these events from 2012 to the present, the Government witnesses' explanations of this event are simply not credible.

The Government's response also ignores the recorded, controlled telephone call between ████████ and Mr. Espinal. That recording clearly confirms that **it was** ████████, not Mr. Espinal, who sought to have a meeting. This recording refutes the Government's latest excuse for the *Massiah* violation – that the Government was simply investigating the possibility of Mr. Espinal trying to obstruct justice. The recorded phone call could not be clearer:

████████████████████████████████████

Jose Espinal:          Yes.

████████████████████████████████████
████████████████

(Gov't Ex. U). There can be no doubt – this phone call makes clear that ████████, not Mr. Espinal or any third party, requested this meeting.

The Government's ever evolving version of facts is also undercut by ████████ Grand Jury testimony of February 8, 2012.

---

[14]     The defense did not possess these draft transcripts and/or summaries until after submitting our initial motion to dismiss.



 (emphasis added). Under oath, ▮▮▮▮▮▮▮ made clear that this encounter was with Mr. Espinal and that neither Mr. Espinal nor any third party requested a meeting with ▮▮ ▮▮▮▮▮▮ on Mr. Espinal's behalf. During his testimony, Assistant United States Attorney Sarah McCallum characterized this initial meeting between Mr. Espinal and ▮▮▮▮▮▮▮ as "a coincidence." (Ex. D at 76). Simply put, there is nothing in ▮▮▮▮▮▮ testimony that suggests conduct by Mr. Espinal that resembles tampering in any way.

Accordingly, ▮▮▮▮▮▮▮ testimony ends any serious consideration of the Government's current position that it was investigating potential witness tampering. (Gov't Opp. 27). Reading this testimony in the context of ▮▮▮▮▮▮ 2014 meeting notes and the recorded January 23, 2012 phone call, it is clear that ▮▮▮▮▮▮▮ sought the Government's clearance to speak with Mr. Espinal about matters unrelated to this case. The Government then seized an opportunity to use a lay witness to request a meeting with Mr. Espinal in the hopes that Mr. Espinal would make statements regarding his pending criminal case. Yet, the Government audaciously persists on painting this exercise as a legitimate investigation into unrelated conduct and without any Government initiation or involvement. The facts speak otherwise.

The Government's latest explanation for this violation of law again demonstrates its unwillingness to accept responsibility for its actions. Its reluctance to admit to any misconduct whatsoever is reinforced by its transparent attempts to gloss over the irresponsible and unethical

conduct of its agents and prosecutors.

Initially, the Government attempts to explain why the "wall agent," Daniel Callaghan, is now its "case agent" by blaming the Department of Homeland Security ("DHS") and prior trial counsel. It claims that DHS reassigned Agent Callaghan to be the case agent in this case and that "AUSAs Sarah Paul and Amie Ely . . . did not know that Special Agent Callaghan had been the 'wall' agent for the ████████ recording matter." (Gov't Opp. 27, n. 17). The sloppy assignment practices at DHS and the prior assigned prosecutors' failure to notify current trial counsel about Agent Callaghan's "wall agent" responsibilities are inexcusable. These are not minor mishaps – they corrupted any semblance of a "taint team" that existed and render the Government's reliance on that "team" completely worthless. A "taint team," by definition, consists "solely of government agents and attorneys not working on the case pending against [the defendant]." *United States v. Jacques*, 684 F.3d 324, 329 (2d Cir. 2012). Here, by stark contrast, the Government is asking the court to consider its case agent part of its "taint team." This reckless conduct is indefensible.

The Government also attempts to excuse Assistant United States Attorney Sarah Paul's failure to recognize and rectify this misconduct for nearly two years by explaining that she was taken off this case during the majority of that time period. Notably though, as set forth in the Motion to Dismiss, Ms. Paul was present for ████████ above-described Grand Jury testimony. (Ex. D at unnumbered cover page). Her "lack of involvement" with this case between 2012 and 2014 does not excuse the entire United States Attorney's Office from its ethical obligations to notify the defense that it recorded conversations between ████████ and Mr. Espinal and to provide the recordings of the conversations to the defense.

54

Even more troubling is that the Government suspiciously did not generate reports of its use of █████████ to speak with Mr. Espinal and that "the recordings were not properly checked into evidence by HSI, and HSI did not prepare a report regarding the call and the meeting." (Gov't Resp. at 29). To summarize, the Government recruited a lay witness to record a conversation with an indicted and represented defendant and according to that witness, instructed him to ask Mr. Espinal about his pending case. Nevertheless, DHS agents apparently did not believe this merited a report or proper cataloging of the recordings and relevant materials.

Conveniently, the Government's latest narrative allows it to argue that ████████████ was simply a "listening post," rather than a government agent who solicited information about Mr. Espinal's pending case. This claim strains credulity and makes clear that, at minimum, a hearing is necessary to resolve the glaring and irreconcilable contradictions. If ████████████, a Government witness, is to be believed, he was instructed to solicit information about Mr. Espinal's case in a meeting with Mr. Espinal that the Government requested that he schedule. This, unquestionably, is a flagrant *Massiah* violation. *See Maine v. Moulton*, 474 U.S. 159, 176 (1985) (noting that regardless of whether the defendant or the informant initiates the contact, the "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity").

Even if, hypothetically, the agents instructed ████████████ not to ask Mr. Espinal about his pending case, the Supreme Court has explicitly held that if such instructions are given and the informant still asks about the pending case, there is a *Massiah* violation. *See United States v. Henry*, 447 U.S. 264 (1980). In *Henry*, the government agent testified that he had told the

55

informant not to ask about the defendant's pending case. *Id.* Nevertheless, the Court held that the Government had "deliberately elicited" that information from the defendant because "[e]ven if the agent's statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." *Id.* at 271.

Importantly, the *Henry* Court noted that the informant had "stimulated" conversations with the defendant with the intent to "elicit" incriminating information about his case. *Id.* at 273. Accordingly, the Court held that the Government had, in effect, "indirect[ly] and surreptitious[ly] interrogat[ed]" the defendant and "creat[ed] a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel." *Id.* at 273-74 (citing *Massiah v. United States*, 377 U.S. 201, 206 (1964) (internal quotations omitted)); *see also United States v. Pannell*, 510 F. Supp. 2d 185 (E.D.N.Y. 2007) (finding a *Massiah* violation where, despite a government agent's instruction not to solicit information about the pending case, an informant "participated in active conversation in a deliberate attempt to elicit incriminating remarks from the defendant") (internal quotations and citations omitted).

Here, contrary to the Government's allusions otherwise, ████████████ own recollection, corroborated by both his Grand Jury testimony and the recorded January 23, 2012 phone call, shows that he "took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *See Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). ████████████ was no mere "listening post." *See Pannell*, 510 F.Supp.2d at 192. Furthermore, his meeting notes also demonstrate that he was acting as a government agent at the time. (Ex. CC) ███████████████████████████████████████ The

Government's latest version of these events flagrantly attempts to create facts that do not exist. Its motive is clear – to avoid a hearing on this aspect of its misconduct by creating a new narrative which ignores its own witness' very clear statements and sworn testimony. This latest misleading and deceptive conduct cannot be condoned.

## V.  THE MISCONDUCT IN THE GRAND JURY WARRANTS THE DISMISSAL OF THE INDICTMENT

The evidence of the Government misconduct occurring in the Grand Jury through the presentation of false and misleading testimony warrants dismissal of the indictment. Based on the deceptive and misleading Grand Jury testimony that has already been turned over to the defense, we respectfully submit that it is appropriate for the Court to review the remaining Grand Jury minutes and, if there is persistent misconduct, the appropriate remedy is dismissal of the indictment.

Indeed, as we noted in the Motion, Special Agent Jason Samuels' testimony in the Grand Jury constitutes misconduct because he testified about a money laundering theory that simply could not be true and the Government was aware of the exculpatory information that undermined his testimony. His testimony was unquestionably refuted by the documentary evidence and witness interviews that the Government knew about at that time. Mr. Espinal does not argue that the Government failed to present exculpatory information to the Grand Jury; rather, the Government knowingly presented false testimony to the Grand Jury. It is indisputable that presenting testimony with no basis in fact prejudiced Mr. Espinal. *See Bank of Nova Scotia*, 487 U.S. at 263; *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485 (W.D.N.Y. May 22, 2006).

Moreover, the Government's response to Mr. Espinal's request for disclosure of the

remaining Grand Jury minutes in this case follows the same pattern as its conduct throughout this case – it attempts to mislead the Court and avoids addressing any of the legal arguments raised by the Defendant's Motion.[15] Nevertheless, the Government's arguments do not change the clear fact that it committed misconduct in the limited portions of the Grand Jury proceedings already turned over to defense. Nor does the Government adequately refute the clear fact that Mr. Espinal has demonstrated a particularized need to review the remaining Grand Jury proceedings to ensure that no further misconduct remains hidden.

Additionally, after demonstrating throughout this case a disturbing failure to grasp the contours of RICO law, the Government cannot be trusted to have properly instructed the Grand Jury. The Government completely fails to refute this fact in its response. It is clear that the Government's deceptive Grand Jury presentation, together with its incorrect understanding of RICO law and its willingness to obscure the truth, demonstrate a strong particularized need for disclosure here. *See* Fed. R. Crim. P. 6(e)(3)(E)(ii); *In re Grand Jury Subpoena*, 103 F.3d 234, 239 (2d Cir. 1996); *United States v. Stevens*, 771 F.Supp.2d 556, 568 (D. Md. 2011). The Government's behavior and poor judgment cannot be ignored and cries out for proper review.

The Government cites one of this Court's decisions on Grand Jury disclosure in an attempt to misconstrue the issues at hand. (*See* Gov't Opp. 76 (citing *United States v. Finnerty*,

---

[15]    Much of the Government's response is needless recitation of undisputed case law. It should be very clear that the defense does dispute the Supreme Court precedent on Grand Jury misconduct. *See, e.g., United States v. Williams*, 504 U.S. 36 (1992); *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988); *United States v. Mechanik*, 475 U.S. 66 (1986). Indeed, we cite all of these cases. (Def. Mot. to Dismiss at 69-70). It should be noted, however, that the Government misrepresents our citation of *United States v. Hogan*, 712 F.2d 757 (2d Cir. 1983), to this Court. (See Gov't Opp. at 75, FN 43). The defense cited *Hogan* once, only to emphasize a prosecutor's "ethical obligation strictly to observe the status of the grand jury as an independent legal body. In short, a prosecutor as an officer of the court is sworn to ensure that justice is done, not simply to obtain an indictment." (Def. Mot. at 70 (citing *Hogan*, 712 F.2d at 759-60)). It is unclear whether the Government is now disputing its well-established ethical obligation or simply distracting the Court from the disputed legal issues in this motion.

No. 05 Cr 393, 397 (DC), 2006 WL 2802042, at *7-9 (S.D.N.Y. Oct. 2, 2006)). Unlike the

defendants in *Finnerty*, the defense here has not alleged that instructions should have been given

because RICO is a complicated statute. *Cf. Finnerty*, No. 05 Cr 393, 397 (DC), 2006 WL

2802042, at *7-9. Nor is the defense request predicated on speculation. *Cf. id.* Rather, this case

requires the disclosure of the entirety of the Grand Jury proceedings because the Grand Jury

proceedings that the Government has turned over demonstrate that the Grand Jury was

deceptively misled, which prejudiced Mr. Espinal.

## VI.   THE TOTALITY OF THE GOVERNMENT'S MISCONDUCT WARRANTS THE DISMISSAL OF THE INDICTMENT

This case presents unique questions of what are appropriate sanctions when

Government misconduct is uncovered pre-trial and the trial has been postponed.   The

Government would have the Court conclude that the only remedy for the delay in turning over

the exculpatory information has already occurred-postponement of the trial.  The Government

would have the Court find that Mr. Espinal has not suffered any prejudice since he now has

received the information and he can pursue an investigation in sufficient time before the

beginning of the trial. In other words, the only appropriate remedy for what has occurred in this

case is further delay.

The totality of the Government's persistent ethical lapses in this case, however, cries out

for much more extreme sanctions.  The Government has been in possession of clear,

unequivocal, unambiguous exculpatory information for three years – exculpatory information

that strikes at the heart of the Government's entire case and the claim that Mr. Espinal is guilty

of any crime. The extraordinary delay in disclosing *Brady* information of the quality and quantity

that has been uncovered has resulted in irreparable harm to Mr. Espinal personally and his ability

59

to effectively defend himself against the false criminal charges that have been filed against him.

**INVESTIGATION**

The three year delay in disclosing the names of the sources of ██████ money that he used to cover checks to FFH and Washington Heights Parking has foreclosed the defense's ability to speak to these witnesses, and learn the details of their recollection of their loan transactions with ██████

The more than four year gap between the conduct that resulted in the witnesses loaning money to ██████ and the expected date of the trial creates enormous problems affecting their ability to recall the events and circumstances of the financial transactions. Memories fade, documents are lost and records disappear. This, of course, assumes that any of the witnesses are willing to speak to the defense at this late point of the criminal proceedings. As it now stands, that assumption does not apply to this case.

Our investigator has attempted to locate and speak with all exculpatory witnesses since their identities were disclosed. Not one of those witnesses who our investigator could locate has been willing to talk. Some have expressed their refusal directly to our investigator. Some refused through their attorneys. It is important to note that despite the witnesses refusing to speak to the defense, many of them have willingly made themselves available to the Government for questioning as recently as this past August.

Moreover, despite our best efforts, we have been unable to locate a number of the exculpatory witnesses. Had Mr. Espinal been provided with this *Brady* information when the Government was required to turn it over, more than three years ago, all the witnesses would have been more likely to have been located and, if found, speak with the defense. They would not

have been repeatedly spoken to by Government agents and prosecutors, brought before a Grand Jury, recalled for questioning by prosecutors at the U.S. Attorney's office and forced to retain counsel. It can hardly be surprising to realize that these witnesses now are scared and thus unwilling to speak with the defense knowing that the Government, with all its power, is attempting to convict a man with whom they did business.

**PERSONAL IMPACT**

The personal impact on Jose Espinal cannot be minimized nor should it be casually brushed aside. Mr. Espinal has a family, including two very young children, and his life, as well as theirs, has been on hold for three years. Not only has he had to live with the pressure of a pending criminal case against him and the fears of sitting as a defendant in a federal criminal trial, but his personal liberty has been restricted as part of his bond conditions restricting his travel. In addition to his personal pressures, Mr. Espinal's business has been irreparably harmed as a result of the Government's repeated and flagrant misrepresentations concerning alleged criminal conduct that agents have expressed both to past friends as well as business associates. This has resulted in many individuals with whom he regularly conducted business to end their business relationship with him.

Moreover, the financial burden suffered by Mr. Espinal and his family cannot be overstated. As a direct result of having to vigorously litigate the Government's clear and intentional *Brady* and *Massiah* violations, Mr. Espinal has incurred enormous legal bills. This law firm, instead of preparing for trial, interviewing witnesses, reviewing thousands of pages of exhibits, preparing direct and cross examinations, has expended in excess of 300 hours exclusively addressing the Government's misconduct.

The Government cannot and must not be given a pass simply because its misconduct was uncovered prior to trial. This is not a case of a singular instance of a *Brady* violation. This is not simply a case of a delayed disclosure of exculpatory information that might have an impact on one witness's credibility. What this case represents is unlike most every other reported case of prosecutorial misconduct pertaining to *Brady* and *Massiah* violations. This case is a disturbing example of a prosecution that from the beginning was permeated by persistent and egregious withholding of *Brady* information. The Government misconduct uncovered on the eve of trial reflects a troubling but intentional decision to hide information from the defense that would allow us to undermine the Government's entire theory of money laundering, It was only because of the defense's efforts to expose the misconduct that the Government was compelled to drop a number of charges that could never have been proven unless the exculpatory information had remained hidden.

The Government misconduct, from *Brady* to *Massiah,* has been so pervasive, and included the withholding of such an extraordinary amount of information and witnesses that it taints this entire prosecution and much more. It strikes at the heart of our justice system. Without a clear message that this conduct, to the extent and magnitude that has been uncovered at the pre-trial stage, cannot and will not be tolerated, we guarantee its repetition. Simply adjourning the start of the trial is a hollow remedy for sure and is an insufficient remedy for the ethical abuses found in this case. This is especially so where the Government, as here, refuses to acknowledge any wrongdoing and fails to accept responsibility for its ethical lapses.

"A robust and rigorously enforced *Brady* rule is imperative because all the incentives prosecutors confront encourage them not to discover or disclose exculpatory evidence. Due to

62

the nature of a *Brady* violation, it's highly unlikely wrongdoing will ever come to light in the first place. This creates a serious moral hazard for those prosecutors who are more interested in winning a conviction than serving justice. In the rare event that the suppressed evidence does surface, the consequences usually leave the prosecution no worse than had it complied with *Brady* from the outset." *United States v. Olsen*, 737 F.3d 625 (9th Cir. 2013) (Kozinski, J. *dissenting*).

We respectfully request that the legacy of this case should not be that the Government suffers consequences no worse than had it complied with *Brady* at the outset. Dismissal of the Indictment, at this time and for all the reasons set forth herein, is the just and appropriate remedy.


Dated: New York, New York
       October 17, 2014

                                        Respectfully submitted,

                                        GOTTLIEB & GORDON LLP

                                        /s/ Robert C. Gottlieb (RG1930)
                                    By: Robert C. Gottlieb

                                        Robert C. Gottlieb
                                        Celia A. Gordon
                                        Justin F. Heinrich
                                        Ravi Kantha
                                        111 Broadway, Suite 701
                                        New York, New York 10006
                                        (212) 566-7766
                                        *Attorneys for Jose Espinal*

TO:    Amie Ely, AUSA (via hand delivery)
       Sarah Paul, AUSA (via hand delivery)
       Margaret Garnett, AUSA (via hand delivery)

## AFFIRMATION OF SERVICE

Ravi Kantha, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Attorney associated with the law firm, Gottlieb & Gordon LLP, attorneys for Defendant Jose Espinal in *United States v. Jose Manuel Espinal*, Indictment Number 10-CR-905 (DC).

That on October 17, 2014, I caused one copy of the within Reply in Support of Motion to Dismiss and accompanying Volume of Exhibits, to be personally delivered to:

Amie Ely, Esq.
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
1 Saint Andrews Place
New York, New York 10007

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
October 17, 2014

Ravi Kantha