```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED: 3-10-2015                │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

                - against -                    :          **OPINION**

JOSE ESPINAL,                               :          10 Cr. 905 (DC)

                   Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**APPEARANCES:**         PREET BHARARA, Esq.
United States Attorney for the Southern District of New York
            By:     Margaret M. Garnett, Esq.
                   Laurie A. Korenbaum, Esq.
                   Harris M. Fischman, Esq.
                   Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007

GOTTLIEB & GORDON LLP
Attorneys for Defendant Jose Espinal
            By:     Robert C. Gottlieb, Esq.
                   Celia A. Gordon, Esq.
                   Justin F. Heinrich, Esq.
                   Ravi Kantha, Esq.
111 Broadway, Suite 701
New York, New York 10006

**CHIN, Circuit Judge:**

         In this case, defendant Jose Espinal moves in the interest of justice to dismiss the indictment against him for prosecutorial misconduct. In particular, he alleges that the government violated his rights under Brady v. Maryland, 373 U.S. 83 (1963), and Massiah v. United States, 377 U.S. 201 (1964). He also contends that the government made misrepresentations in wiretap and search warrant applications and in presentations to the grand jury.

While I conclude that the government did engage in a pattern of troubling and overly aggressive conduct in this case, for the reasons set forth below, Espinal's motion to dismiss is DENIED.  The following constitute my findings of fact and conclusions of law.[1]

## STATEMENT OF THE CASE

### A.   Background

#### 1.   The Enterprise

The government alleges that Manuel Geovanny Rodriguez-Perez ("Rodriguez") and more than fifty co-defendants participated in a substantial criminal enterprise (the "Enterprise") that engaged in narcotics trafficking, acts of violence (including murders and attempted murders), money laundering, illegal money transmitting, and bank fraud, from the mid-1990s through 2013, primarily in the Washington Heights and Inwood neighborhoods of Upper Manhattan.  (Gov't Exs. C at ¶¶ 1-3, D at 5, 12, Z at ¶¶ 1-4,).  Indeed, the government alleges that the Enterprise committed ten murders from 1997 through 2006.  (Gov't Ex. Z at 12-31).

#### 2.   Espinal's Alleged Participation

In the S31 Indictment, which is the operative indictment, the government charges that Espinal participated in and associated with the Enterprise.  (Gov't Ex. D at 8; see Dkt. No. 879).  Count One charges Espinal and others with racketeering and alleges seventeen racketeering acts, including narcotics trafficking, murder, and money laundering.  (Gov't Ex. D at 9).  Count Two charges Espinal and others with conspiracy to commit racketeering.  (Id. at 10).  Count Twenty-Eight charges Espinal with participating in a money laundering conspiracy from 2009 through 2011.  (Id.).  The government contends that, beginning in 2009, Espinal played a

---

[1]     To be clear, the Assistant United States Attorneys ("AUSAs") listed in the appearances first appeared in the case to oppose Espinal's motion to dismiss.

"key role" in laundering the Enterprise's proceeds from its narcotics sales. (Id. at 13). Espinal purportedly accepted large amounts of cash from members of the Enterprise and then, concealing the source of the cash, made investments in real estate, including a tract of land in upstate New York. (Id.). Espinal allegedly masked Rodriguez's involvement by making it appear as though other individuals were the sources of the funds. (Id.). Espinal and Rodriguez purportedly funneled cash through intermediaries, who wrote checks to make it seem as if they were investing in real estate controlled by Rodriguez and Espinal. (Id. at 13-14). Counts Thirty-Four and Thirty-Five allege that Espinal engaged in obstruction of justice in 2010 by asking a lay witness to prepare false receipts that understated the amounts of cash Rodriguez and Espinal had paid him for hunting trips and taxidermy work. (Id. at 15-16). In addition, Counts Thirty-Seven and Thirty-Eight allege that in the fall of 2011, Espinal engaged in obstruction of justice by creating false documents that suggested that certain checks he received from intermediaries were "loans." (Id. at 16).

## B.    The Government's Investigation

In February 2009, the government intercepted certain telephone calls that eventually led to Rodriguez. (See Gov't Ex. B at 3-18). Two brothers were intercepted discussing the need to pay money to "Shorty" for marijuana they had purchased from him. Shorty was later identified as Rodriguez. (Id. at 1, 5). Agents arranged for surveillance of a planned cash handoff between one of the brothers and Shorty. When Shorty drove away from the meeting, agents stopped his vehicle, identified him as Rodriguez, and found $25,000 in cash. (Id. at 5-6). After Rodriguez told the agents that the money was from a restaurant, the agents seized the money and allowed Rodriguez to drive away. (Id. at 6; Def. Ex. HH ¶ 28). Approximately twenty minutes after the stop, Rodriguez made two unsuccessful telephone calls

to Espinal. Fifteen minutes later, Espinal returned the call and spoke to Rodriguez for approximately eight minutes. (Def. Ex. HH ¶ 29).

In the course of the investigation, agents uncovered evidence that Rodriguez and Espinal had engaged in real estate transactions together and were cosignatories on a bank account. They had used money in the account to purchase a property in Sullivan County, New York, which they dubbed Fly Fisherman's Heaven ("FFH"). (Gov't Ex. B at 18). The government contends that the account was being used to launder drug money. (Id.).

On July 19, 2010, the government applied for authorization to intercept Rodriguez's "money phone," a cellphone Rodriguez allegedly was using to discuss laundering his dirty cash. (Gov't Ex. F). This was the same phone that Rodriguez had used to call Espinal after the $25,000 had been seized during the vehicle stop. On September 23, 2010, the government sought leave to intercept Espinal's cellphone. (Def. Ex. HH). The wiretap authorizations were granted and later reauthorized for an additional month.

## C.   **Prior Proceedings and Trial Delays**

The government indicted Espinal on December 8, 2011, and filed superseding indictments on February 7, 2012, and July 26, 2012. (Dkt. Nos. 686, 877).

On January 22, 2014, the charges against Espinal were severed from those of the more than fifty other defendants. (Dkt. No. 1362). On February 13, 2014, Judge Swain, before whom the case was then pending, set trial for April 28, 2014. (Dkt. No. 1374). On February 26, 2014, Espinal's case was reassigned to me. On March 6, 2014, I set a trial date of August 4, 2014.

The government filed a "Trial Indictment," S31-R 10 Cr. 905, on July 16, 2014, redacting many of the allegations. (Dkt. No. 1565-1). The Trial Indictment, which sets forth

4

only charges against Espinal, contains seven counts, as follows:  Count One (racketeering, based on three racketeering acts), Count Two (racketeering conspiracy), Count Three (money laundering conspiracy), Counts Four and Six (obstruction of justice), and Counts Five and Seven (conspiracy to obstruct justice).  (Id.).

On July 24, 2014, I heard oral argument on the parties' motions in limine.  I excluded some of the government's proposed evidence, allowed some, and deferred decision on other evidence.  On July 26, 2014, nine days before trial was to begin, the government produced to defense counsel a computer disk containing more than 1,500 recorded telephone phone calls, most or all in Spanish, and more than 2,000 pages of line sheet summaries of the calls.  (Dkt. No. 1582 at 15-16).  At a conference on July 29, 2014, defense counsel argued that some of the newly disclosed 3500 material might in fact be Brady material, and that they needed additional time to review the calls.  I adjourned the trial until September 8, 2014.  (Dkt. No. 1582).

On September 4, 2014, just four days before the start of the rescheduled trial, the government made additional disclosures to counsel; defense counsel contended that these included Brady material that should have been disclosed much earlier.  (Dkt. No. 1611 at 9-14).  Also on September 4, 2014, the government notified counsel by letter that it had just learned that one of the potential government witnesses had been asked by the government in 2012, after Espinal had been indicted and was represented by counsel, to wear a recording device during a conversation with Espinal.  The government advised that it was in the process of trying to determine whether the recording still existed. (Dkt. No. 1611 at 14-21, 25).

I saw the parties the next day, September 5, 2014.  Defense counsel indicated that they intended to file a motion to dismiss the indictment.  In contemplation of this motion and briefings from both parties, and in part because there was an open question of whether there

existed a recording of Espinal, I again adjourned the trial, until October 14, 2014.  (Dkt. No.

1611).  Thereafter, by letter dated September 17, 2014, the government notified defense counsel

that it did not intend to proceed at trial on Counts One, Six, or Seven.  (Def. Ex. Y).

   Espinal filed the instant motion to dismiss on September 24, 2014.  (Dkt. No.

1618).  On October 7, 2014, in light of the motion, I once again adjourned trial until February 2,

2015.  I heard oral argument on October 21, 2014, at the conclusion of which I reserved decision.

(Dkt. No. 1628 ("10-21-2014 Oral Arg. Tr.") at 44).

   On January 21, 2015, at the request of the parties, I adjourned the trial again, until

April 27, 2015.  The government advised that two new AUSAs would be taking over the case.

## DISCUSSION

   Espinal moves to dismiss the indictment on the grounds that the government

engaged in such egregious prosecutorial misconduct that his right to due process was violated.

(Def. Mem. at 49 (citing United States v. Chapman, 524 F.3d 1073, 1084 (9th Cir. 2008)).  In

Chapman, the Ninth Circuit held that while the appropriate remedy for a Brady violation and

other constitutional violations "will usually be a new trial, a district court may dismiss the

indictment when the prosecution's actions rise . . . to the level of flagrant prosecutorial

misconduct."  524 F.3d at 1086 (citation omitted).  Espinal argues in the alternative that even if

the government's misconduct here did not violate his constitutional rights, the indictment should

be dismissed pursuant to the Court's supervisory powers.  (Def. Mem. at 49-50 (citing Chapman,

524 F.3d at 1084, and United States v. Turner, 23 F. Supp. 3d 290 (S.D.N.Y. 2014) (court has

"authority to dismiss the indictment" pursuant to supervisory powers doctrine, but declining to

do so "absent demonstrable prejudice, or substantial threat thereof")).

I discuss in turn (a) the government's conduct, (b) whether Espinal's rights were violated, and (c) the appropriate remedy.

## A.    The Government's Conduct

The government has engaged in a pattern of troubling and overly aggressive conduct in this case. I discuss some of these actions below.

### 1.    The Government's Effort to Record Espinal

In January 2012, the government apparently learned that a cooperating witness ("W-1")[2] had been asked by a third person to meet with Espinal. (Gov't Ex. R at 2). The government instructed W-1 to meet with Espinal and to record the meeting surreptitiously. W-1 did so on January 23, 2012; he recorded the meeting, without Espinal's knowledge or consent, and even though Espinal was already under indictment and was represented by counsel. Due to potential Massiah issues, a "wall AUSA" was assigned to handle this portion of the investigation, and coordinated with a Homeland Security Investigations ("HSI") "wall agent," Special Agent Daniel Callaghan. (Gov't Exs. R, S, V; Def. Ex. EE). In 2013, even though he was the "wall agent," Callaghan was reassigned by HSI to be the case agent for the entire investigation of the Enterprise. (Gov't Opp'n 27 n.17). Callaghan subsequently served as the case agent for the trials of two of Espinal's original co-defendants, and was slated to serve as the case agent for Espinal's trial in 2014, until defense counsel raised this issue. (Id.).

The defense was not given notice of the recording until almost two-and-a-half years later. In July 2014, an AUSA who had previously worked on the case was reassigned to it and remembered that there had been an effort to record a meeting with Espinal. (Gov't Opp'n 28

---

[2]    This opinion will refer to cooperating witnesses and other witnesses who testified in the grand jury by an identifying abbreviation rather than the actual names. In a separate order filed under seal, I provide the actual names of the witnesses in question.

n.18).  The AUSA then attempted to determine whether a recording had been made and asked the "wall AUSA" and HSI for clarification.  A search was made and no recording was found.  The "wall AUSA" and HSI indicated that they believed no recording had been made.

On September 4, 2014, just a few days before trial was to commence, the government met with W-1 and he recalled that a recording had been made on January 23, 2012. (Def. Ex. CC).  The government renewed its effort to find the recording, which apparently had not been "logged in" properly by HSI, and finally located the recording on September 19, 2014, when it provided a copy to defense counsel, pursuant to Fed. R. Crim. P. 16.  (Def. Ex. Z).  Draft transcripts and summaries of Spanish language telephone calls between W-1 and Espinal were provided to counsel.  (Gov't Exs. U, V, W).

In the September 4 meeting with the government, W-1 recalled that during the meeting with Espinal, he "asked Espinal what was going on with his situation with the government."  (Def. Ex. CC).  And in a meeting with the government on September 12, 2014, W-1 said that he had been "picked up in the van by agents and told to go into [Espinal's] office and ask [Espinal] about or bring up the subject of his situation.  (Which he interpreted to be Espinal's case.)"  (Def. Ex. DD; see also Def. Ex. W).  W-1 further recalled that "Espinal was very curt and changed the subject.  Espinal didn't want to talk about his case with the government."  (Def. Ex. CC; see also Gov't. Ex. V).  After the meeting, the agents relayed to the AUSAs that nothing of investigatory interest had been said.  One AUSA emailed another to report:  "Just heard from the wall agent.  Nothing happened."  (Gov't Ex. T).

The government contends that it instructed W-1 not to initiate any conversation with Espinal about the criminal proceedings.[3] I am skeptical, because the notes from the two interviews suggest W-1 was firm in his recollection that he was told to ask Espinal about his case, and then subsequently did so. He had no reason to lie in this respect in his debriefings with the government. On the other hand, the transcript of the meeting is not conclusive, as portions of it are marked unintelligible. (Gov't Ex. V). In the end, I need not resolve the factual dispute, in light of my legal conclusions below.

### 2.   The Government's Effort To Use Unduly Prejudicial Evidence

#### a.   Acts of Violence

Although Espinal was not alleged to have joined the Enterprise until 2009 (Dkt. No. 1560 at 56), and although he was not alleged to have personally engaged in acts of violence, (Dkt. No. 1565-1), the government moved in limine for leave to introduce at his trial evidence of acts of violence committed by members of the Enterprise, including the murder of Francisco Perez in 1997, the murder of an individual known as Carlos Valentin or "Campi" in 2000, the murder of Wilfredo Molina in 2004, and the murder of Richard Cabrera in 2006. (Gov't Ex. D at 18). At oral argument, I suggested that I would preclude evidence of the 1997, 2000, and 2004 murders because they were unduly prejudicial and remote in time -- one was twelve years before Espinal purportedly became involved in the Enterprise. (Dkt. No. 1585 ("7-24-2014 Tr.") at 9-

---

[3]     HSI's Operations Plan for the January 23, 2012 meeting between Espinal and W-1 stated that "[t]he witness has been instructed not to initiate any conversation regarding the criminal proceedings." (Gov't Ex. R; see also Gov't Ex. S; Def. Ex. EE). Special Agent Ismael Quintana stated that W-1 was "told not to talk about investigation/case, but told to see what [Jose Espinal] wanted to talk about." (Gov't Ex. S). Special Agent Callaghan stated that he did not remember being asked to assist, or the event itself, though he also stated that he would not have instructed W-1 to ask Espinal about the ongoing case. (Def. Ex. EE).

10, 22).  In subsequent proceedings, I made clear my intent to rule out these three murders.  (See

Dkt. No. 1605 ("8-20-2014 Tr.") at 23).

At the same time that the government wanted to offer evidence of acts of violence

to prove that Espinal was a knowing member of a violent organization, the government refused

to acknowledge that it had an obligation to prove that Espinal had a general awareness of the

general violent nature of the Enterprise, as shown by the following colloquy:

> THE COURT:  . . . I just asked you a question:  Does the
> government agree that it must prove general knowledge of the
> general nature of the enterprise?
>
> [THE AUSA]:  Could I have a moment.
>
> THE COURT:  Yes.  I think that is right out of a case.
>
> [THE AUSA]:  At the risk of sounding like former President
> Clinton it depends on what the idea of general nature means.

(7-24-2014 Tr. at 21).  The government continued to take the position that it could allege that

Espinal was a member of an enterprise that engaged in violence without being required to prove

that he had a general awareness of its violent nature.  (Dkt. No. 1582 ("7-29-2014 Tr.") at 9).

Over the government's objection, I ruled that if the government wanted to charge a violent

enterprise, it had the right to do so, but it would have to prove that Espinal was generally aware

of the general violent nature of the Enterprise and the conspiracy.  I ruled that I would so instruct

the jury.  (7-29-2014 Tr. at 14).[4]

---

[4]    I made clear that I agreed with the government that it was not required to
prove that he had specific knowledge of any particular murder or that he knew of every single
aspect of the Enterprise, but that it had to prove a general awareness of the violent nature of the
organization.  (7-24-2014 Tr. at 11, 18, 21).  See, e.g., United States v. Huezo, 546 F.3d 174, 180
(2d Cir. 2008) ("The government need not show that the defendant knew all of the details of the
conspiracy, so long as he knew its general nature and extent." (internal quotation marks
omitted)); United States v. Viola, 35 F.3d 37, 44 (2d Cir. 1994) ("[T]o demonstrate a RICO
conspirator's knowledge of the RICO conspiracy, it is sufficient for the Government to show that

### b.   The Hunting Video

The government also sought to offer into evidence a video of a hunting trip, during which Espinal shoots and kills a deer. (7-24-2014 Tr. at 4). In the video, Espinal is shown hunting; he is wearing hunting clothing and is carrying a rifle, sitting in a deer stand. The video shows the deer -- a buck -- walking through the woods, approaching a steam, and bending its head to drink water. There is a loud bang, and the deer falls to the ground, into the stream. The video then shifts to Espinal, after the kill, wearing a hunting ski mask. There were other scenes with multiple deer carcasses. I sustained the defense's objection to the video. (7-24-2014 Tr. at 4, 35-36, 38). The probative value was slight, and the danger of unfair prejudice was great. The government contended that it wanted to offer the video to show the relationship Espinal had with a witness who was on the hunting trip, but obviously there were less prejudicial ways for the government to prove the relationship than with a video of Espinal shooting and killing an animal.

### c.   The Mounted and Stuffed Animals

The government also sought to offer a video and photographs of ten or more dead mounted and stuffed animals in Espinal's real estate office. These were life-sized, seemingly museum-quality animals prepared by a taxidermist, including a lion standing over a dead zebra, gazelles, and other wild game animals from Africa and elsewhere, which the government described as Espinal's "hunting trophies." (Gov't Ex. OO at 4; see 8-20-2014 Tr. at 15, 18; 7-24-2014 Tr. At 36-37). My reaction to seeing the video was: "it's a bit of a shock, frankly" (8-20-

---

the defendant knows the general nature of the enterprise and knows that the enterprise extends beyond his individual role." (internal quotation marks omitted)); cf. United States v. Friedman, 300 F.3d 111, 124 (2d Cir. 2002) (conspiracy charge requires government "to prove, beyond a reasonable doubt, that the defendant knew the specific nature of the conspiracy or underlying crime").

2014 Tr. at 15), and it was obvious a New York City jury would react in the same way.  The

government's stated purpose for offering the video and photographs of the dead animals was thin,

and the probative value was far outweighed by the danger of unfair prejudice.  I sustained the

defendant's objection, although I noted that the government could renew its offer of proof if

circumstances changed.  (8-20-2014 Tr. at 19-21).

3.    **The Government's Untimely Disclosures**

a.    **July 2014 Disclosures**

On July 26, 2014, nine days before the scheduled start of trial, the government

produced 3500 material, including some 1,500 recorded telephone calls, all or most in Spanish,

and more than 2,000 pages of line sheets.  (7-29-2014 Tr. at 15-16).  Although the vast majority

of the recordings had been made by the government in 2007, the government tried to explain the

delay by noting that it had decided to call the cooperating witness in question only recently, and

that "[d]ifferent assistants worked on the case of [this witness]."  (7-29-2014 Tr. at 27-28).

Because it was impossible for defense counsel to be able to meaningfully review this material in

time for trial, with the government's consent, I adjourned the trial until September 8, 2014.  (7-

29-2014 Tr. at 29-30, 33).

b.    **Additional Disclosures**

In August 2014, the government made additional disclosures of 3500 material.  At

the August 27, 2014 court conference, defense counsel inquired as to why they had not received

3500 material for certain individuals the government had alleged were involved in the alleged

money laundering.  (8-27-2014 Tr. at 11-12).  Counsel also requested any Brady material the

government might have had for these individuals, on the theory that if the government had

decided not to call them as witnesses, they must have made exculpatory statements.  (8-27-2014

12

Tr. at 12). The government confirmed that it was no longer calling these individuals as witnesses. (8-27-2014 Tr. at 14). As for Brady material, the government represented that any Brady material was previously produced, and that it would go back to confirm that all material required to be produced was in fact produced. (8-27-2014 Tr. at 13-14). Sure enough, the government subsequently produced additional material. As discussed below, the supplemental production contained certain exculpatory material that had not been produced previously.

In addition, as discussed above, the government disclosed in early September that W-1 had recorded a conversation with Espinal back on January 23, 2012, and the recording was produced to defense counsel on September 19, 2014.

On September 17, 2014, the government made yet another production of what it characterized as 3500/Giglio material, including proffer notes for three of the alleged straw investors ("W-2," "W-3," and "W-4"). This material, however, contained evidence that at least arguably undercut the government's assertions with respect to the straw investing scheme. (See Def. Exs. G, I, J, K, L, P, Q, Y). For example, proffer notes from July 10, 2014 show that W-2 reiterated that he made a loan to Espinal, which Espinal later paid back in cash and by check. (Def. Ex. Q). Likewise, proffer notes showed that W-3 lent money to Espinal and asked Espinal to sign a promissory note. (Def. Exs. G, I, J, K, L). These materials undermined the government's contention that Espinal created a false promissory note to make it look like a loan. Defense counsel argues that the documents were actually Brady material that should have been produced earlier.

On October 11, 2014, the government produced to Espinal grand jury transcripts for five additional witnesses. This material was also exculpatory to the extent that four of the witnesses confirmed that they gave cash to one of the alleged straw investors ("W-5") and the

13

fifth witness testified that W-5 received cash from another source.  (Def. Exs. NN, OO, PP, QQ,

RR).  In other words, this evidence contradicted the government's assertion that Espinal funneled

cash from Rodriguez's marijuana business through W-5; rather, it showed that W-5 received the

funds from other sources.  (Def. Ex. A).

### c.   The Misleading Disclosures

#### 1.   March 16, 2012

On March 16, 2012, the government advised defense counsel of the following,

"pursuant to its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and/or Giglio v.

United States, 405 U.S. 150, 154 (1972), and in an abundance of caution":

> [W-3] and [W-4] have stated, in substance and in part, that various
> funds they provided to FlyFishermen's Heaven LLC and to Jose
> Espinal and various other companies with which Espinal is
> affiliated constituted loans to Espinal.  [W-3] and [W-4] have
> further stated that they received no repayments for those loans,
> either in cash or otherwise, and that they received no cash
> payments for work performed at 131st Street townhouse.

> [("W-6")] has stated, in substance and in part, that he believed all
> cash he was paid in connection with developing the FlyFisherman's
> Heaven acreage in Sullivan County was from Espinal, and had no
> awareness that Manuel Rodriguez was Espinal's partner.

(Def. Ex. S).  This summary, defense counsel would later learn, was inadequate.  First, the

summary omits detail about the loans and promissory note later provided in the September 17,

2014 production of W-3 and W-4's proffer notes -- disclosed as 3500/Giglio material -- that

arguably undermines the government's straw investor theory, and arguably provides a defense

against the government's obstruction charge.

Second, not only had W-6, a contractor, stated that he believed that all the cash he

was paid was from Espinal, but he also testified that he had asked for cash from Espinal on his

own initiative because he did not want to risk receiving a bad check:

> [THE AUSA]:  Did you enter into a contract with Espinal or the corporation?
>
> [W-6]: No.  What I did was initially charged him week by week.  I didn't really know the guy.  I wasn't 100 percent, what is the word, confident.  I just did another job, had trouble getting money out of a large job.  So what I did is I went in there, worked week by week with him, made him pay me once a week, made him pay me in cash.
>
> [THE AUSA]:  In cash, why?
>
> [W-6]:  I just didn't feel like struggling for money.

(Def. Ex. B at 22).  This testimony from W-6 undermines the government's theory that Espinal was the one pushing the cash on W-6 as part of the money laundering operation.

### 2.    November 21, 2012

On November 21, 2012, following W-5's testimony before the grand jury, the government advised defense counsel of the following, "pursuant to its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and/or Giglio v. United States, 405 U.S. 150, 154 (1972), and in an abundance of caution":

> [W-5], who testified in the grand jury pursuant to a grant of immunity, has stated in sum and substance and in part that a substantial portion of the money that he and companies controlled by him paid to the defendant, . . . and to others whom the defendant identified in or about the first half of 2010 constituted repayment of a $100,000 loan the defendant had secured through a mortgage on 871 Bruckner Blvd.

(Def. Ex. T).  Here again, the summary was inadequate and misleading.  In fact, W-5 had testified not just that a substantial portion of the money was to repay a loan, but that all of it was.  (Def. Ex. A at 119).  Also troubling in light of the government's sparse summary is that W-5 testified in detail about the sources of the funds that he used to repay the loan to Espinal.

W-5 testified that four individuals had provided him with the money to cover his checks to FFH and to others. As noted above, the four individuals corroborated W-5 in this respect.[5]

## B.    Were Espinal's Rights Violated?

### 1.    *Massiah*

#### a.    Applicable Law

In <u>Massiah v. United States</u>, the Supreme Court held that a defendant's Sixth Amendment right to counsel is violated when a private individual, acting as a government agent, "deliberately elicit[s]" incriminating statements from the accused. 377 U.S. 201, 206 (1964). <u>Massiah</u> applies where the government uses an informant "to circumvent the Sixth Amendment right to counsel." <u>Illinois v. Perkins</u>, 496 U.S. 292, 299 (1990). The <u>Massiah</u> rule, however, covers only those statements that are obtained as a result of intentional government conduct. <u>United States v. Stevens</u>, 83 F.3d 60, 64 (2d Cir. 1996). "[A] defendant does not make out a violation . . . simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986). A violation occurs only when the government uses "investigatory techniques that are the equivalent of direct police interrogation." <u>Id.</u> There is no violation where the informant merely acts as a passive "listening post." <u>Smith v. Fischer</u>, 957 F. Supp. 2d 418, 439 (S.D.N.Y. 2013); <u>see also</u> <u>United States v. Birbal</u>, 113 F.3d 342, 345-46 (2d Cir. 1997); <u>Stevens</u>,

---

[5]    The government argues that W-5's statements to the grand jury in August 2012, while potentially exculpatory, directly contradict the inculpatory version of events provided by Espinal in his proffer sessions. Espinal participated in two proffer sessions, attended by counsel, on December 23 and December 26, 2011. The government submits as exhibits the proffer session notes, which they interpret as being inculpatory on a number of points regarding his relationship with W-2, W-3, W-4, W-5, and others. (Gov't Opp'n 24-25; <u>see</u> Gov't Exs. O, P). Defense counsel, on the other hand, provides several plausible arguments as to how the government misreads the notes. (Def. Reply 44-50). Even if the government is correct in its interpretation of Espinal's proffer session, W-5's testimony was material to Espinal's preparation of his defense.

83 F.3d at 64-65.  Some courts have suggested that intentional elicitation by a government agent is a Massiah violation even where the government had instructed the informant not to speak with the defendant about the case.  "In considering whether there has been deliberate elicitation, the intentional actions of a government agent are attributable to the government for the purposes of the Sixth Amendment."  United States v. Basciano, 763 F. Supp. 2d 303, 326 (E.D.N.Y. 2011) (citing United States v. Pannell, 510 F. Supp. 2d 185 (E.D.N.Y. 2007)).

The Sixth Amendment right is "offense-specific," United States v. Mapp, 170 F.3d 328, 334 (2d Cir. 1999), that is, the Sixth Amendment is not violated unless the informant actively elicits statements that are incriminating with respect to the "charged crimes," United States v. Jacques, 684 F.3d 324, 332 (2d Cir. 2012) (citing Kuhlmann, 477 U.S. at 456, 459).  A defendant's Sixth Amendment rights with respect to a charged crime are not violated by investigating or interrogating the defendant "with regard to a separate crime that has not been charged."  United States v. Jacques, 684 F.3d at 331 (citing Moulton, 474 U.S. at 180).  "This is true even where the latter crime is 'factually related' to a charged offense, so long as the offense being investigated is not considered the 'same offense' for the purposes of determining the applicability of the Fifth Amendment's Double Jeopardy Clause."  Id. (quoting Texas v. Cobb, 532 U.S. 162, 168 (2001)).

Though Massiah is inapplicable to questioning on separate crimes, where the investigation of the separate offense is "a pretext for avoiding the dictates of Massiah," the use of the evidence is barred.  Maine v. Moulton, 474 U.S. 159, 189 (1985).  And at least one court in the Second Circuit has identified a so-called "strict liability" Massiah violation, where the government violates the defendant's rights "insofar as its informant elicited statements regarding

the charged crimes in the course of investigating an attempt to obstruct justice." United States v. Baslan, 13-CR-220, 2014 WL 3490682, at *5 (E.D.N.Y. July 11, 2014).

     **b.**    **Application**

       The government concedes that several aspects of the W-1 facet of the investigation were mishandled.  (10-21-2014 Oral Arg. Tr. at 23) ("[T]hat situation is one that is embarrassing to the government . . . .").  First, Special Agent Callaghan was assigned as the case agent despite having previously served as the "wall agent," and the AUSAs then assigned to the case were unaware of this conflict.  (Gov't Opp'n 27 n.17).  Callaghan, of course, knew that he had been a "wall agent."  Second, the government lost track of the recording.  "Erroneously . . . the recordings were not properly checked into evidence by HSI, and HSI did not prepare a report regarding the call and the meeting."  (Gov't Opp'n 28).  Third, when an AUSA recalled that there might have been a recording made, the government did not make a sufficient effort to locate it.  Fourth, even after W-1 alerted the government that the recording existed -- or might exist -- it took too long for the government to track it down.

       Ultimately, these investigatory blunders are ancillary to the question of whether the recorded meeting between W-1 and Espinal constituted a Massiah violation.  The government's defense against the claim is two-pronged:  first, though Espinal was represented by counsel, the government was using W-1 to see whether Espinal would attempt to influence his grand jury testimony; it was an investigation for potential new obstruction charges, independent of the charges in Espinal's pending indictment, see United States v. Jacques, 684 F.3d at 331, and, second, W-1 was sent in as a listening post, and it was not intended that he actively elicit statements from Espinal about the indicted charges, see id. at 332.

Both arguments fail, for related reasons.  First, the record suggests that W-1 did not act as a mere listening post.  Instead, W-1 clearly recalls that he was "picked up in the van by agents and told to go into [Espinal's] office and ask [Espinal] about or bring up the subject of his situation.  (Which he interpreted to be Espinal's case.)"  (Def. Exs. CC, DD; see also Def. Ex. W).  Second, the government's contention that it was investigating an independent crime -- obstruction of justice -- is simply not convincing.  Any obstruction would have been related to the charged crimes.  Moreover, the government contends that it wanted to see whether Espinal would try to influence W-1's grand jury testimony – this was clearly related.  While the government contends that it instructed W-1 not to inquire about the pending case, I am not persuaded that W-1 was acting as a listening post to investigate independent crimes.  As a consequence, Espinal's Sixth Amendment rights were put at risk.

In any event, I conclude that there was no Massiah violation, for Espinal did not say anything incriminating.  If he had, a basis would exist for suppressing the statements.  But here there is nothing to suppress, for Espinal told W-1 nothing of substance.  See United States v. Hammad, 858 F.2d 834, 840 (2d Cir. 1988) (citing Mapp v. Ohio, 367 U.S. 643 (1961)).

Of course, the government's handling of this matter is still troubling.  The government overreached by attempting to have a cooperating witness record a conversation with Espinal, after he had been indicted and while he was represented by counsel.  The government then failed to properly log in the recording and then somehow lost track of it for two and a half years.  Indeed, it was unable to find the recording until after the trial was adjourned.

2.      ***Brady***

a.      **Applicable Law**

The Supreme Court held in Brady v. Maryland "that the suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution." 373 U.S. at 87.  That duty applies to impeachment evidence as well as

exculpatory evidence.  See Giglio v. United States, 405 U.S. 150, 154 (1972).  "There are three

components of a true Brady violation: The evidence at issue must be favorable to the accused,

either because it is exculpatory, or because it is impeaching; that evidence must have been

suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

Whether evidence is suppressed is often a question of timing.  "[T]he timing of

disclosure under Brady and Giglio may be of critical importance in many criminal cases."

United States v. Coppa, 267 F.3d 132, 138 (2d Cir. 2001).  A defendant has no constitutional

right to receive Brady material prior to trial.  See United States ex rel. Lucas v. Regan, 503 F.2d

1, 3 n.1 (2d Cir. 1974).  The scope of a defendant's right is analyzed retrospectively.  Strickler,

527 U.S. at 281-82; see Youngblood v. West Virginia, 547 U.S. 867, 870 (2006).  "[A]s long as a

defendant possesses Brady evidence in time for its effective use, the government has not

deprived the defendant of due process of law simply because it did not produce the evidence

sooner."  Coppa, 267 F.3d at 144.  A disclosure, however, can be "too little, too late."  Leka v.

Portuondo, 257 F.3d 89, 100 (2d Cir. 2001).

With respect to Giglio material, information bearing on witness credibility may be

turned over at the same time as material under the Jencks Act, 18 U.S.C. § 3500 (1986).  United

States v. Feldman, 731 F. Supp. 1189, 1200 (S.D.N.Y. 1990); United States v. Biaggi, 675 F. Supp. 790, 812 (S.D.N.Y. 1987).  In the Southern District of New York, Giglio material is customarily produced "with Section 3500 material in recognition of the fact that this type of Brady material does not ordinarily require any independent investigation to use it effectively at trial.  Consequently, neither the courts nor the parties in criminal cases have assumed that there is any pretrial right to disclosure of Giglio material."  United States v. Jacques Dessange, Inc., No. 99-CR-1182, 2000 WL 280050, at *9 (S.D.N.Y. Mar. 14, 2000).  While, as a technical matter, 3500 material is not required to be produced until the witness has testified on direct examination, 18 U.S.C. § 3500(a) (disclosure not required "until said witness has testified on direct examination in the trial of the case"), the practice in the Southern District of New York is for the government to produce 3500 (and Giglio) material a week or two before the start of trial, depending on the complexity of the case.

There is a possible grey area in the timing of these disclosures.  A witness statement -- or parts thereof -- may fall within the ambit of both Brady and Giglio, and thus the government may be required to be produce it in advance of the trial testimony despite the Jencks Act.  Coppa, 267 F.3d at 146.  There is an undeniable tension between the government's disclosure obligations under Brady and the government's right to delay disclosure under the Jencks Act.  The court has some latitude in deciding whether a statement should be treated under Brady, Giglio, or the Jencks Act.  Of course, how far in advance of trial Brady material must be produced for defense counsel to be able to put it to "effective use" is unclear, and will depend on the circumstances.  Notably, here the government made disclosures in March and November 2012, early on in the case and long before trial was scheduled.

b.    **Application**

I conclude that the government's disclosures were untimely and misleading, but

that, in the end, his Brady rights were not violated.

First, the government concedes that perhaps it should have disclosed more, and

that it should have done so sooner.  At oral argument on this motion, the government --

represented by a supervising AUSA -- stated:

> I think that if the question were being reconsidered today, under
> DOJ policy, I think that disclosure with regard to [W-6] should
> have been fuller . . . .  [I]f the question were presented to me, as a
> supervisor today, I think that I would make the recommendation
> that the disclosure include that fact that [W-6] also testified that he
> had made a request that the payments be in cash, rather than check.

(10-21-2014 Oral Arg. Tr. at 26-27).[6]  Furthermore, on the subject of the W-6 disclosure, the

government stated:

> I think, as I said, I think the summary, looking back now, with
> everything that has developed since then, I think that the summary,
> as a matter of a judgment call, the summary should have included
> the fact that [W-6] said he requested cash.

(10-21-2014 Oral Arg. Tr. at 31).

Second, the March 2012 and November 2012 Brady disclosures were inadequate.

They were misleading in the sense that they did not reveal the full picture.  When the

_____

[6]    For DOJ disclosure policy, see U.S. Attorney's Manual ("USAM") 9-
5.001, 9-5.100.  "Department policy recognizes that a fair trial will often include examination of
relevant exculpatory or impeachment information that is significantly probative of the issues
before the court but that may not, on its own . . . , make the difference between guilt and
innocence.  As a result, this policy requires disclosure by prosecutors of information beyond that
which is 'material' to guilt as articulated in Kyles v. Whitley, 514 U.S. 419 (1995), and Strickler
v. Greene, 527 U.S. 263, 280-81 (1999)."  USAM 9-5.001.  "Under this policy, the government's
disclosure will exceed its constitutional obligations.  Thus, this policy encourages prosecutors to
err on the side of disclosure in close questions of materiality and identifies standards that favor
greater disclosure in advance of trial through the production of exculpatory information that is
inconsistent with any element of any charged crime . . . ."  Id.

government discloses only part of the story and omits matters that undercut its charges, it is not meeting its discovery obligations. When the government disclosed that W-6 believed that all the cash he received came from Espinal and that he did not know that Rodriguez was Espinal's partner, it should have also disclosed that W-6 testified that <u>he</u> asked for cash from Espinal because he did not want to struggle to be paid.[7] When the government disclosed that W-5 had testified that "a substantial portion" of the cash he paid to Espinal was to repay a loan (Def. Ex. T), it should have also disclosed that W-5 testified that <u>all</u> of the cash was for repayment of a loan, and, further, that he had gotten the cash from other individuals (Def. Ex. A).

Third, the government's disclosure of the additional material in September 2014 was unduly late. This material could not have been effectively used at trial, if the trial had proceeded as scheduled. This is material that could have been disclosed months earlier, back when the government made its partial disclosures. It was not.

The government contends that the pretrial disclosures made to Espinal were constitutionally adequate because it identified the witnesses who might have exculpatory information and it had no obligation to provide the information itself. The thrust of the government's argument is that under <u>United States v. Zackson</u>, the government is "not obligated to disclose allegedly exculpatory grand jury testimony when the [defendant] knew long before trial the identity of the witnesses and that they would be testifying before the grand jury." 6 F.3d 911, 918 (2d Cir. 1993). The government argued at oral argument that "it would be sufficient to have just said you may wish to speak to [W-6], and not provide any information, at

---

[7]     The government argues that just because W-6 was an eager recipient of the cash does not absolve Espinal of his desire to rid himself of the cash. But whether Espinal paid cash because he wanted to pay cash or Espinal paid cash because W-6 asked him to pay cash are subtleties that are in dispute. The former, of course, is more in line with the government's theory of the case. But that only means that evidence supporting the latter is all the more relevant to the preparation of the defense.

all, about what he said." (10-21-2014 Oral Arg. Tr. at 27). The government was only obligated, it contends, to give cursory notice to Espinal about the grand jury testimony of W-3, W-4, W-5, and W-6 because Espinal had the "essential facts" to investigate any exculpatory information further.[8] Anything beyond the name of the grand jury witness was, it contends, as it stated in its 2012 disclosure letters, disclosed out of "an abundance of caution."

I have difficulty with the government's position. The government has the ability to subpoena a witness and place him in the grand jury, where he must testify under oath. A defendant does not have that power, and knowing the identity of a witness is a far cry from knowing what he said, under oath, in the grand jury. Moreover, the witness may not be willing to speak to the defendant or defense counsel, and even if he is willing to talk, he may say something different from what he said in the grand jury. Merely providing the name of a witness who has said something exculpatory in the grand jury is not the equivalent of disclosing the exculpatory information.

Even assuming the government is correct, however, that it was legally obligated only to provide the names of the witnesses to the defense, the government's reliance on LeRoy and Zackson in this case is misplaced. First, LeRoy and Zackson cannot control with respect to

---

[8]     See United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982) (evidence is not deemed suppressed "if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence") (citation omitted); United States v. Grossman, 843 F.2d 78, 85 (2d Cir. 1988) ("The government has no duty actually to turn over grand jury testimony where the defendant knows of the witness' identity; that the witness might have testified before the grand jury; and that the witness' statements might have supported the defendant's defense." (internal quotation marks omitted). Espinal, on the other hand, cites to United States v. Triumph in support of his argument that the grand jury testimony and proffer note disclosures were governed by Brady. 544 F.3d 149 (2d Cir. 2008). The court in Triumph, however, was faced with a clear Giglio violation, because the government withheld the witness's proffer notes even after the witness testified against the defendant at trial. I need not squarely resolve any perceived tensions between Zackson and LeRoy and Triumph because, ultimately, there is no prejudice arising from the government's untimely disclosures.

the October 10, 2014 disclosure of the four grand jury witnesses whom Espinal did not know and with whom Espinal had no business relationship. Espinal did not have the "essential facts" about their dealings with W-5 necessary to properly investigate their role. The government contends that the testimony of the four associates of W-5 was not exculpatory because they had no direct dealings with Espinal, and that therefore they at best corroborate W-5's version of the source of his cash. Even indirectly, however, the four witnesses help bolster W-5's story. And W-5's story is valuable to Espinal because it helps rebut the government's cash-for-checks theory, as the witnesses suggest that the money W-5 paid to FFH did not originate with Espinal. Their testimony is exculpatory and should have been disclosed earlier.

Second, the government did not just provide names here, but it gave partial summaries. Even assuming the government is not required to provide more than a name, once it elects to provide more it must do in a straightforward and non-misleading manner. See, e.g., Gantt v. Roe, 389 F.3d 908, 913 (9th Cir. 2004) (finding Brady violation where, though defendant "could have conducted his own investigation, he was surely entitled to rely on the prosecution's representation that it was sharing the fruits of the police investigation"). While the March and November 2012 disclosures never explicitly purported to be comprehensive accounts of statements made by the witnesses, they certainly belied the true extent of the exculpatory content.

Third, when the Brady question is close, a prosecutor should err in favor of disclosure. See, e.g., Kyles v. Whitley, 514 U.S. 419, 439 (1995) ("[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."); United States v. Agurs, 427 U.S. 97, 108 (1976) ("[T]he prudent prosecutor will resolve doubtful questions in

favor of disclosure.").  At a minimum, the question of the additional disclosures was close, and yet the government failed to disclose the additional information.

Hence, I find the first two components of a Brady violation:  there was evidence favorable to the accused, and the government suppressed it -- at least until after it could have been effectively used had the trial proceeded as scheduled.  The question of the third component -- prejudice -- remains.

Espinal claims that he is permanently and irreparably prejudiced because witnesses who may have spoken to defense counsel's investigators three years ago will no longer speak with them.  (10-21-2014 Oral Arg. Tr. at 17-18).  Unlike Espinal, the government can compel the same witnesses to testify under oath before a grand jury.  In addition, Espinal argues that the "drip by drip" disclosure of exculpatory information has forced defense counsel to scramble to adapt to constantly changing witness lists and theories of the case.  Counsel initially prepared for trial under the theory that the government would be calling the alleged straw investors, only to later discover that the government had long seen the holes in that theory.  As the defense notes, the timeline is suspect: years after the indictment the government made disclosures relevant to certain counts and then almost immediately indicated that it had decided not to proceed on those counts.

These are important concerns, and I agree that Espinal has been prejudiced in the sense that the trial has been delayed, the charges have remained pending, and he and his lawyers have had to expend extra effort, expense, and energy because of the government's conduct.  On the other hand, the usual case for prejudice is the truncated pretrial timeframe to investigate leads.  That concern has been addressed -- by the adjournments of the trial.  Although evidence was suppressed, that evidence has now been disclosed and the trial has been adjourned.  Hence,

while the government has engaged in troubling conduct in this respect, there has been no <u>Brady</u> violation.

### 3.    The Government's Additional Conduct

In addition to the <u>Massiah</u> and <u>Brady</u> matters, the government engaged in other conduct in this case that is of concern to the Court: (1) the last-minute production of 3500 material (1500 tapes, all or most in Spanish); (2) the attempt to offer evidence of murders that occurred long before Espinal is alleged to have joined the conspiracy even though the government does not allege that he was personally involved in any violence; (3) the argument that the government could convict Espinal of knowingly being a member of a violent organization without being required to prove that he was generally aware of its violent nature; and (4) the attempt to offer into evidence videos and photographs of Espinal hunting and shooting a deer and the mounted and stuffed "hunting trophies" in his office -- a transparent attempt to prejudice a New York City jury against him.

These actions were not unlawful, and Espinal's rights were not violated. Nonetheless, these actions were part of the overly aggressive approach adopted by the government in this case. While prosecutors should be aggressive and they should litigate hard, here the government displayed an unreasonable and perplexing tenacity. As the Supreme Court observed long ago:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from

> improper methods calculated to produce a wrongful conviction as
> it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935); accord Drake v. Portuondo, 553 F.3d 230, 240

(2d Cir. 2009) ("[T]o reduce the danger of false convictions, we rely on the prosecutor not to be

simply a party in litigation whose sole object is the conviction of the defendant before him.  The

prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the

jury, not to win at any cost."); Jenkins v. Artuz, 294 F.3d 284, 296 n.2 (2d Cir. 2002) (noting that

duty of prosecutors is "to seek justice, not merely to convict"); United States v. Love, 534 F.2d

87, 88-89 (6th Cir. 1976) ("We recognize that a United States Attorney should 'prosecute with

earnestness and vigor,' but it also is 'his duty to refrain from improper methods calculated to

produce a wrongful conviction.'").

      In my experience, the United States Attorney's Office for the Southern District of

New York has long understood its obligations and it has always faithfully carried out its

responsibility "to seek justice, not merely to convict."  In this case, however, the government's

conduct has been disappointing.

## C.    Remedy

      Espinal argues that even if his due process rights were not violated, the Court

should exercise its supervisory powers to dismiss the indictment because the government has

engaged in misconduct so egregious that a remedy harsher than adjournment is necessary to deter

the government from similar future behavior.  (Def. Mot. 49 (citing United States v. Chapman,

524 F.3d 1073, 1084 (9th Cir. 2008); United States v. Wang, No. 98-CR-199, 1999 WL 138930,

at *37 (S.D.N.Y. Mar. 15, 1999)).  But Espinal's reliance on Chapman and Wang is misplaced.

In Chapman, the trial was already underway.  The Ninth Circuit affirmed the district court's

dismissal of the indictment, noting that the district court found that the government had acted

28

"flagrantly, willfully, and in bad faith." 524 F.3d at 1080.  The Ninth Circuit held that a district

court may dismiss an indictment pursuant to its supervisory powers only when the defendant

suffers "substantial prejudice," and "no lesser remedial action is available."  Id. at 1087 (internal

quotation marks omitted).

       In Wang, the district court ordered a pretrial dismissal of the indictment because it

had become impossible for the defendants to receive a fair trial.  One week before the trial date,

the government disclosed statements made by a potential witness.  By that point, the witness had

disappeared and was unavailable for the purpose of the defendants' Sixth Amendment right to

confrontation and right to prepare a defense.  Id. at *44.  The district court determined that

"[e]ven if the Government reasonably and in good faith determined that [the witness'] testimony

was not necessary to its case in chief, the Government's failure either to notify defendants that

they were not going to call [the] witness or to keep track of [the witness] . . . displayed a 'reckless

disregard for the value of [the witness'] . . . potential testimony' to the defense case."  Id. at *52.

The court rejected adjournment as an insufficient remedy.  "[A]ny further adjournment here

would be unavailing since the Government notified defense counsel on February 11, 1999, that

[the witness] had left the United States, that his attorneys were not responding to the

Government, and that [the witness] has no plans to return to the United States."  Id. at *45.

       Here, the extraordinary remedy of dismissal of the indictment is not warranted.

See, e.g., United States v. Gagnon, No. 06-CR-21, 2006 WL 3328122, at *2 (D. Vt. Nov. 14,

2006) ("It is a rare case where dismissal of an indictment is an appropriate sanction."); United

States v. Bellomo, 944 F. Supp. 1160, 1168 (S.D.N.Y. 1996) ("Dismissal of the indictment for

prosecutorial misconduct is an exceedingly rare sanction.").  I do not believe the government

acted flagrantly, willfully, or in bad faith.  Moreover, the adjournments of the trial have done

much to alleviate the prejudice to Espinal.  See United States v. Morrison, 449 U.S. 361, 365 (1981) ("[W]e do not condone the egregious behavior of the Government agents.  Nor do we suggest that in cases such as this, a Sixth Amendment violation may not be remedied in other proceedings. We simply conclude that the [dismissal of the indictment] . . . is inappropriate where the violation, which we assume has occurred, has had no adverse impact upon the criminal proceedings.").  No jury has been empanelled, no conviction has been obtained, and no witnesses have died or become unavailable.  While some prejudice remains -- the delay and increased effort and cost -- the answer is not to dismiss the charges.

## CONCLUSION

For the foregoing reasons, Espinal's motion to dismiss the indictment is DENIED. The requests for additional relief, including a Franks hearing with regards to the wiretap and warrant applications and disclosure of the entirety of the grand jury transcripts, are similarly DENIED.

SO ORDERED.

Date:     New York, New York
          March 10, 2015


DENNY CHIN
United States Circuit Judge
Sitting by Designation

30